CIVIL RIGHTS CORPS,

          Plaintiff,

v.

JUDGE DORETTA L. WALKER, in her
official capacity, and CLARENCE F.
BIRKHEAD, in his official capacity,

          Defendants.

Case No.: 1:24-cv-943

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This lawsuit challenges Defendants' repeated denial of Plaintiff Civil Rights Corps' First Amendment right to observe judicial proceedings relating to one of the most profound exercises of state power—the forcible separation of children from their parents. While North Carolina generally has a history of public access to dependency proceedings, Defendants have repeatedly excluded Plaintiff Civil Rights Corps from observing these proceedings, even when the proceeding was open before Civil Rights Corps sought to attend and even when other members of the public were permitted to remain after Civil Rights Corps was excluded.

2.     Civil Rights Corps is a civil rights law firm dedicated to addressing systemic injustice in our legal system through advocacy, public education, policy change, and litigation. Consistent with that mission, Civil Rights Corps has recently focused on potential injustices in dependency proceedings in North Carolina juvenile courts. But

repeatedly, Civil Rights Corps has been barred from observing these proceedings, without any opportunity to be heard or even an ability to obtain a transcript of the exclusion orders. Without the relief sought in this lawsuit, Civil Rights Corps will continue to be barred from the courtroom in violation of the First Amendment. Litigants like Civil Rights Corps are entitled to secure their constitutional rights through declaratory and, if declaratory relief is violated, injunctive relief in federal court against state judicial officers in their official capacities. 42 U.S.C. § 1983; *see Ruhbayan v. Smith*, No. 21-7419, 2022 WL 2764422, at *1 (4th Cir. July 15, 2022) ("prospective declaratory relief" "avoid[s] judicial immunity"); *Donato Malave v. Abrams*, 547 F. App'x 346, 347 (4th Cir. 2013) (recognizing that § 1983 permits injunctive relief if "declaratory decree was violated or declaratory relief was unavailable").

3. Civil Rights Corps has compelling reasons to observe dependency proceedings. Dependency courts wield some of the greatest power in our society, determining whether to take children from their families and even permanently terminate their legal relationships. These proceedings affect one of the most fundamental liberty interests: the right to family integrity, including the right of a parent to care for and raise their own children and the right of a child to be raised by their own parent. With one order, a child sleeps in a stranger's house; a mother cannot nurse her newborn baby; a father can no longer lead bedtime prayers; and siblings are separated and sent to different households. Entire communities have been reshaped and reorganized by such orders.

4. The liberty interest of a parent in the "care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by" the

Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Removing a child from their parent's care, even temporarily, is a profound matter. So fundamental is the ability to raise one's own children—and the equivalent right of children to be raised by their parents—that courts refer to the termination of parental rights as the "civil death penalty." *Stann v. Levine*, 636 S.E. 2d 214, 220 n.9 (N.C. Ct. App. 2006) (citation omitted).

5. Despite the incredible government power exercised in dependency proceedings, they are some of the least scrutinized proceedings in our legal system. Too often, the dependency judge is arbitrarily or presumptively closing doors to the courtroom, excluding even extended family, friends, community support organizations, and clergy without particularized findings that such confidentiality is necessary for the specific case at issue. This is inconsistent with the First Amendment. Indeed, the Supreme Court has explained that courtrooms without juries present—such as dependency proceedings—are especially in need of sunshine and public access. *See Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 12–13 (1986) (*Press-Enterprise II*) ("[T]he absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and . . . judge, . . . makes the importance of public access . . . even more significant." (citation and internal quotations omitted)).

6. In the last several years, communities in Durham and across the nation have attempted to observe court proceedings, including in this courtroom, to shed light on the operation of courts in dependency cases. Many of these groups have sought to observe proceedings to promote transparency and improvements to dependency court practices. In Durham, however, advocates have repeatedly been excluded from court in violation of the

First Amendment.

7.      When Civil Rights Corps has attempted to view dependency proceedings in Durham, the courtroom is often open until Civil Rights Corps staff are recognized. At that point, Defendants close the courtroom without the evidence-based, case-specific findings the First Amendment requires about why closure is required and narrowly-tailored alternatives would not suffice. Indeed, Civil Rights Corps has not even been allowed to be heard on the access issues. Moreover, other members of the public, unaffiliated with the case at bar, are sometimes permitted to remain in court even while Civil Rights Corps staff are excluded.

8.      Generalized notions of privacy and confidentiality interests have sometimes been cited but there has never been a specific finding that a child has been or will be harmed if court proceedings are open to Civil Rights Corps, much less a finding that protections short of total exclusion would be insufficient to meet any competing interest. Even when a dependency proceeding raises legitimate confidentiality interests of children, those interests must be balanced with the public's right to oversee the workings of courts. In most cases, the interests can be balanced through narrowly tailored protections, such as the use of pseudonyms. This is how privacy is protected, for example, in criminal cases involving sexual abuse of minors. Moreover, reams of research, reporting, and testimonials from impacted families show that presumptively closed courtrooms do not promote children's safety, but instead shield government officials from accountability.

9.      Civil Rights Corps intends to continue studying the Durham County dependency court process in 2024 and 2025. Civil Rights Corps brings this lawsuit to

vindicate its constitutional right to observe judicial proceedings in Durham County. Civil Rights Corps seeks a declaration that the First Amendment presumptive right of access applies to dependency proceedings and that such proceedings may not be closed without first providing an opportunity to be heard, and without making specific, on-the-record, reviewable findings that closure is necessary to meet a compelling government interest and that narrowly tailored alternatives would be insufficient.

## JURISDICTION AND VENUE

10. This action arises under 42 U.S.C. § 1983, and this Court's equitable jurisdiction. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201–02. Federal courts have the authority and responsibility to enforce the First Amendment right of public access to state courts. *See, e.g.*, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (enforcing First Amendment right of public access to newly-filed general civil complaints in state court).

11. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

12. Plaintiff Civil Rights Corps is a civil rights organization dedicated to challenging systemic injustice in the United States legal system. Civil Rights Corps specializes in innovative, systemic civil rights reform through litigation, advocacy, and public education. Since its founding in 2016, the organization has sought reform through advocacy and successful lawsuits in federal and state courts around the country challenging pretrial detention practices; state and municipal policies that incarcerate

people because they cannot afford debts; abusive policing, prosecutorial, and surveillance practices; and other systemic practices that are unjust and unconstitutional and that separate families. These legal cases—and related policy collaboration with state supreme courts, rulemaking bodies, attorneys general, federal government officials, legislators, local presiding judges, and others—have resulted in widespread changes in how some of the most marginalized people in our society are treated by the court and police systems. Investigations into these practices almost always involve watching court proceedings.

13. District Court Judges in North Carolina have jurisdiction to hear certain civil, criminal, and juvenile cases. The court's juvenile jurisdiction includes both delinquency cases (i.e., proceedings during which a child is charged with conduct that would be considered a crime if the child were an adult), as well as neglect, abuse, and dependency proceedings. The proceedings to which Civil Rights Corps seeks access are neglect, abuse, and dependency proceedings. Defendant Judge Doretta L. Walker is an elected District Judge for the 14th Judicial District in Durham County, currently assigned to preside over neglect, abuse, and dependency proceedings (collectively, "dependency proceedings" or "dependency court"). This judicial officer is being sued in her official capacity for prospective declaratory relief only.

14. Defendant Clarence F. Birkhead is the Sheriff of Durham County. Deputy Sheriffs staff the dependency courtrooms and act as bailiffs and general security for Durham County dependency proceedings, including Judge Walker's courtroom. Durham County Deputy Sheriffs have escorted Civil Rights Corps attorneys and staff out of the Defendant Judge's courtroom; placed and maintained a sign on the courtroom door

stating, "CLOSED HEARING"; and otherwise enforced local policy and court directives prohibiting Civil Rights Corps and other members of the community from watching judicial proceedings in the Defendant Judge's courtroom. Mr. Birkhead is being sued in his official capacity for prospective relief.

## FACTUAL ALLEGATIONS

## I.     Observing Dependency Proceedings Is Critical to Understanding Potential Deficiencies in the Dependency Court Process

15.     Civil Rights Corps wants to observe dependency court proceedings because it is investigating whether Durham County dependency proceedings are violating the civil rights of children and parents. Access to these proceedings is a critical step in evaluating the system and considering potential changes. Embedded in the First Amendment is the fundamental idea that government operates best when exposed to sunshine and public supervision.

16.     Civil Rights Corps routinely investigates government practices that potentially infringe the fundamental rights of cash-poor communities and communities of color. In recent years, an increasing number of academics and community members have been studying judicial dependency proceedings, through which children are removed from their families and placed in foster care because of allegedly unsafe home environments. Civil Rights Corps is concerned that such proceedings often may not actually benefit the children. For example, compared to children who remain in households with maltreatment, children removed to the foster system have 1.5 times the risk of early

death.[1]  And they experience worse mental and behavioral health outcomes over their lifetimes, especially if removed at a young age.[2]

17.    The impact of the system is also enormous, particularly in cash-poor and Black communities.  According to the federal government's Adoption and Foster Care Analysis and Reporting System, each fiscal year between 2013 and 2022, 570,000 to 689,000 children were in foster care and 60,000 to 71,800 parents had their parental rights terminated.[3]  Nationwide, one-third of all children—and over 50% of Black children—will be subjected to a child welfare investigation by age 18.[4]

18.    Poverty, not physical or sexual abuse, is the single strongest predictor of an investigation by a government agency.[5]  Indeed, the majority of children taken from their families are removed based on allegations of "neglect," a vague category that encompasses conditions like unstable housing, lack of food or clothing, inadequate childcare, or school absences.[6]  It is not uncommon for a child to be taken because a

---

[1] Erin Sugrue, *Evidence Base for Avoiding Family Separation in Child Welfare Practice*, Alia, 10 (2019), https://www.ncsc.org/__data/assets/pdf_file/0031/18985/alia-research-brief.pdf.
[2] *Id.* at 9.
[3] *Trends in Foster Care and Adoption: FY 2013–2022*, Children's Bureau (Mar. 20, 2024), https://www.acf.hhs.gov/cb/report/trends-foster-care-adoption.
[4] Hyunil Kim et al., *Lifetime Prevalence of Investigating Child Maltreatment Among US Children*, 107 Am. J. Pub. Health 274, 274–280 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5227926/.
[5] K.S. Slack et al., *Risk and Protective Factors for Child Neglect During Early Childhood: A C-Study Comparison*, 33 Child. & Youth Servs. Rev. 1354, 1354–63 (2011), https://doi.org/10.1016/j.childyouth.2011.04.024.
[6] Josh Gupta-Kagan, *Distinguishing Family Poverty From Child Neglect*, 109 Iowa L. Rev. 1541, 1556 (2024); Children's Bureau, *The AFCARS Report: Preliminary Estimates for FY 2022* (May 23, 2023); Hina Naveed, *"If I Wasn't Poor, I Wouldn't Be Unfit": The Family Separation Crisis in the U.S. Child Welfare System*, Hum. Rights Watch (Nov. 17, 2022), https://www.hrw.org/report/2022/11/17/if-i-wasnt-poor-i-wouldnt-be-unfit/family-separation-crisis-us-child-welfare#:~:text=.

family's food stamps ran out, a child's illness went untreated after parents were removed from Medicaid, or a single mother was unable to find childcare while she worked.

19.     One of the most extreme harms that dependency proceedings inflict on children and parents is the *permanent* termination of their legal rights to each other.[7] Nationally, between 2016 and 2019, at least 60,000 children every year lost their legal ties to their parents and families through termination of parental rights.[8] Across the United States, 1% of all children will have their legal relationship to their families completely severed by judges.[9] The rates are higher for Native children, 3% of whom will have their legal ties to their families severed, and for Black children, 1.5% of whom will experience this trauma.[10]

20.     North Carolina's statistics mirror national trends. The state removes about 5,000 children from their homes and families every year.[11] Most of the children the government takes will never be reunified with their parent or even placed with a relative.

---

[7] *See* Ashley Albert et al., *Ending the Family Death Penalty and Building a World We Deserve*, 11 Colum. J. Race L. 861, 887 (2021); *id.* at 886 ("[e]quating this action to the death penalty is not hyperbole, in fact . . . it's not a strong enough comparison").

[8] V.S. Sankaran & C.E. Church, *The Ties that Bind Us: An Empirical, Clinical, and Constitutional Argument Against Terminating Parental Rights*, Fam. Court Rev. 1, 1–19 (2023), https://familyjusticeinitiative.org/wp-content/uploads/sites/48/2023/10/Ties-That-BInd-Us.pdf.

[9] Christopher Wildeman et al., *The Cumulative Prevalence of Termination of Parental Rights for U.S. Children, 2000–2016*, Child Maltreatment (May 21, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6868298/.

[10] *Id.*

[11] *North Carolina*, Child Welfare Outcomes, https://cwoutcomes.acf.hhs.gov/cwodatasite/byState/north-carolina#footnote9 (last accessed Nov. 1, 2024); Sarah Catherine Williams et al., *State-Level Data for Understanding Child Welfare in the United States*, Child Trends (July 9, 2024), https://www.childtrends.org/publications/state-level-data-for-understanding-child-welfare-in-the-united-states.

In 2022, only 20% of children taken from their families in Durham County were reunified with their parents or placed with a relative.[12] Approximately 1,200 North Carolina parents have their rights permanently terminated every year.[13]

21. A report from 2022 reveals a general dysfunction in dependency proceedings in Durham. Attorneys and families describe proceedings as "slow-moving" and "inefficient," noting that there are "unrelenting continuances," and that the courts often limit forcibly-separated parents and children to only one hour a week to see each other, even when the child is a breastfeeding infant.[14]

22. There is a growing movement of families and scholars that are sounding the alarm about a system that has largely escaped scrutiny, in part because so many courtrooms where these cases are decided are closed. The concerns of so many families, advocates, and scholars creates a critical need for sunshine: for the evidentiary, adversarial, judicial proceedings that take place in dependency courts to operate openly, with scholarly attention, with feedback from advocates, and with public accountability.

## II. Defendants Consistently Close Dependency Proceedings to Civil Rights Corps

---

[12] Marcia Owen et al., *Durham Community Safety and Wellness Task Force Proposal*, Dep't of Soc. Servs., 2 (July 12, 2023), https://www.durhamnc.gov/DocumentCenter/View/51820/Durham-AbuseNeglectDependency-AND-Court-Department-of-Social-Services-DSS--Child-Welfare-Reforms.

[13] Jeffrey Billman, *Best Interest of the Child*, The Assembly (Dec. 5, 2023), https://www.theassemblync.com/politics/courts/child-welfare-investigation/#:~:text=As%20of%20September%2C%2011%2C000%20children,most%20will%20never%20go%20home.

[14] Memorandum from Emancipate NC & Thrive Tribe NC on Potential Avenues for County-Level Reform to Child Welfare System to Durham County (Sept. 29, 2022), https://emancipatenc.org/wp-content/uploads/2022/09/Emancipate-NC-Thrive-Tribe-NC-Report-on-Durham-County-Child-Welfare-Reform-9.29.22.pdf

23.　　Durham County residents have started organizing to support families facing separation, helping them prepare for court hearings and demanding rigorous representation from their lawyers.  They have tried to attend court hearings to support families facing termination of parental rights and to learn more about how the courts function.  At every turn, however, local residents' efforts to learn more and to speak out have been thwarted:  protests have been broken up; parents facing termination have been warned not to associate with these concerned citizens; and advocates, journalists, law students, and community members have been excluded from dependency court proceedings without explanation, and parents facing termination have been warned not to associate with these concerned citizens.

24.　　After learning of these efforts, along with the larger problems in the North Carolina foster system, Civil Rights Corps decided to investigate further.  In particular, Civil Rights Corps is seeking to better understand dependency court proceedings in Durham County, including how judicial officers apply legal standards and make discretionary decisions in cases implicating fundamental rights.  Civil Rights Corps seeks to evaluate whether any aspects of the dependency court's processes might be harming cash-poor communities and communities of color and whether dependency proceedings raise civil rights and constitutional concerns.  Consistent with its general approach, Civil Rights Corps wants to learn as much as possible about how judicial proceedings function so it can offer potential policy changes to judicial, political, and community leaders based on empirical evidence and best practices.  In other jurisdictions, public access has

contributed to changes to dependency proceedings that the courts and the community agree promote child safety and family well-being.

25.     But Civil Rights Corps' attempts to observe dependency proceedings have been rebuffed by Defendants who are not complying with the First Amendment's presumption of access to the courtroom, which requires that "the proceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 13–14 (citation and internal quotation marks omitted).

## A.     Judge Walker's Courtroom

26.     Dependency court operates in Durham County during two weeks each month, and Judge Walker presides over one of those weeks of hearings each month. Judge Walker prevented Civil Rights Corps from observing her courtroom, without making any specific findings justifying closure, on September 13, 14, and 15, 2023; December 14, 2023; February 15, 2024; March 13, 2024; and August 6, 2024.  During Civil Rights Corps' March 13, 2024 attempt to observe the dependency proceedings, the court was closed even after a Department of Social Services attorney stated he did not see a reason to close the courtroom if sensitive information was not being shared.

27.     On some occasions, Civil Rights Corps has been removed from the courtroom even while other persons unaffiliated with the case are permitted to stay.  For example, on September 15, 2023, Civil Rights Corps alone was ordered out of the courtroom.  Parents, attorneys, social workers, family members, and potential guardians who had other business before the court were permitted to remain throughout the day's

proceedings, regardless of whether they were involved in the particular matter being heard at the time. Civil Rights Corps attorneys and staff had done nothing to interrupt, influence, or disrupt court proceedings in any way. A Deputy Sheriff facilitated the removal of only Civil Rights Corps employees from the courtroom and placed a "CLOSED HEARING" sign on the courtroom door, although other people uninvolved in the pending proceeding remained in the courtroom. On information and belief, Defendants are aware that Civil Rights Corps is an advocacy organization investigating the operation of, and potential injustices in, dependency proceedings.



28.     Similarly, when a Civil Rights Corps attorney, along with a law student and two employees of a local advocacy organization, were excluded from the courtroom on March 13, 2024, everyone else in the courtroom was permitted to stay.

29.     Civil Rights Corps has routinely been prohibited from even being heard in

opposition to closing the courtroom. Civil Rights Corps' requests for the transcripts of the closure decisions and the exclusion orders also have been denied. (These were not requests for the transcripts of the underlying dependency proceedings.) When a Civil Rights Corps attorney requested a record of the order closing the court on one occasion in September 2023, the Deputy Sheriff escorted the attorney out. On another occasion in August 2024, when a Civil Rights Corps attorney asked for a transcript of the proceedings relating to the decision to close the courtroom, the request was denied without any further explanation.

30.     Civil Rights Corps has been permitted to watch full hearings in this courtroom on only two occasions, each of which presented an unusual circumstance. On April 4, 2024, Civil Rights Corps observed two virtual hearings. Anyone could access the virtual court system and listen to the hearings. In those instances, people on the line were not asked to identify themselves or their affiliation. Upon information and belief, Civil Rights Corps was able to attend these virtual hearings only because it was not apparent to the judge or attorneys that Civil Rights Corps staff were listening to the proceedings. On August 5, 2024, Civil Rights Corps employees were able to be present in the courtroom. But on that day, officials from North Carolina's Administrative Office of the Courts were also present. Upon information and belief, Civil Rights Corps employees were able to attend proceedings on that day because of the presence of the other state officials. When Civil Rights Corps returned the following day on August 6, 2024, and Administrative Office of the Courts officials were no longer present, Civil Rights Corps attorneys and staff were again removed from the courtroom for the rest of

the session.

31.     In or about February 2024, the Presiding Judge of the Durham County District Court, Clayton Jones, adopted new local rules for dependency proceedings. Rule 15.1 provides that "[n]o party or attorney shall disseminate case-related information to the media or public that identifies or can lead to the identification of a child or family involved in [Abuse, Neglect, and Dependency] Court. Release of such information may be subject to sanctions and contempt of court."[15] The effect of this local rule is that not only is the public excluded from the courtroom, the parties and attorneys who *are* permitted in the courtroom appear to be prohibited from sharing *any* information about their own cases with their family, clergy, friends, or any other member of the "public." A mother cannot talk about her own case to members of the community or her church because it could lead to the identification of a family involved in the dependency court. In other words, a mother accused of neglecting her children can have her children taken from her in a closed, secret hearing, and during and after this traumatic, life-defining experience, she cannot talk about it without risking sanctions and contempt of court.

32.     Civil Rights Corps intends to continue attempting to observe proceedings in this courtroom, as well as the courtroom of other Durham County dependency court judges, in the remainder of 2024 and 2025.

### B.     Durham County Sheriff Birkhead

33.     The Durham County Sheriff staffs the dependency courtrooms with Deputy

---

[15] Rule 15.1 of the Sixteenth Judicial District, for Juvenile Abuse/Neglect/Dependency Court, https://www.nccourts.gov/assets/documents/local-rules-forms/2024%20Local%20Rules.pdf.

Sheriffs who serve as bailiffs. These Deputy Sheriffs enforce the unconstitutional courtroom exclusion orders, such as by patrolling the courtroom to ascertain the identity of members of the public who are present, including Civil Rights Corps; by escorting Civil Rights Corps out of the courtroom; and by hanging a "CLOSED HEARING" sign on the courtroom door after Civil Rights Corps personnel are excluded. Multiple times when Civil Rights Corps staff were ordered to leave the courtroom, a Deputy Sheriff escorted Civil Rights Corps staff from their seats and past various other individuals who were unaffiliated with the particular proceedings but permitted to remain.

III. **The Exclusions of Civil Rights Corps Violate Plaintiff's Presumptive, Qualified Right of Public Access to Dependency Proceedings**

34. The First and Fourteenth Amendments to the U.S. Constitution guarantee the public a "qualified . . . right of public access" to certain types of judicial proceedings. *Press-Enterprise II*, 478 U.S. at 9. This qualified right of public access was first articulated in the context of criminal trials, but it extends to civil proceedings and court records generally, including in the Fourth Circuit. *See Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014).

35. A two-pronged "logic and experience test" applies in determining whether the First Amendment's presumption of access applies to a particular type of proceeding. *Press-Enterprise II*, 478 U.S. at 8. In analyzing whether a presumption of public access applies, the Court should consider (1) whether "the place and process have historically been open to the press and general public," and (2) whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.*

When a First Amendment right of access attaches, a court cannot "deny the right of access" unless the government shows that "the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982).

36.     The First Amendment's presumption of public access applies to dependency proceedings. These proceedings have a history of openness, and public access improves their functioning.

### A.     Dependency Proceedings Have a History of Openness

37.     The "experience" prong of the *Press-Enterprise* test is met because dependency proceedings historically have been open to the press and general public. The history of dependency proceedings reflects a general trend of openness, including a recognition, from the start, of the importance of presumptive public access.

38.     Chancery courts in the 1600s and 1700s heard cases involving what we now called dependency issues, such as cases involving children who were wards of the state due to parental abuse or neglect. Records show that proceedings involving minors and the state's intervention in their care were open to the public both in English Chancery court and in early American courts.

39.     North Carolina's modern dependency proceedings—along with most modern dependency proceedings in the United States—can trace their origins to the first specialized juvenile court in the United States, which was established in Cook County, Illinois. The Cook County juvenile court, which at the time had jurisdiction over both delinquency and dependency cases, was established in 1899 as a presumptively open

court.

40.     Moreover, the contemporaneous legislative records and newspapers reflect an active debate about the value of public access versus total secrecy.  During the debate surrounding the 1899 enabling statute, some advocates fought to close the courts entirely to anyone who did not have a direct interest in the pending case.  These advocates proposed a "secret hearings" clause to the bill.  Their proposal drew immediate and strenuous backlash.  Critics of this proposal were concerned that closing courts would allow the government to avoid public scrutiny of, and accountability for, its decisions to separate families—and even profit off that separation.[16]

41.     Concerns about closing the courts were driven primarily by a backlash against the Orphan Trains and the Children's Aid Society, which are widely accepted as precursors to the modern day foster system.  In other words, the most vocal proponents of presumptively open courts were those who feared what would happen not to children accused of crimes but rather to the impoverished children who became wards of the state after their parents were deemed unfit in dependency proceedings.[17]

42.     The night before legislative hearings on the bill, for example, the *Chicago Inter-Ocean* ran a front-page story opposing closed hearings in the strongest terms.[18]  The

[16] David S. Tanenhaus, *The Evolution of Juvenile Courts in the Early Twentieth Century: Beyond the Myth of Immaculate Construction*, in A Century of Juvenile Justice 42, 61 (Margaret Rosenheim ed., 2002).

[17] *Id.*

[18] *Id.*  This article, entitled "Child Slaves," quoted several sources who argued that "closed hearings in the juvenile court would only contribute to the enslaving of poor children by allowing charity organizations to remove them from their families and sell them as cheap laborers."  *Id.*  One source stated: "Should this bill become law no child in the poorer sections of

article noted that closed hearings would prevent families and the press from exposing the wrongful takings of children from loving, albeit poor, families, as well as "the anguish of a mother whose child was being taken from her[.]"[19]

43.     Persuaded by concerns about the government taking children from their parents behind closed doors and demands for transparency and accountability, Illinois legislators removed the "secret hearings" clause.  The bill then passed unanimously on the last day of the legislative session.

44.     Those who supported open juvenile courts thus prevailed, and the earliest juvenile courts had open hearings and public records.[20]  Courts remained open to the public in the following decades.  Photographs of the Cook County Juvenile Court in 1905, like the one below, show packed proceedings, with many individuals in attendance, and news reports from the early decades of the 1900s show that press coverage of dependency hearings was commonplace.

---

Chicago would be safe from the 'associations' interested in securing children. . . . The mother who permitted her little one to appear on the street not washed, curled, and combed to suit the critical inspection of an 'association' practicing philanthropy at $50 a head would be in danger of losing her child."  *Id.*

[19] *Id.*

[20] *Id.* at 43.



**Fig. 2.1** Juvenile Court in Session. From Cook County Charity Service Report, Fiscal Year 1905. Courtesy of The University of Chicago Libraries.

45.     Eventually, most states adopted the Illinois statutory language, including the provisions relating to public court access.  As of 1939, the majority of states had dependency proceedings that were presumptively open to the public.[21]  And even in states with statutes that formally closed hearings, or that gave judges discretion to close hearings, the public was often permitted to observe these proceedings in practice.

46.     North Carolina, specifically, enacted a juvenile court law in 1919, which provided that while courts "may" close hearings, they were presumptively open to the public.  North Carolina newspapers during this time period reported on juvenile cases and

---

[21] Gilbert Cosulich, *Juvenile Court Laws of the United States* 50 (2d ed. 1939) (stating that only Connecticut, the District of Columbia, Minnesota, Maryland, Pennsylvania, Virginia, and Wisconsin had presumptively closed courts).

provided accounts of open hearings.

47. Judges presiding over dependency proceedings across the United States quickly adapted to their public nature, even using the media as a way to enhance the courts' legitimacy and to educate the public about what the judges saw as the benefits of these courts.

48. In the late 1960s and 1970s, there was a move to restrict public access to dependency proceedings. Some states passed laws that presumptively closed dependency proceedings to the public, or closed them completely without providing any mechanism for the public to seek access. However, even in this period, courts that were nominally "closed" did permit public access. For example, the Illinois juvenile court supposedly "closed" its hearings in 1965, but it still permitted public access to the press.[22] And throughout the country, judges often permitted teachers, counselors, clergy, extended family members, and other members of the public to attend proceedings.

49. This experiment with closed dependency proceedings in some states did not last long. In the 1980s, many states that had closed their dependency courts began reopening them—reaffirming the value of public access upon which the dependency court system was originally built. Oregon led the shift in 1980, with Michigan and New York following soon after, and Minnesota in 1998.

50. Reflecting this trend toward openness, the National Council of Juvenile and Family Court Judges, an organization that "identifies problems within our nation's

_____

[22] Barbara White Stack, *The Trend Toward Opening Juvenile Court Is Now Gaining Momentum*, Pittsburgh Post-Gazette, Sept. 23, 2001, at A1.

juvenile and family courts and formulates ways of improving practice in order to enhance justice," issued a resolution in 2005 in support of presumptively open hearings. The Council acknowledged that "the public has a legitimate and compelling interest in the work of our juvenile and family courts" and stated that presumptively "open court proceedings will increase public awareness of the critical problems faced by juvenile and family courts and by child welfare agencies in matters involving child protection, may enhance accountability in the conduct of these proceedings by lifting the veil of secrecy which surrounds them, and may ultimately increase public confidence in the work of the judges of the nation's juvenile and family courts."[23]

51.     In other words, except for a period in the 1960s and 1970s when closure occurred in some courts, there has been a long and broad history of public access to dependency proceedings in this country. The value of openness in these proceedings has been widely discussed and publicly acknowledged for decades. Even when some states chose to presumptively close their courts, those closure policies were confined to specific jurisdictions, were unevenly enforced, and did not last long.

52.     The history of access to dependency courts in North Carolina is not a history of closure to the public, but rather a history of general openness to the public. Notwithstanding Defendants' unconstitutional practice, state law still provides for a presumption of open courts, and the legislative history of the relevant statute shows that

---

[23] *68th Annual Conference Resolution No. 9*, Nat'l Ctr. For Juv. Just. (July 20, 2005), https://www.ncjfcj.org/wp-content/uploads/2019/08/in-support-of-presumptively-open-hearings.pdf.

legislators explicitly rejected a closed court provision in favor of presumptively open courts. N.C. Gen. Stat. Ann. § 7B-801; *see also* N.C. const. Art. I § 18; *Virmani v. Presbyterian Health Services Corp.*, 350 N.C. 449, 463 (1999) (the "necessary and inherent power of the judiciary" to close court proceedings "should only be exercised" when "required"). According to state law and policy, decisions to close the courts for a particular court proceeding are supposed to be made on a case-by-case basis. Moreover, appeals of dependency cases are heard in open court in North Carolina, and oral arguments are fully available to the public.[24]

## B. Public Access Plays a Significant Positive Role in the Functioning of Dependency Courts

53. The "logic" prong of the *Press-Enterprise* test is met because public access improves the functioning of dependency courts.

54. As the Supreme Court and the Fourth Circuit have recognized, court-watching is a crucial civic activity that assures the public that the proceedings are fair. Open proceedings "[give] assurance that the proceedings [are] conducted fairly to all concerned, . . . discourage[] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). Such "access allows the public to 'participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.'" *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 327 (4th Cir. 2021) (quoting *Globe*

---

[24] *See* North Carolina Court of Appeals, YouTube, https://www.youtube.com/channel/UC5RBqtdOMqHTErl7ysntfBA (last accessed Nov. 8, 2024) (displaying video recordings of appellate arguments).

*Newspaper Co.*, 457 U.S. at 606).

55.     Indeed, the Supreme Court has explained that public access is especially critical to the democratic need to hold public officials accountable through observation in courtrooms without juries present—such as dependency proceedings.  *See Press-Enterprise Co.*, 478 U.S. at 12–13 ("[T]he absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and . . . judge, . . . makes the importance of public access . . . even more significant." (citation and internal quotations omitted)).

56.     The purpose of dependency court proceedings is to "assure fairness and equity" and "protect the constitutional rights of juveniles and parents."  N.C. Gen. Stat. Ann. § 7B-100; *see In re R.R.N.*, 368 N.C. 167, 171 (2015) (stating that "trial courts should consider the purposes of the Juvenile Code when determining whether intervention is necessary to protect the welfare of the child" and if intervention is not necessary, "DSS should not intervene"); *Matter of K.M.W.*, 376 N.C. 195, 208 (2020) (recognizing that one of the purposes of the statute governing dependency court proceedings is to "prevent[ ] the unnecessary or inappropriate separation of juveniles from their parents" (quoting N.C.G.S. § 7B-100(4)) (alteration in original)); *id.* (stating that the purpose of "fundamentally fair procedures" is to "prevent[] unnecessary interference with the parent-child relationship" (citation and internal quotation marks omitted)).

57.     Public access to dependency proceedings in Durham County would play a significant positive role in the functioning of dependency courts, in part by permitting an

informed public to identify ways in which the system is not meeting its purposes and to propose reforms that will better protect children and families.

58. Public access plays a critical role in evaluating constitutional and other deficiencies in the proceedings. Advocacy organizations like Civil Rights Corps cannot identify potential injustices, make policy proposals, or bring information about potential civil rights violations to community members and impacted families without observing how the system works. Public access would permit observers—like Civil Rights Corps, the press, and other members of the community—to evaluate whether government officials are making decisions that are influenced by explicit or implicit bias, whether legal and evidentiary standards are being properly applied, and whether those standards could be improved by the legislature or courts. The ability to observe judicial proceedings—both in the courtroom as well as in the written materials produced in adversarial litigation—enables journalists, scholars, advocates, and the community to document, study, and help officials ultimately address patterns in judicial decisions.

59. Crucially, public proceedings also create an outlet for community concern. The public's ability to listen is fundamental to its ability to hold government officials accountable and to express its views about the workings of government. In other jurisdictions, court-watching and participatory defense efforts have provided the basis for communities to self-educate, organize, identify policy platforms, and push for changes. The positive experience in these other jurisdictions establishes that public access to North Carolina dependency courts would likewise improve the legal process.

60. Other jurisdictions have successfully and positively opened their

dependency proceedings to the public. For example, in 1997, New York officially codified a presumptive right of public access to its dependency courts. The new rule was passed in the face of concerns that opening the courts would stigmatize young people and completely negate children's interests in confidentiality. The opposite has proven true. Public access has been central to the development of a vibrant landscape of activism, led by directly impacted families, that has brought greater awareness to the problems in the system and achieved reforms that have dramatically reduced the number of foster system admissions: between 1997 and 2024, the number of children in the foster system decreased by almost 50 percent. Presumptively open courts in New York have permitted scholars to publish books on the system and investigative journalists to publish well-researched critical analysis that has led to informed policy changes. Additionally, community members who observed the system pressured the defense bar to provide more rigorous representation and ensured greater accountability for other institutional actors.

61. Similar effects have been seen in other court-reform contexts. For example, Philadelphia Bail Watch was a court-watching project that organized efforts to observe bail hearings at the Philadelphia Criminal Justice Center between 2018 and 2023. As part of this project, Philadelphia Bail Watch conducted in-person observation of bail hearings for a 24-hour period once each year, using a rotating group of volunteer court-watchers. Philadelphia Bail Watch found that during their 24-hour court-watching period, magistrates set cash bail less frequently than they did on other days of the year. Results like this confirm that lawyers and judges consider their words and actions more carefully when they know that members of the public are present and paying attention to their

decisions. Public observation of dependency proceedings could likewise lead judges to separate children from their parents less frequently.

62. Given judges' wide discretion and their mandate to act in the "best interests of the child," public access can prevent arbitrary or unreasonable decisions.[25] It can also shed light on this otherwise little-known system. Public access to dependency proceedings also can bolster the voices of impacted families whose stories and perspectives are too-often unheard.[26] A qualified, presumptive right of access promotes fairness and helps ensure that discretionary decisions—for example, what constitutes neglect, when a removal or termination is necessary, or whether a parent has adequately redeemed themselves—conform to community standards and values. Presumptive access gives the public an opportunity to assess whether judges are fairly enforcing the laws and making reasoned decisions based on the evidence.

63. Given that removals and terminations are routinely intertwined with issues of race, poverty, and various forms of bias (for example, discrimination against people with disabilities, people who use drugs, and LGBTQ communities), a presumptive right of access to the courts can help ensure public awareness of unmet community needs.

---

[25] For example, a Philadelphia family court judge was reassigned and ultimately suspended for "blatant and inexcusable" misconduct after a news article exposed her history of due process violations. *See* P.J. D'Annunzio, *Philadelphia Judge Lyris Younge Gets Six-Month Suspension for 'Blatant and Inexcusable' Misconduct*, The Legal Intelligencer (June 3, 2021), https://www.law.com/thelegalintelligencer/2021/06/03/philadelphia-judge-lyris-younge-gets-six-month-suspension-for-blatant-and-inexcusable-misconduct/?slreturn=20241027-15630.
[26] *See generally* S. Lisa Washington, *Survived & Coerced: Epistemic Injustice in the Family Regulation System*, 122 Colum. L. Rev. 1097 (2022) (explaining the ways that dependency court judges coerce parents who have experienced intimate partner violence into complying with the system's narrative in order to regain custody of their children).

64.     Consistent with its history of investigating legal and bureaucratic practices that criminalize poverty, Civil Rights Corps seeks to observe dependency proceedings in Durham County in order to learn more about the court system and how it operates, including how legal standards are applied and how judges make discretionary decisions in these cases.  Civil Rights Corps seeks to understand which aspects of the dependency court's process might contribute to the dependency court's disproportionate impact on low-income communities and communities of color.[27]  And Civil Rights Corps has partnered with local community members and organizations to further facilitate these activities.

## IV.     North Carolina Dependency Proceedings Are the Types of Proceedings Traditionally Open to the Public in That They Are Evidentiary, Adversarial Proceedings That Affect Fundamental Rights

### A.     Dependency Proceedings Affect Fundamental Rights

65.     Dependency court judges oversee proceedings that impact the "fundamental" liberty interest of a parent in the "care, custody, and control of their children."  *Granville*, 530 U.S. at 65.[28]  This right, which is shared by both children and parents,[29] is "perhaps the oldest of the fundamental liberty interests recognized by [the

---

[27] Many observe that the child welfare system, including dependency proceedings, enjoy a "veneer of benevolence" that has permitted a myth to develop that the system primarily operates to protect children.  *See* Dorothy Roberts, *A Veneer of Benevolence*, Inquest (Apr. 29, 2022), https://inquest.org/a-veneer-of-benevolence/.  Scholars refer to this system as the Family Policing System.  *Id.*

[28] *See also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

[29] *See, e.g., Ratte v. Corrigan*, 989 F. Supp. 2d 550, 561 (E.D. Mich. 2013); *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002), *as amended on denial of reh'g* (June 26, 2022) ("Parents have

United States Supreme Court].” *Granville*, 530 U.S. at 65.  Courts refer to the

termination of parental rights as the “civil death penalty,” *Levine*, 636 S.E.2d at 220 n.9

(citation omitted), in recognition of the fact that terminating parental rights is “an

exercise of awesome power” that completely and irrevocably extinguishes a parent’s

fundamental liberty interest in raising their child, *Smith v. Smith*, 720 P.2d 1219, 1220

(Nev. 1986), *overruled on other grounds by In re of Termination of Parental Rights as to

N.J.,* 8 P.3d at 132 n. 4 (2000); *see also, e.g.*, *Interest of D.T.*, 625 S.W.3d 62 (Tex. 2021)

(“Termination of parental rights is traumatic, permanent, and irrevocable. . . . [P]arental

termination constitutes the death penalty of civil cases.” (citations and internal quotation

marks omitted)).[30]

66.     Dependency proceedings also implicate a broad range of other important

constitutional interests, including rights against government surveillance, rights against

search and seizure, the right to associate with extended family and one’s community, and

the right to associate with siblings.

**B.     Dependency Proceedings in North Carolina Are Adversarial, Evidentiary Hearings That Are Meant to Resemble Trials**

67.     In North Carolina, petitions by the state alleging child neglect or abuse or

---

a fundamental due process right to care for and raise their children, and children enjoy the corresponding familial right to be raised and nurtured by their parents.”); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc) (“[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.”); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) (“Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children.”).

[30] *See also* Sankaran & Church, *supra* footnote 8, at 14–15.

seeking to remove children from their homes and families, and actions to permanently terminate parental rights, are heard in district court.[31]

68.     These cases involve heightened evidentiary burdens of proof; formal legal standards; counsel; complex legal and constitutional questions; disputes of fact with direct- and cross-examination of a range of government and private witnesses; formal transcripts; written filings, and memorialized rulings.  And they implicate precious liberty interests.[32]

69.     A dependency case proceeds much like a criminal case.  It begins with a report of wrongdoing, which can come from anyone.  The agency then decides whether to investigate the report and, if it does investigate, whether to formally allege neglect or abuse.  To make a formal allegation, the agency must initiate court proceedings by filing a petition, which functions like a criminal complaint.

70.     The shelter hearing is typically the first hearing in a dependency case.  At this hearing, a judge decides whether the state lawfully can take a child into custody.  Next is the pre-adjudication hearing, during which the parties litigate pre-trial motions and discovery requests.  The judge may reassess where and with whom the child lives and the parent's visitation right.  The adjudication trial follows.  This is a formal trial on the merits of the state's allegations.  N.C. Gen. Stat Ann. §7B-807.  Formal rules of

---

[31] Those same district courts hear child custody and divorce cases.  Although Defendants routinely close *dependency* proceedings to the public, divorce and custody cases—which often raise the same sensitive issues relating to parental abuse and neglect, children's mental health, and other private information, but do not involve the state as a party—are open to the public.
[32] *In re A.K.*, 360 N.C. 449 (2006); *Owenby v. Young*, 357 N.C. 142, 144–45 (2003).

evidence apply, and the state is supposed to prove its allegations by clear and convincing evidence. If the judge makes a finding of neglect or abuse, the judge is supposed to write an opinion setting forth conclusions of law and findings of fact and explaining the reasons for the decision. N.C. Gen. Stat. Ann. § 7B-807. The disposition trial follows. This trial is analogous to a sentencing hearing. The judge is required to consider evidence of the child's "best interests" and decide what will happen next for the family, including whether the child will be kept separated from her family and under what conditions reunification can occur. N.C. Gen. Stat. Ann. § 7B-808; *id.* § 7B-903.

71.     After trial, if a child remains in state custody, the court must hold regular permanency planning hearings to evaluate the child's and family's circumstances. At these hearings, the court considers the "best interest[s]" of the child and makes findings about which services have been and should be offered and whether the child's placement is appropriate. N.C. Gen. Stat. Ann. § 7B-808. If a parent and child are not reunified, the state will file a petition to terminate parental rights.

72.     Termination proceedings occur in two phases: an adjudication phase and a disposition phase. After adjudication, the judge must issue a written order explaining whether the state has proven one of the statutory grounds for termination by clear and convincing evidence. If the court finds that the state has met its burden, the court then decides by clear and convincing evidence whether termination is in the child's "best interest." N.C. Gen. Stat. Ann. § 7B-1109.

73.     Throughout the entire court process, the judge is responsible for considering and resolving factual and legal questions that implicate the fundamental

liberty interests of the child and parent. Each one of these hearings is adversarial in nature and involves the substantive consideration of evidence, factfinding on disputed questions by a neutral arbiter, application of legal standards and precedent, the interplay of statutory and constitutional law, and the exercise of immense discretion by the judge. The stakes for families involved in these proceedings are life-defining and typically permanent.

## V. <u>A Presumptive, Qualified Right to Access Dependency Courts Does Not Harm Children, and Closed Courts Do Not Promote Child Safety or Well-Being Better Than Alternatives</u>

74.     A presumptive, qualified right of access to dependency courts protects children by bringing public attention to the harms imposed on them when the government separates them from their families, and by ensuring that their constitutional and statutory rights are respected. Children are typically unable to sound the alarm themselves, and they must rely on an informed public to protect them from government overreach. Although children are represented in dependency proceedings, their attorneys often advocate for what the attorneys view as the child's best interests, rather than what the child says he or she wants. Moreover, children's attorneys are unable to advocate for systemic change during individual, secret proceedings. Thus, public access is necessary to raise awareness about how this government bureaucracy functions.

75.     A presumptive, qualified right of access to dependency courts does not harm children or other participants in the proceedings. In fact, out of all the states that have opened their courts after a period of closure, only Connecticut closed them again (after a limited experiment ended). The state of Minnesota, for example, conducted a

three-year experiment in 12 counties before opening courts statewide. Opening the courts in Minnesota led to reforms that all stakeholders have praised, including increased funding for parent defense lawyers and eventually an entirely new, interdisciplinary model of defense.[33] These experiments would not have stuck or been expanded if they were harming or traumatizing children.

76. Many people working in dependency courts recognize that increased transparency promotes child safety and does not cause harm.[34]

77. Crucially, parents and children who are directly impacted by the system in Durham County are asking for a presumptively open court that is closed only in narrow circumstances. They state that closed courts allow their rights to be violated and their lawyers to get away with providing lackluster representation. They believe that presumptive public access would expose bias in the system and would permit them to more effectively advocate for policy changes that protect their communities.

78. Judges have numerous tools available to them, short of total closure, to protect children's interest in privacy, including imposing conditions on attendance that, if violated, are punishable through the court's contempt power.

---

[33] Richard Wexler, *Civil Liberties Without Exception: NCCPR's Due Process Agenda for Children and Families*, Nat'l Coal. for Child Prot. Reform (May 2022), https://nccpr.org/solutions-due-process/.
[34] *See generally id.* (citing a range of former and current government officials, judges, and law professors from a variety of states who support open dependency courts, including former Chief Judge of the New York Jonathan Lippman, who stated that opening the courts in that state "has been 100 percent positive with no negatives. . . . Our worst critics will say it was the best thing we ever did. Their fears were unfounded[.]").

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### First Amendment Violation (42 U.S.C. § 1983)

**Right of Access to Dependency Proceedings Under the First Amendment to the United States Constitution Against the Defendant Judge in Her Official Capacity for Declaratory Relief**

79.     Civil Rights Corps re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 76 above.

80.     The Defendant Judge's actions under color of state law, including without limitation, the policy and practice of closing dependency proceedings without an opportunity to be heard and without making specific, on-the-record, reviewable findings demonstrating that closure is necessary to meet compelling government interests, deprive Civil Rights Corps, and by extension the public, of the right of access to court proceedings secured by the First Amendment to the U.S. Constitution.

81.     Civil Rights Corps has no adequate remedy at law to prevent or redress Defendant's unconstitutional actions and will suffer irreparable harm as a result of Defendant's violations of Civil Rights Corps' constitutional rights.  Civil Rights Corps is therefore entitled to declaratory relief to prevent further deprivation of the First Amendment rights guaranteed to Civil Rights Corps and the public.

## SECOND CLAIM FOR RELIEF

### First Amendment Violation (42 U.S.C. § 1983)

**Right of Access to Dependency Proceedings Under the First Amendment to the United States Constitution Against Sheriff Birkhead, in His Official Capacity, for Declaratory and Injunctive Relief**

82.     Civil Rights Corps re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 79 above.

83.     Sheriff Birkhead's actions under color of state law, including without limitation, Defendant's policy and practice of enforcing the exclusion orders, deprive Civil Rights Corps, and by extension the public, of the right of access to court proceedings secured by the First Amendment to the U.S. Constitution.

84.     Civil Rights Corps has no adequate remedy at law to prevent or redress Defendant Sheriff's unconstitutional actions and will suffer irreparable harm as a result of Defendant Sheriff's violations of Civil Rights Corps' rights.  Civil Rights Corps is therefore entitled to declaratory and injunctive relief to prevent further deprivation of the First Amendment rights guaranteed to Civil Rights Corps and the public.

## PRAYER FOR RELIEF

WHEREFORE, upon all allegations and counts alleged herein, Civil Rights Corps respectfully requests that this Court issue the following relief:

A.     A declaration that the First Amendment presumption of public access applies to dependency proceedings;

B.     A declaration that all Defendants will violate Civil Rights Corps' rights under the First Amendment if Defendants deny Civil Rights Corps access to dependency proceedings without an opportunity to be heard and without making specific, on-the-record, reviewable findings that closure is necessary to meet a compelling government interest and without considering narrowly tailored alternatives to closure;

C.     A preliminary and permanent injunction against Defendant Sheriff

prohibiting him from enforcing directives to close dependency proceedings that were issued without notice, an opportunity to be heard, consideration of alternatives, and reviewable findings explaining why totally excluding the public is necessary to meet a compelling government interest, or from implementing his own unconstitutional policies and practices;

D.      Reasonable expenses and costs of litigation;

E.      Reasonable attorney's fees; and

F.      Such other relief as the Court deems just and proper.

Dated: November 13, 2024

*Christopher J. Heaney*

Christopher J. Heaney (SBN 46095)
Law Office of Christopher J. Heaney
P.O. Box 25397
Raleigh, North Carolina 27611

Rohit K. Singla (*of counsel, pro hac vice forthcoming*)
rohit.singla@mto.com
Shannon Aminirad (*of counsel, pro hac vice forthcoming*)
shannon.aminirad@mto.com
Aditi N. Ghatlia (*of counsel, pro hac vice forthcoming*)
aditi.ghatlia@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California 94105-2907
(415) 512-4000

Ariella H. Park (*of counsel, pro hac vice forthcoming*)
Ariella.Park@mto.com
Sarah M. Pfander (*of counsel, pro hac vice forthcoming*)
Sarah.Pfander@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Plaintiff*
