# EXHIBIT 4




To: Durham County

From: Emancipate NC & Thrive Tribe NC[1]

Re: Potential Avenues for County-Level Reform to Child Welfare System

Date: September 29, 2022

---

*Emancipate NC and Thrive Tribe NC affirm their deep love for children and their commitment to protecting children from abuse and neglect. Children deserve to be cared for and loved unconditionally. Unfortunately, the child welfare system needs deep systemic reform to fulfill its mission of protecting children. Whenever possible, we need to give families the support they need to keep children safe with their parents, rather than rupturing family bonds and imposing increased attachment wounds.*

*Research demonstrates that forced family separation of any length imposes life-long trauma on a child.*

*The selection of a new Director of Social Services presents an opportunity to make a commitment that Durham will be a Best Practices county: one that strives to keep children safe in their homes by providing high levels of services; that when children must be removed as a last resort, our goal is prompt reunification; one that affirms that involuntary family separation is a tragedy that must be avoided with rigor; and one that knows our agency is charged with providing resources to keep families safe together.*

**Introduction**
A mother holds her young child close, staring into his sparkling eyes as the hovering social worker tells her that it's time to leave. She leans in, warm hand running through curly black hair as she reassures the frightened boy with a kind smile: "I'll see you next

---

[1] Report authored by Attorney J Hallen and Attorney Elizabeth Simpson, with research assistance from Duke Law students Frank Colaruotolo and Haley Harris.

1

week." Years later, the mother's voice cracks as she describes her last interaction with her child. Within hours of the promise, a Judge had stopped all future visitation. The Department of Social Services and the Judge reasoned that this outcome was necessary due to the young boy's inclination to "act out" after visits, punishing mother and child for separation anxiety. Another Black family is torn apart by the stroke of a judicial pen.

Many indigent parents in Durham County face intransigent and slow-moving bureaucracy as they try to navigate interactions with the Department of Social Services (DSS) and the Durham Abuse, Neglect, and Dependency (AND) Courtroom. ***Parents and their children are forced to reckon with inefficient processes, long court delays, and a system that adjudicates weighty questions of family rights in a courtroom better designed for traffic matters.***

In this world, **understaffing and underpay** is the norm for DSS social workers and attorneys representing parents alike.

Through interviews with attorneys, educators, parents, foster parents, GAL volunteers, and DSS stakeholders,[2] this policy paper seeks to outline the harms arising from our child welfare system before offering a series of reforms recommended to address these injustices.

**An Unending Process**
One concern almost universally expressed by those interviewed, regardless of role, is the ***slow, inefficient process and unrelenting continuances ever-present in child welfare proceedings.*** Given the lack of time-slot scheduling, attorneys are forced to loiter in court for days waiting on cases, at huge expense to taxpayers, and contributing to their frustration and burnout. Meanwhile, parents must find ways to miss work repeatedly without losing their jobs. Parents and attorneys alike expressed frustration about lingering in court for hours only to have their cases continued, or pushed back to another date, on repeat.

An experienced attorney who has represented parents in AND Courts for over ten years noted that, while cases are fluid and some cases do need to be continued due to new documents, such occurrences should not happen every court date. Far too often, cases are continued due to DSS failing to provide discovery or delays in court summaries prior to the pretrial date, delaying other cases docketed for the same day. One parent, speaking on condition of anonymity due to ongoing litigation, discussed the stressful conditions of taking work off repeatedly only to have their case continued. ***Foster parents described cases taking years to close, with children growing up estranged from biological parents by the passage of time and lack of meaningful visitation.***

---

[2] Confidentiality was maintained for all participants who requested it.

To address these concerns, multiple attorneys and educators interviewed encouraged the usage of time-slot scheduling and some recommended virtual hearings in the AND Courtroom in certain contexts. ***Time-slot scheduling would conserve parent-attorney time, conserve the time of DSS social workers and Guardian ad litem volunteers, and would mitigate an array of harms arising from inefficient proceedings and month-after-month continuances.*** Some attorneys, including Sydney Batch, a State Senator and longtime court-appointed parent attorney, also support the notion of virtual hearings. Senator Batch argues that virtual hearings would allow for higher participation. If everyone is given a time and a link, parents become able to take time off work and participate more easily, regardless of reliable transportation. Still, in-person hearings should be the norm when important credibility determinations are being made by judges.

Other options exist to improve scheduling and increase efficiency through AND Courtroom processes. Timothy Heinle is the Civil Defender Educator at the UNC School of Government. Prior to joining UNC, Mr. Heinle spent a decade in litigation, representing both DSS and parents in AND proceedings. According to Mr. Heinle, lack of communication is prevalent between parents and their attorneys, particularly in advance of the initial court hearing. While there are a variety of causes for this insufficient communication, these gaps can contribute to delays with the proceeding, as delays are sometimes necessary to allow for proper preparation.

Reforms aimed at addressing the root causes of the lack of communication could increase the overall efficiency of AND proceedings. Mr. Heinle suggested that one possible local solution is to provide additional confidential spaces at the courthouse for parents and attorneys to meet. Doing so would increase the opportunity for parents—many of whom work multiple jobs or lack reliable transportation—and their often-busy attorneys to form professional bonds, develop trust, and communicate about important matters related to representation. All of this, Mr. Heinle says, has the potential for a positive impact on the efficiency and effectiveness of AND proceedings.

**The Challenges of Burnout**
Beyond scheduling and logistical issues, the AND Courtroom is a brutal place for vicarious trauma, which impacts judges, attorneys, GAL volunteers, social workers, and court staff alike. Hearing these stories day in and day out, and layering bureaucratic processes on top of human suffering, in a courtroom with a lot of repeat players, leads to an environment that is ripe for burnout.

Over a decade into working in parent defense, one attorney explains how a case that starts with one issue can quickly snake its way into every aspect of a parent's life: "[the courts] tell parents to do A, B, and C and most of these things are boilerplate, standard requirements put on every family" even if the requirements have nothing to do with the case. A child might be taken for a domestic violence concern, but instead of domestic

violence counseling or a parenting course, DSS will focus on employment, housing, or substance abuse. "It's a rubber-stamp mentality."

***This assembly line of paperwork and case plans and the daily presence of trauma and overwork, creates an unhealthy work environment for everyone present in the courtroom. Judges remain in their positions for an extended period, and regularly hear stories of death, severe abuse, and other complex trauma on an always-overflowing docket. The result of this is burn out and numbness.***

Parent attorneys feel this strain as well, and indigent attorneys within the courtroom tend to have very high rates of turnover. A parent facing termination of rights stated that they had been transitioned between 3 attorneys over the course of their proceedings. They describe an attorney who didn't review medical records. A foster parent interviewed shared similar concerns. The birth parent of the 3-year-old foster child in their care was shuffled between three attorneys over the course of a single year. High DSS social worker turnover is also the norm, necessitating transitions between workers that lead to further delays in proceedings.

Many noted that severe underfunding plays a significant role in this high turnover rate. Senator Batch discussed that until recently, court-appointed attorneys experienced a decrease in their hourly state pay. She also noted that many attorneys have to wait weeks or months in order to be paid for their legal services. ***Court-appointed attorneys representing parents are among the lowest paid court-appointed attorneys in the state.*** Increased pay for court-appointed attorneys, alongside funding for additional deputy parent defenders, could play an outsized role in addressing attorney turnover. Indigent Defense Services recently increased the hourly rate for several court-appointed matters, including parent attorneys.

**Beginning to Envision Reform**
Alongside direct funding for attorneys who represent parents, support for a range of aspects within the child welfare system could benefit procedural fairness and the lives of those involved in the system. Mr. Heinle argues that the overall system could be improved with the creation and updating of additional resources and continuing legal education programs for AND attorneys. Additional funding may be required to support these educational resources. Local bars and judges could arrange to host continuing legal education programs in their area, which may make attending said training more feasible. Local rules could also be established to encourage or require attorneys who practice in AND court to attend training focused on education relevant to those proceedings. ***Other individuals interviewed for this policy paper suggested additional recommendations, including appointment of legal counsel to parents prior to removal of children, increased funding for social workers who are dedicated to working with the parents directly, and schemes to incentivize the use of support staff to improve quality of***

*attorney representation.* Many attorneys working these cases are solo practitioners without robust infrastructure and support, straining their capacity.

Outside of the courtroom, continuances, delays, underfunding, and unjust social policies create impossible situations for families making their way through the child welfare system. ***While cases drag on, parents must contend with a system where one hour of visitation per week may be their allotment, even in the case of newborn infants, and meetings are held in small rooms.*** At times, the deflated relationships stemming from months or years of limited visitation are used as further evidence against reunification, with DSS attorneys and social workers arguing that the lack of a bond is one more reason in favor of terminating parental rights.

"It is absurd," one attorney stated, "[DSS] takes newborns from the hospital and thinks it's ok for a mother to only have one hour a week with a newborn baby." "We're kidding ourselves to call these reunification cases," Attorney Lenoir-Peek, the Deputy Parent Defender for Indigent Defense Services separately stated. Alongside increases in weekly visitation time, Attorney Lenoir-Peek also noted that ***a greater variety of locations for visitation, including recreational options, could help facilitate continued bonds.*** "Visitation doesn't always have to be at DSS," she explained, "If children were removed due to homelessness or a similar issue, why can't they meet at the mall or a bowling alley?"

These strict restrictions placed on visitation, alongside the trauma of being ripped from one's parents and, when present, parental abuse, place a huge psychological toll on impacted children. Removing a child from a parent is a very traumatic process. S***tudies show that children placed with foster parents ultimately do not enjoy improved outcomes in comparison to their peers, with regard to juvenile justice involvement, reactive attachment disorder, or early mortality.***

A forced removal, especially with law enforcement involvement, can have a severe detrimental impact on a child's psyche, and can completely alter their security and attachment later in life. ***Foster parents report being tasked with caring for traumatized, at times suicidal, children without sufficient support from DSS.*** One foster parent even reported having a foster child removed from their care after they expressed concern to DSS that DSS was not meeting the child's mental health needs.

Experienced parent attorneys have witnessed the intergenerational nature of these complex psychological harms. One such attorney, who has advocated for parents in AND Courts for over ten years, has represented both ex-foster children who have gone on to have their own kids removed and guardians who took guardianship over a child because the court system was eager to close out a case and give the child to someone else.

5

**Conclusion**
These children deserve better. They deserve the opportunity to rebuild relationships with their biological parents through visitation and a court system that seeks to heal rather than punish. They deserve robust psychological services and mechanisms to efficiently access these services. They deserve funding, not just via advocates, but also directly through investments in biological families commensurate with those given to foster families. ***These children, and their families, deserve a chance.***

This chance does not exist in our current system, where families are separated and prayers for reunification are answered with a maze of red tape. Through the fog of trauma and loss, parents stumble through shifting requirements and underfunded support systems. Overworked social workers and attorneys burn out and end up quitting, finding the pain of second-hand trauma and bureaucracy too dire for the measly pay. Disproportionately Black children from families experiencing poverty are placed with disproportionately wealthier white families, or wealthier Black families, under the guise of "safety."

While the only remedy to the harms outlined in this piece is a systematic shift away from our current system into one focused on rehabilitation and reunification, the reforms listed below will help mitigate the ongoing trauma and protect families.

**Recommended Reforms**
After consulting with a diverse group of stakeholders including attorneys, foster parents, guardian ad litem volunteers, former DSS workers, scholars, policymakers, and impacted parents, and after researching emerging consensus on best practices, we recommend the following avenues for County-Level Reform to the Child Welfare System in Durham, North Carolina:

1. **Keep Families Together while Investing in Families**

    a. **Funding to support biological family** – investments commensurate with those given to foster families.

        i. The Family First Prevention Services Act of 2018 (FFPSA) introduced sweeping federal reform to child welfare funding.[3] The FFPSA allows states to receive federal reimbursement under Title IV-E for services that <u>prevent</u> foster care placements. This includes evidence-based mental health, substance abuse, and parenting treatments to keep children safely with their families.[4] Before the

---

[3] https://www.ncdhhs.gov/divisions/social-services/child-welfare-services/family-first-prevention-services-act.

[4] *Id*.

6

FFPSA, Title IV-E funds were reserved for foster care placements. Under FFPSA, those foster care funds can—and should—be used on prevention services that allow kids to stay at home or live with a kin caregiver temporarily or permanently.[5] North Carolina's Family First Plan was approved in 2022.[6] Durham County should take advantage of the opportunities provided under North Carolina's FFPSA plan.[7]

b. **Family Stabilization Programs** are designed to ensure the safety and well-being of children and youth in their homes; prevent their initial placement or re-entry into foster care; and preserve, support, and stabilize their families. Family stabilization programs are aimed at families who have come to the attention of child welfare services and are in crisis and/or facing imminent risk of removal.[8] Examples of successful, evidence-based family stabilization programs include:

c. **Family Centered Treatment (FCT).**[9] FCT is a primary prevention program that addresses critical areas of family functioning that are the underlying causes for the risk of family dissolution (e.g., lack of housing, difficulty accessing medical, mental, or substance abuse treatments). FCT relies on in-home treatment and is an alternative to residential placement. **FCT is approved for Title IV-E funding**.[10]

   i. A 2012 Maryland study—comparing children receiving FCT to children put in residential placements—found that FCT provides significant, positive behavioral results and reduces posttreatment placements.[11] Additionally, a cost analysis indicates that FCT is a cost-effective alternative to residential placement.[12]

---

[5] *See* https://imprintnews.org/finance-reform/cliffsnotes-family-first-anatomy-massive-child-welfare-entitlement-reform/29894

[6] *See* https://www.ncsl.org/research/human-services/family-first-legislation-the-family-first-prevention-services-act.aspx

[7] *See* North Carolina Department of Health and Human Services (NCDHHS) Child Welfare Manual for Funding for Prevention Services under Title IV-B. Accessed at https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policy-manuals/modified-manual-1/appendix-3-3-prevention-services-funding.pdf. The manual was last updated in July 2019. It must be revised with the expanded Title IV-E reimbursements for prevention services, granted by the FFPSA.

[8] *See* https://www.cebc4cw.org/topic/family-stabilization/

[9] For more information about FCT, *see* https://www.familycenteredtreatment.org/. Access Family Services and Carolina Outreach provide FCT to Durham County. See https://www.familycenteredtreatment.org/. Durham County DSS should widely utilize these services to prevent residential placements.

[10] *See* https://preventionservices.acf.hhs.gov/programs/399/show

[11] Sullivan, M. B., Bennear, L. S., Honess, K. F., Painter W. E., Jr., & Wood, T. J. (2012). Family Centered Treatment - An alternative to residential placements for adjudicated youth: Outcomes and cost effectiveness. OJJDP Journal of Juvenile Justice, 2(1), 25-40. https://www.ojp.gov/pdffiles/240461.pdf

[12] *Id*.

7

ii. A 2018 Maryland study indicated that FCT participants had a significantly lower risk of adult conviction and adult incarceration relative to youth who received group care.[13]

iii. A 2021 Maryland study indicated that every dollar spent on FCT saved the state $2.29 in out-of-home placement costs. The study focused on adjudicated delinquent youth who were treated with FCT instead of being sent to group homes. Within two years of receiving treatment, FCT youth had a significant decrease in adjudications while youth placed in group homes showed a significant increase in adjudications. Within a year of treatment, FCT youth had:

1. a 24% reduction in group home placements;

2. a 20% reduction in length of group home placements;

3. a 39% reduction in days spent in Pending (out-of-home) Placements; and

4. a 23% reduction in length of average Community Detention.[14]

d. **Homebuilders**[15]**.** Homebuilders provides intensive, in-home counseling, skill building and support services for families and children at risk of out-of-home placement, or who are in placement and cannot be reunified without intensive in-home services. Homebuilders practitioners collaborate with family members in developing intervention goals and corresponding service plans that address factors directly related to the risk of out-of-home placement. Homebuilders utilizes research-based intervention strategies including Motivational Interviewing, a variety of cognitive and behavioral strategies, and teaching families new skills to facilitate behavior change. Practitioners provide families with concrete goods and services related to the intervention goals, collaborating with community supports and systems, and teaching family members to advocate for themselves. Homebuilders is approved for Title IV-E funding.[16]

---

[13] Bright, C. L., Farrell, J., Winters, A. M., Betsinger, S., & Lee, B. R. (2018). Family Centered Treatment, juvenile justice, and the grand challenge of smart decarceration. Research on Social Work Practice, 28(5), 638-645. https://doi.org/10.1177/1049731517730127

[14] Sullivan, M. B., Bennear, L. S. (2021). A Quasi-experimental Evaluation of Family Centered Treatment® in the Maryland Department of Juvenile Services Community Based Non-residential Program: Child Permanency and Well-being. Family Centered Treatment Foundation. https://bit.ly/3wNw13Y.

[15] For more information about Homebuilders, *see* http://www.institutefamily.org/

[16] *See* https://preventionservices.acf.hhs.gov/programs/254/show

8

    i. A 1988 California study compared families receiving Homebuilders to families receiving usual CPS services. Results showed 74% of the Homebuilders children remained at home compared to 45% of the comparison group. Placement costs were also significantly lower for the Homebuilders group.[17]

    ii. A 1996 randomized controlled trial in Utah indicated that significantly more children receiving Homebuilders returned to their families within the 90-day program than did children receiving regular CPS services. Homebuilders children also returned in a shorter amount of time than did control children. At one-year postintervention follow-up, 70% of Homebuilders children remained home as compared to 47% of children in the control group.[18]

e. **Family Group Decision Making (FGDM).**[19] FGDM involves family groups in decision making about children who need protection or care. In FGDM processes, a trained coordinator who is independent of the case brings together the family group and agency personnel to create and carry out a plan to safeguard children and other family members. FGDM processes position the family group to lead decision making, and the statutory authorities agree to support family group plans that adequately address agency concerns. The statutory authorities also organize service providers from governmental and non-governmental agencies to access resources for implementing the plans.[20] FGDM is approved for Title IV-E funding.[21]

    i. A 2009 Texas study—comparing families receiving FGDM services to families that did not receive FGDM services—found that exits from care are faster if families participate in FGDM, and exits to reunification are increased. 32% of African-American children whose families attended an FGDM conference had returned home, relative to 11% whose families attended a Permanency Planning Team meeting. 40% percent of Hispanic children from families

---

[17] Wood, S., Barton, K., & Schroeder, C. (1988). In-home treatment of abusive families: Cost and placement at one year. *Psychotherapy, 25*(3), 409-414. Accessed at https://www.cebc4cw.org/program/homebuilders/

[18] Fraser, M. W., Walton, E., Lewis, R. E., Pecora, P. J., & Walton, W. K. (1996). An experiment in family reunification: Correlates of outcomes at one-year follow-up. *Children and Youth Services Review*, 18(4/5), 335-361. Accessed at https://www.cebc4cw.org/program/homebuilders/

[19] For more information about FGDM, *see* https://medschool.cuanschutz.edu/pediatrics/sections/child-abuse-and-neglect-kempe-center/our-work/national-center-on-family-group-decision-making-(fgdm)

[20] *See* "Family Group Decision Making in Child Welfare: Purpose, Values and Process." https://medschool.cuanschutz.edu/docs/librariesprovider68/default-document-library/fgdm-purpose-values-and-processes.pdf?sfvrsn=f9ee95ba_2

[21] *See* https://www.cebc4cw.org/program/family-group-decision-making/

9

participating in FGDM had returned home compared to 13% participating in traditional services. Parents and relatives were more satisfied with FGDM than standard practice, and relatives felt especially empowered by FGDM. Children are less anxious if their families participate in FGDM.[22]

ii. A 2006 Kent County, Michigan study tracked the County's attempts to use FGDM to divert children from regular foster care services and keep them within their extended families. Long-term outcomes of the 257 cases referred to the FGDM program showed that most of the children placed through FGDM remained outside the child welfare system. However, children remaining with legal guardians received significantly less financial assistance than they would have if they were placed in foster care or were adopted.[23] This result indicates a need to increase funding to families in addition to implementing FGDM.

iii. A 2003 Washington State study showed that after 6 months of receiving FGDM, fewer children were living with non-relatives and more children were living with their parents. Only 6.8% of the children were re-referred for alleged abuse and neglect in comparison with a statewide average of 8.1%. Placements also appeared to be stable with only 10.1% of children being placed in out-of-home care.[24]

iv. A 2000 Canadian study found that FGDM families reported half the number of maltreatment events after receiving FGDM, while families receiving traditional CPS services experienced increases in maltreatment events. The number of reports to and actions taken by CPS also fell for the FGDM group. Cases of mother/wife abuse also declined in FGDM group families and rose somewhat in traditional CPS families.[25]

---

[22] Sheets, J., Wittenstrom, K., Fong, R., James, J., Tecci, M., Baumann, D., J., & Rodriguez, C. (2009). Evidence-based practice in Family Group Decision-Making for Anglo, African American and Hispanic families. Children and Youth Services Review, 31, 1187-1191. Accessed at: https://www.cebc4cw.org/program/family-group-decision-making/

[23] Crampton, D., & Jackson, W. L. (2006). Family Group Decision Making and disproportionality in foster care: A case study. Child Welfare, 86(3), 51-69. Accessed at: https://www.cebc4cw.org/program/family-group-decision-making/

[24] Gunderson, K., Cahn, K., & Wirth, J. (2003). The Washington State long-term outcome study. Protecting Children, 18(1/2), 42-47. Accessed at: https://www.cebc4cw.org/program/family-group-decision-making/

[25] Pennell, J., & Burford, G. (2000). Family Group Decision Making: Protecting children and women. Child Welfare, 79(2), 131-158. Accessed at: https://www.cebc4cw.org/program/family-group-decision-making/

2. **Calendaring/Scheduling Reform in the AND Courtroom**

    a. Institute **time-slot scheduling** to conserve time of parent-attorneys and mitigate harms resulting from:

        i. The need for attorneys to be present throughout the day, at huge expense to taxpayers and expense to attorneys' ability to prepare in advance for court; contributes to burn-out and under-preparation by attorneys when they sit through court waiting for appearance.

        ii. Parents taking time off work, only to have their case continued.

    b. Consider usage of **virtual hearings** when appropriate, especially in hearings without live testimony, to mitigate time commitment and encourage parental participation.

        i. In a 2021 survey of virtual child welfare hearing practice during the COVID-19 pandemic, responses indicated, most notably, that virtual hearings facilitated greater attendance of parties by relieving transportation barriers and reduced delays by improving the ability to conduct hearings on time.[26]

    c. **Rotate Judges** in AND cases due to burn-out and overly-familiar relationships between judges and DSS/GAL teams.

    d. **End continuances as a general rule.** Reduce caseloads by identifying families that can receive services outside of court proceedings; establish much shorter time spans between court dates. These cases are urgent; treat them as urgent every time.

3. **Funding/Staffing - Attorneys Representing Parents**

    a. Increase pay for contract attorneys representing indigent parents. The County could cover additional funding.

    b. Provide funding for additional Assistant Parent Defenders.

---

[26] A. Summers & S. Gatowski (2021). Virtual (Remote) Hearings in Child Welfare Cases: Perspectives from the Field. Accessed at: https://www.researchgate.net/publication/351885759_Virtual_Remote_Hearings_in_Child_Welfare_Cases_Perspectives_from_the_Field ; *see also* National Center for State Courts (2022). Study of Child Welfare Hearings Facilitating Trauma-Responsive Virtual Hearings for Dependency Cases. Accessed at https://ncsc.contentdm.oclc.org/digital/collection/famct/id/1738/

i. Staffing is a critical factor in delivering high-quality legal representation. An adequately-staffed legal services office results in fewer delays to the court process, greater consistency in representation for the client, and opportunity to improve practice through training, experience, and oversight.[27]

ii. **Title IV-E Reimbursement for Legal Services for Parents, Children and Youth.** High quality legal representation and services that benefit the parents, children and youth are critical to supporting family and youth voice. DSS can claim title IV-E administrative costs of independent legal representation by an attorney for a child who is a candidate for title IV-E foster care or in foster care, and his/her parents to prepare for and participate in court proceedings. This will help ensure that, among other things, reasonable efforts are made to prevent removal and finalize the permanency plan, parents and youth are engaged in and understand their case plan, and compliance with case plans progress is appropriately reported.[28]

c. Provide more extensive spaces for attorneys to meet with parents in the Courthouse.

d. Appointment of counsel upon initiation of CPS investigation.

i. A growing body of empirical research found that early appointment of counsel–at or prior to a party's first appearance in court–improved case planning, expedited permanency, and decreased costs for state government.[29]

e. Continuing legal education requirements for attorneys to improve quality of representation

i. A 2012 study of three enhanced parent representation programs across the country found that providing parents with quality representation (1) reduces the time that children spend in foster care and leads to quicker permanency for children across all permanency

---

[27] ABA Center on Children and the Law (2020). E*ffects of Funding Changes on Legal Representation Quality in California Dependency Cases*. Accessed at: https://www.americanbar.org/groups/public_interest/child_law/project-areas/legal-representation/calrep-funding/

[28] U.S. Department of Health and Human Services Administration for Children and Families (2019). *Reshaping Child Welfare in the United States to Focus on Strengthening Families Through Primary Prevention of Child Maltreatment*. Accessed at: https://www.acf.hhs.gov/sites/default/files/documents/cb/im1903.pdf

[29] U.S. Department of Health and Human Services Administration for Children and Families (2017). *High Quality Legal Representation for All Parties in Child Welfare Proceedings*. Accessed at: https://www-media.floridabar.org/uploads/2017/09/High-Quality-Legal-Representation.pdf

12

outcomes, and (2) leads to faster and more successful family reunifications.[30]

   1. The findings of this study point to the conclusion that providing parents with high-quality representation can reduce the hard costs to local and state governments associated with extended foster-care placement.[31]

 f. **Interdisciplinary Representation Models** allow attorneys to collaborate with a team of professionals like social workers, parent advocates, investigators, and interpreters when representing parents involved with the child welfare system.[32]

   i. A multi-year study of the New York City child welfare system found that children of parents represented by an interdisciplinary team spent nearly four less months in foster care and achieved permanency, including reunification and guardianship, faster than children of parents represented by solo practitioner attorneys.[33]

   ii. A 2016 study of the children welfare proceedings in Flint, Michigan indicated that interdisciplinary representation supports case resolution and family preservation through a greater likelihood of case dismissal at adjudication, an increased likelihood of placement with relatives instead of foster care, and a decrease in termination of parental rights petitions.[34]

4. **Funding/Staffing - Non-Attorney**

 a. More social workers on Parent-side

 b. Improved compensation for DSS social workers to discourage turnover

---

[30] E. Thornton & B. Gwin (2012). High-quality legal representation for parents in child welfare cases results in improved outcomes for families and potential cost savings, *Family Law Quarterly*, *46*(1), 139-154.

[31] *Id.*

[32] Family Justice Initiative, https://15ucklg5c821brpl4dycpk15-wpengine.netdna-ssl.com/wp-content/uploads/sites/48/2020/03/fji-implementation-guide-attribute2-2.pdf

[33] L.A. Gerber, Y.C. Pang, T. Ross, M. Guggenheim, P.J. Pecora, & J. Miller (2019), Effects of an interdisciplinary approach to parental representation in child welfare. *Children and Youth Services Review*, *102*, 42-55. https://doi.org/10.1016/j.childyouth.2019.04.022

[34] R. Pott (2016). The Flint MDT Study: A Description and Evaluation of a Multidisciplinary Team Representing Children in Child Welfare, *in* Children's Justice: How to Improve Legal Representation of Children in the Child Welfare System 189, 203–04. Accessed at: https://www.researchgate.net/publication/318281229_The_Flint_MDT_Study_A_Description_and_Evaluation_of_a_Multidisciplinary_Team_Representing_Children_in_Child_Welfare

13

c. Funding schemes to incentivize the use of support staff to improve quality of representation.

    i. **The Iowa Parent Partner Approach**: Parent Partners are parents who have been in the child welfare system and have achieved reunification, or resolved parental terminations issues. Parent Partners provide one-on-one mentoring by providing advice, support, and encouragement to families whose children are currently involved with DHS in efforts to enhance their capacity to provide for and guide their children's healthy development. Parent Partners meet with families face-to-face as well as contact by phone. Parent Partners offer to be present as a support at Family Team Decision Making Meetings, staffings, and court appearances.

        1. Results indicated that the children of Iowa Parent Partner Approach participants were significantly more likely to return home at discharge from their foster care placement than the children of matched nonparticipants. Additionally, Iowa Parent Partner Approach participants were significantly less likely to have a subsequent child removal within 12 months of the child returning home than matched nonparticipants.[35]

  d. Creation of a representative for the express interests of the children involved (potentially above a certain age). GAL's represent the "best" interests of the child, rather than the "express" interest.

5. **Visitation/Family Time**

  a. **Increase in weekly visitation time.**

    i. Increasing evidence associates regular, meaningful family time for children in out-of-home care with several positive outcomes, including: (1) Enhanced parental engagement; (2) greater likelihood of reunification; (3) expedited permanency; (4) increased chances of reunification being sustained; (5) more meaningful connections to parents for older youth without reunification as permanency goal; and (6) improved emotional well-being for parents and children.[36]

---

[35] Chambers, J., Lint, S., Thompson, M. G., Carlson, M. W., & Graef, M. I. (2019). Outcomes of the Iowa Parent Partner program evaluation: Stability of reunification and re-entry into foster care. Children and Youth Services Review, 104, Article 104353. https://doi.org/10.1016/j.childyouth.2019.05.030

[36] U.S. Department of Health and Human Services Administration for Children and Families (2020). *Family Time and visitation for children and youth in out-of-home care*. Accessed at: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf

ii. Frequency of parental visiting is a strong predictor of family reunification.[37] For example, a 1996 study of reunification in a sample of 922 children aged 12 and younger found that children who were visited by their mothers were 10 times more likely to be reunited.[38]

b. Greater variety of locations available for visitation (recreational activity options in order to facilitate continued bonds)

i. The Wisconsin Department of Children and Families Ongoing Services Standards recommend that visits occur in the least restrictive setting and include parent attendance in regular parenting activities, like medical appointments and school events.[39]

c. Shifting supervision model towards a system that does not require supervision in every case, and does not require a social worker to supervise in every meeting

i. The presence of a social worker can affect the quality of the time a parent spends with his or her child. During such supervised visits, a parent may feel uncomfortable and have difficulty engaging with his or her child. [40]

d. Institution of DSS policies to discourage recommendations that end visitation

i. A parent's failure to attend a visit is not always indicative of a lack of interest–meeting family time schedules is sometimes difficult due to a variety of everyday challenges that may exist in the life of parents involved with the child welfare system. Ending or reducing family time as a form of punishment for noncompliance can set back parental progress.[41]

---

[37] Child Welfare Information Gateway. (2011). *Family reunification: What the evidence shows.* Washington, DC: U.S. Department of Health and Human Services, Children's Bureau. Accessed at: https://www.mncourts.gov/mncourtsgov/media/scao_library/CJI/family_reunification.pdf; Leathers S. J. (2002). Parental visiting and family reunification: could inclusive practice make a difference?. *Child welfare*, *81*(4), 595–616.

[38] Davis, P., Landsverk, J., Newton, R. (1996). Parental visiting and foster care reunification. *Children and Youth Services Review, 18*(4-5), 363–382. https://doi.org/10.1016/0190-7409(96)00010-2

[39] U.S. Department of Health and Human Services Administration for Children and Families (2020). *Family Time and visitation for children and youth in out-of-home care.* Accessed at: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf

[40] *Id.*

[41] *Id.*

6. **Training and Mentality Shifts**

    a. Consider models for trauma-informed courtrooms and processes. The adversarial model is a poor fit for these cases, and observers find that the judge affirms DSS decision in overwhelming majority of cases, reducing the efficacy of the adversarial model – how can we tweak this courtroom to make it more trauma-informed for all participants.

        o A statewide initiative in Connecticut combined workforce development, trauma screening, policy change, and improved access to evidence-based trauma-focused treatments, with a result of frontline staff reporting improvements, **including in understanding how trauma history can affect a parent's response to workers and children welfare system activities/mandates.**[42]

    b. Increased training on the impact of domestic violence and family violence on survivors, including parent victims of violence. Truly integrate trauma-informed approaches within DSS and courtroom.

    c. Watch the use of jargon in the courtrooms; many parents are confused by extensive use of acronyms and legal language

    d. Improved language justice, including increasing number of bilingual social workers, therapists, parental evaluation examiners, and interpreters

        o Interview subjects reported monolingual Spanish speakers having to undergo parental capacity evaluations and therapy through an interpreter.

    e. Convene conversations with stakeholders for vulnerable conversations about how this system is doing; and how it can be improved for everyone's benefit – especially children

    f. Adopt a Durham County resolution reaffirming that we are a "Family First County" – that we strive to keep children safe in their homes by

---

[42] Lang, J. M., Campbell, K., Shanley, P., Crusto, C. A., & Connell, C. M. (2016). Building Capacity for Trauma-Informed Care in the Child Welfare System: Initial Results of a Statewide Implementation. Child Maltreatment, 21(2), 113–124. https://doi.org/10.1177/1077559516635273

providing high levels of services; that when children must be removed as a last resort, our goal is prompt reunification; and that involuntary family separation is a tragedy that must be avoided with rigor; that our agency is charged with providing resources to keep families safe together

- *Prioritize this mentality in all hiring and training processes within the agency, especially in the selection of a new DSS director*

g. Reconsider the impact of negative drug screens on parents' rights – especially marijuana – given the racial justice movement to legalize marijuana and the fact that drug screens may not reveal the difference between illegal marijuana and legal hemp

7. **Requests for Data from Durham County**

- Collect and publish data on the following subjects for the last 10 years so that our community is aware of the contours of the situation
    - How many kids are separated from their parents annually
    - Race, gender, age demographics of those children
    - Are they placed in Durham or out of Durham?
    - Are they placed with kin or non-kin?
    - Are they kept with siblings?
    - What are average number of months/years until reunification?
    - What is percent reunification rate?
    - How many children are missing as runaways or otherwise in unknown location?
    - How many adoptions?
        - Were these voluntary or involuntary terminations of parental rights?
    - How many vacancies in DSS team?

8. **Additional Resources**

a. The U.S. Department of Health and Human Services, Administration for Children and Families has released information memorandums urging local agencies to initiate child welfare reform, including planning, implementing, and maintaining prevention programs to prevent unnecessary separations. See https://www.acf.hhs.gov/sites/default/files/documents/cb/im1903.pdf and https://familyfirstact.org/sites/default/files/ACYF-CB-IM-18-05.pdf

i. The Children's Bureau Regional Office Program Manager for North Carolina is:

      Shalonda Cawthon
      Region 4 - Atlanta
      shalonda.cawthon@acf.hhs.gov
      61 Forsyth Street SW, Ste. 4M60
      Atlanta, GA 30303-8909
      (404) 562-2242

b. Title IV-E Prevention Services Clearinghouse: https://preventionservices.acf.hhs.gov/
c. Family First Act: https://familyfirstact.org/ and https://imprintnews.org/finance-reform/chronicles-complete-guide-family-first-prevention-services-act/30043
d. California Evidence-Based Clearinghouse for Child Welfare: https://www.cebc4cw.org/
e. Child Welfare Information Gateway: https://www.childwelfare.gov/
f. Blind Removal Process: reducing racial disparities among children entering care: https://www.casey.org/blind-removals-nassau/
g. UNC School of Government's Manual on Abuse, Neglect, Dependency, and Termination of Parental Rights: https://www.sog.unc.edu/resources/microsites/abuse-neglect-dependency-and-termination-parental-rights/