# EXHIBIT 7

**73 Tul. L. Rev. 1287**

**Tulane Law Review**
March 1999

**Article**
Vernon Valentine Palmer [d1]

Copyright (c) 1999 Tulane Law Review Association; Vernon Valentine Palmer

# “MAY GOD PROTECT US FROM THE EQUITY OF PARLEMENTS”: [a1] COMPARATIVE REFLECTIONS ON ENGLISH AND FRENCH EQUITY POWER

This Essay argues that different constitutional structures and historical experiences have played a large role in the development of judicial equity. The comparison of English and French history offers two contrasting models for institutionalizing and containing judicial equitable power. England's experience led to a bicameral court structure that ultimately minimized equitable power as a source of constitutional friction and avoided protracted constitutional struggle. France's experience, by contrast, led to a long constitutional confrontation during the Ancien Régime between the parlements and the monarchy, which culminated at the French Revolution in the introduction of English equity's polar opposite, a system of “legislative equity.” Thereafter, constitutional mechanisms banished equity from the field of private law. This constitutional arrangement still has official support, but judicial equity has in modern times made a quiet return from exile.

| | | |
|---|---|---|
| I. | Introduction | 1287 |
| II. | The English Experience | 1288 |
| III. | The French Experience | 1292 |
| | A. The Parlements as Institutions | 1293 |
| | B. The Exercise of Equity in Private Law | 1294 |
| | C. Equitable Review of Legislation | 1297 |
| | D. The Rise of Legislative Equity | 1301 |
| IV. | Concluding Thoughts | 1306 |

## I. Introduction

It has been said that “[the] legal body or set of officials which ultimately holds the power to dispense equity and the degree to which this power is freely exercised may reflect the outcome of a long constitutional struggle.” [1] Though the forces completely differed and ***1288** the effects and timing were not the same, such a struggle occurred in both England and France. By the sixteenth century, the English had isolated and concentrated equity within a bicameral court structure. [2] The battle between the judges and the King's Chancellor had been fought and decided in favor of the Chancellor. The regular courts often disowned the need for equity in their own system and refused to temper the common law by making reasonable exceptions and adjustments, but the chancellor's court was permitted to correct the deficiency of the common law. [3] This dual structure of unwritten law contrasted completely with the solution reached in France at the time of the Revolution.

Whereas throughout the Ancien Régime the regular courts had embraced equitable decisionmaking, they were now accused of having done so excessively and of overstepping the bounds of proper tribunals. [4] The revolutionary legislature now struck hard and amputated the functions of ordinary courts, stripping them of all discretionary equitable powers. [5] The legislature seized and henceforth reserved these powers for itself. Equity in France was thereafter to be a written legislative equity, a monopoly to which regular courts were subordinated. [6] The French rebelled against judicial equity and instituted a system of legislative control over it. Thus, the approaches of England and France were and are radically different--the products of two distinct constitutional experiences.

It was already part of the folk wisdom of the sixteenth century to distrust the equity of the parlements. A well-known proverb declared, “May God preserve us from the equity of Parlements.”[53] The adage still communicates to us something of the suffering of the people at the hands of judges who abused the proper functioning of a court. One difficulty in understanding the proverb, however, is that it only expresses an attitude without disclosing the precise objection.

If I may speculate to some extent, the underlying objection was probably the very general belief or perception that the equity of the parlements (meaning the power to judge en équité) was arbitrary and partial, subjective and unpredictable. This may not be an unfamiliar complaint about judicial equity in other legal systems,[54] but in France the complaint circulated far and wide in the form of a proverbial refrain. My own view is that the French people's impression was sharply intensified by two factors. First, the rationality of equity was not and could not be explained or revealed to the lay world because the parlements operated in total secrecy. The judges were under a sworn duty not to reveal the grounds of decision.[55] Thus, the entire reasoning ***1297** that justified transforming the existing law was kept from the public. The real motives of the judges must have been a combination of speculation and rumor. In contrast, the English Chancellors operated an open court and pronounced reasons for their decrees.

Second, the parlements' equity was, in all likelihood, intensely resented as an interference with the cherished general and local customs, which dotted the countryside of pre-Revolutionary France. There is no surprise that the people's reverence for their own customs was somewhat blind to the advantages of equitable rulings, which, as stated earlier, could hardly express their superior rationality. “The Normans,” wrote Chancellor D'Aguesseau, “are accustomed to respect their customary law like the gospel; and a change of religion would perhaps be easier to introduce in Normandy than a change of jurisprudence.”[56] The proverb may have been the lament of people in the process of losing part of their identity.

### C. Equitable Review of Legislation

The most grandiose of the prerogatives claimed by the parlements was the power to review royal legislation prior to its inscription. The parlement's refusal to register laws that it deemed inequitable or unconstitutional operated as a kind of legislative veto, and made the parlements a second constitutional force in the Ancien Régime. Their powers of verification and remonstrance entailed use of a vast political discretion, surely one capable of advancing equity, but equally capable of disregarding it except in name. The parlements might oppose royal absolutism with enlightened reasons or simply with an absolutism of their own.

Equitable review of the laws was, of course, a more contested right than the parallel right of the parlements to judge en équité. As seen earlier, the constitutional power to decide cases in accordance with equity was probably at its maximum strength when used to modify customary law, to receive Roman Law in custom's place, to ***1298** interpret legislation, or to fashion new arrêts de réglement.[57] In these areas the courts' creative work, while not necessarily popular or well understood, usually had the implicit backing of the King.[58] In the process of verification and remonstrance, however, these discretionary powers knew no boundaries or standards and became a great source of political friction.[59]

Because the Kings never overtly recognized the parlements' power to suspend registration while issuing remonstrances, it may be asked where this power came from. We know that it was formally interdicted by ordinance as early as 1566,[60] and it was temporarily repressed during the reign of Louis XIV.[61] Constitutionally speaking, a delegation of power from the King was not the origin of these pretensions. It seems accurate to say that the parlements simply appropriated this power through a combination of fait d'accompli, civil disobedience, prescription, and acquiescence, despite the use of every means at the King's disposal to prevent its extension.[62] The historical facts are somewhat difficult to interpret because there was a great gap between theory and practice. Whatever the Kings officially declared or refused to recognize in theory, in practice they finally gave in and submitted all laws to verification by the parlements.[63]

This gradual coup d'etat runs contrary to facile assumptions about the absolute powers of the King. France was far from having royal absolutism in which the King's right to command and the corresponding duty to obey were unlimited. It was a system, more properly speaking, of limited monarchy (“une monarchie temperée” according to Pierre Goubert) in which the King himself was bound by the constitution and fundamental laws, even though the constitution was unwritten and coutumière.[64] Within an ill-defined constitutional ***1299** framework, the parlement system became a counterforce capable of containing, restraining or, at the least, deflecting the King's fiat.


© 2024 Thomson Reuters. No claim to original U.S. Government Works.