# EXHIBIT 8

# THE ELIZABETHAN COURT OF CHANCERY

BY
W. J. JONES
*University of Alberta*
*Edmonton*

CLARENDON PRESS
OXFORD
1967

AF-JGM Document 14-8 Filed 1

increasingly to the practice of commissioning outsiders and the habit of holding sittings at the Rolls became a characteristic of the Elizabethan court. The Rolls court was a regular feature from 1571 or thereabouts, and many Chancery orders are to be found endorsed with a note that the case had been heard there. By 1616, the Rolls was open three times a week for hearings and motions. Although some litigants were initially dissatisfied when their affairs were heard at the Rolls,[1] a hearing there was regarded as formal as any in open court and attorneys were expected to be present.[2]

Inevitably there were a number of occasions on which temporary measures were necessary, either because there was a vacancy in the position of Lord Chancellor, or because he was incapacitated through ill-health. In these circumstances it was normal to empower a commission, in which the Master of the Rolls was supported by Masters and other lawyers, to hear Chancery cases. In 1559 for instance, a commission was issued during the illness of Lord Keeper Bacon.[3] This kind of arrangement was not normally required after the death of a Lord Chancellor, but it was often necessary for the sovereign to commission some of her leading advisers to apply the Great Seal. However, in the long vacancy after Hatton's death, two commissions were appointed: one had the task of applying the Seal and the other, headed by the Master of the Rolls, was appointed to hear cases.[4] Commissions issued on two other occasions fulfilled a somewhat similar function. In 1529, four months before Wolsey's fall, a commission was issued to twenty persons, including both judges and Masters, an action which symbolized the collapse of the Cardinal Chancellor's health and influence.[5] Of more interest is the semi-permanent arrangement utilized between 1596 and 1603, when Egerton was both Lord

[1] *CSP Dom. Add.* 1566–79, pp. 429–30.

[2] Lansdowne 163, ff. 211, 212v. In 1516–17, commissions were issued to hear bills of complaint from poor people. The courts thus empowered were those of the Whitehall, the King's Almoner, the Lord Treasurer's chamber, and the Rolls in the afternoon. The latter place seems to have been busy for a time, but it suffered from characteristic delays. Few conclusions were reached, and even when a settlement was ordered there was no guarantee that it had any legal validity. There seems to be no reason to suppose that this court held at the Rolls had any institutional connexion with the later court which was held there as an overflow from Chancery. El. 2810.

[3] El. 2810. [4] Cf. above, p. 45.

[5] 5 Foss, p. 85. *L. and P.H. VIII*, iv. pt. 3, No. 5666.

LAF-JGM Document 14-8 Filed 1

The opportunities for an effective demurrer were limited, and this doubtless explains some of the dismissions to other courts which were directed once an issue had been reached in Chancery. But there was no alternative. Evidence of which the court knew nothing and which was not on oath could not be handled in a summary fashion.

In so far as it rested on the assertions made by the plaintiff, the demurrer was a pleading which dealt in the obvious. It was, however, notorious as a delaying tactic. At various times in the middle of the sixteenth century and again in the Stuart period, it was held that costs could not be obtained when a demurrer was rejected because the truth of the matter had not been tried. Egerton, however, tried to discourage defendants from a facile resource to this pleading, and he was willing to grant costs, particularly against defendant's counsel, if a demurrer was submitted containing 'many matters of fact and other things frivolous and vain'.[1]

The hearing of a demurrer, which could lead to the defendant's discharge, was given priority on those days when the court was sitting to give orders. The decision, while theoretically in open court, was in the Elizabethan period usually based on the report of a Master to whom the demurrer had been referred and who had listened to the arguments of counsel. Even at this time, however, the Masters were not regarded as competent to handle a question of jurisdiction if it rested on a straight point of law, and in this eventuality it was customary to call upon the opinions of common law judges.[2] Francis Bacon, who in any case responded to current doubts about the jurisdictional implications of the system of references in general, attempted to do away entirely with the habit of submitting demurrers to the Masters, and he ordered that these pleadings should always be examined and ordered in open court.[3]

---

Edward Hoby, alleged that the marriage claimed on the behalf of the plaintiff, widow of Sir Humphrey Gilbert, was dissolved by virtue of a 'pre-contract'. This, noted Matthew Carew, 'unlooseth *vinculum matrimonii* and maketh the marriage void, so as they be not man and wife together'.

[1] Cary 27, *Hill's Case* (1603). C38/4, *Cotton* v. *Lloyde* and *Adderley* v. *Hollins* (1601).

[2] Monro, p. 702, *Throckmorton* v. *Fynch* (1597). C38/2, *Baker* v. *Robinson* (1597).

[3] 1 Sanders, i. 117. There seems to have been an idea that this would discourage suitors from exhibiting demurrers. Hargrave 227, f. 249. For a discussion of later developments, cf. *Nottingham's Chancery Cases*, i. xlv.

LAF-JGM Document 14-8 Filed 12