# EXHIBIT 11

PAUL D. HALLIDAY

# Habeas Corpus

*From England to Empire*

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2010

This One
E3P6-RGU-40S3
Copyrighted material

practice in most cases up to that time. Another way to put this is that factual demands made by the writ increased in order to answer the greater legal demands the writ now expressed. The legality of imprisonment came to be concerned increasingly with the precise factual circumstances of the arrest and the factual matter that established the jurisdiction of the tribunal that ordered the detention. As we shall see in Chapter 4, demanding and receiving more facts, and better articulated facts, would encourage greater creativity by the justices of King's Bench in the decades ahead as they read deeply into the returns they received, and far beyond them too.

### Hearing the Return

Lowe's writ required that the cause of his commitment be returned on October 12, 1605, the day after his writ issued. The court showed it meant business by moving quickly, and by indicating that simply sending the return was not enough—his body had to be brought as well.[65] Though not always. Variations in time and place of return, detailed in the writ, indicate judicial innovation and flexibility, especially during the last years of the sixteenth century and the first years of the seventeenth, when Sir John Popham presided.

Writs might require that the return be made on a particular date, "immediately after receipt," or "promptly"; in term or during vacation; and in court or to a particular justice's chambers, home, or somewhere else altogether. Before 1592, when Popham became chief justice, 93 percent of writs whose return dates may be ascertained were ordered returned on a specific date that was usually some days, even weeks, in the future. During Popham's and Fleming's tenure as chief justices (1592–1613), by contrast, the number of writs issuing with the demand that they be returned "immediately after receipt"—typically taken to mean the day of issuance or the next—jumped from 8 percent to one half. This rate continued until the passage of the Habeas Corpus Act of 1679, after which nine out of ten writs contained this requirement.[66] This is one of the few areas in which the Habeas Corpus Act had a clear influence on practice, though a vigorous chief justice like Popham could have as great an influence without statutory help.

We can chart a similar increase in orders requiring that returns be made to individual justices in chambers. Prior to 1592, only one in ten

Copyrighted material

writs contained directions to send the return to a justice in chambers, while more than half contained this requirement when Popham and Fleming were in charge.[67] This shift should not surprise us, since writs issued for return in chambers—which were often issued during court vacations, but might also be sent during term—usually issued with a demand for immediate return.[68] The command to return to chambers in term might have been used to underline judicial anger in cases when the justices had to send multiple writs (alias and pluries) to get a return, especially when the receiving jurisdiction claimed to be exempt from Queen's Bench oversight.[69] Orders to return to a single justice—usually the chief justice—might also issue when a return had already been delayed, or on the last day of term, when there would be no time to put the return before the whole court without waiting until the next term.[70] Chambers usage would continue after Fleming's death, though not at the same rate.[71] In a similar vein, during Popham's tenure and afterward there are signs of even more creative return locations, for instance to a justice in the country, often as a matter of convenience while justices rode their assize circuits.[72]

Some objected to making returns to habeas corpus to justices in chambers. During parliamentary debates in 1674 on a proposed bill to amend habeas usage, one speaker complained that the review of returns had always been done in "public . . . but now 'tis done in private chambers; in the Court there is consideration and debate, and Counsel heard on all sides."[73] Who knew what went on when a justice was at home or in his rooms in Serjeants' Inn? A survey of chambers returns in the 1670s indicates that something different did happen when justices worked behind closed doors. From 1500 to 1800, just over one-fifth of cases were ordered returned in chambers.[74] Whereas during this period the average rate of bail or discharge for all prisoners using habeas corpus was 53 percent, the rate rose to 79 percent for those whose writs were returned in chambers. One explanation might be that writs returnable to chambers tended to issue in cases that may have concerned more dubious imprisonment orders: perhaps it was just this that inspired justices to act during vacation. But part, or all, the explanation for this release rate may have arisen from the capacity of judges to act independently when out of view.

That high release rates on chambers writs may have resulted from

Copyrighted material