# EXHIBIT 19



# “If I Wasn’t Poor, I Wouldn’t Be Unfit”

## The Family Separation Crisis in the US Child Welfare System

HUMAN RIGHTS WATCH

ACLU

# “If I Wasn’t Poor, I Wouldn’t Be Unfit”

## The Family Separation Crisis in the US Child Welfare System

Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 3 of 12

NOVEMBER 2022

ISBN: 979-8-88708-015-4

# "If I Wasn't Poor, I Wouldn't Be Unfit"

## The Family Separation Crisis in the US Child Welfare System

**Summary** ........ 1

**Key Recommendations** ........ 12

**Methodology** ........ 14

**I. Background: Key Developments in the US Child Welfare System** ........ 23

Chattel Enslavement, 1619-1865 ........ 23

Children's Aid Society, Orphan Train Movement, 1850s ........ 24

Other Early Systems ........ 25

Punishment Over Support: Child Abuse Prevention and Treatment Act, 1974 ........ 27

Prioritizing Family Preservation: The Adoption Assistance and Child Welfare Act, 1980 ........ 28

Undermining Family Reunification: Adoption and Safe Families Act, 1997 ........ 29

"Emphasizing" Prevention: Family First Prevention Services Act, 2018 ........ 30

System Today: Federal and State Roles and Responsibilities ........ 31

**II. The US Child Welfare System's National Impact** ........ 32

Child Welfare Involvement by the Numbers ........ 33

Most Reported Cases Involve Neglect, Not Abuse ........ 34

Harm to Black Families ........ 38

**III. Harm to Indigenous Communities** ........ 41

Indian Boarding Schools, 1810s-1969 ........ 41

Indian Adoption Project, 1958-1967 ........ 42

Indian Child Welfare Act (ICWA), 1978 ........ 43

Disproportionate Harm to Indigenous Families ........ 44

Supreme Court's Review of ICWA: *Brackeen v. Haaland* ........ 45

**IV. The Experience of "Family Regulation"** ........ 47

Reporting Not Supporting: How Child Welfare Involvement Begins ........ 49

"Rupturing the Village": Investigations ........ 56

Families Torn Apart: Removals ........ 70

Living in Limbo: Court Ordered Removal and Service Plans ........ 76

Family Surveillance: Visitation, Supervision, and the Role of Caseworkers ........ 79

Determining the Family's Fate: Reunification or Termination of Parental Rights ......................82

**V. Equating Poverty with Parental Unfitness ........................................................... 89**

Housing Instability as Evidence of Parental Unfitness ..........................................................90

Inadequate Resources as Evidence of Parental Unfitness .....................................................95

**VI. Substance Use as Evidence of Parental Unfitness ........................................................ 101**

Indiscriminate Punishment............................................................................................... 102

Intervening at Birth ........................................................................................................ 104

Barriers to Reunification.................................................................................................. 107

Undermining Substance Use Recovery ............................................................................ 109

**VII. Punishing Poverty........................................................................................................111**

Exacerbating Poverty......................................................................................................... 111

Impact on Children, Intergenerational Harms .......................................................................117

**VIII. Due Process Concerns.................................................................................................. 121**

Lack of Information on Rights .............................................................................................121

Caseworkers' Conflicting Responsibilities .......................................................................... 123

Inadequate Legal Protections ........................................................................................... 124

Consequences of Being Placed on a Registry...................................................................... 125

**IX. International Human Rights Law and United States Law ..............................................129**

Child Rights and Family Separation.................................................................................... 129

Right to Family and Privacy, Protection Against Arbitrary or Unlawful Interference ..................131

Right to Equal Protection ................................................................................................. 132

Rights to Equality Before Courts and a Fair Trial ...................................................................135

Right to an Adequate Standard of Living...............................................................................135

Right to Health.................................................................................................................. 136

**X. Conclusion .......................................................................................................................139**

**Recommendations ...........................................................................................................140**

**Acknowledgments.............................................................................................................146**

**Appendix I: Response from the New York City Administration for Children's Services (ACS), February 1, 2022 ...................................................................................................................148**

**Appendix II: Response from the Los Angeles County Department of Children and Family Services (DCFS), February 16, 2022 ....................................................................... 161**

# II. The US Child Welfare System's National Impact

The child welfare system in the United States disproportionately investigates and removes children from over-policed, underserved communities, especially Black and Indigenous children and those living in poverty.[50] One in three children in the US will be subjected to a child welfare investigation by age 18, and every three minutes a child is removed from their home and placed in the foster system.[51] Black children are almost twice as likely to be investigated as white children and are more likely to be separated from their families.[52]

Neglect, as defined by the child welfare system, is often a proxy for poverty-related circumstances and is the primary reason for child welfare involvement in the overwhelming majority of cases.[53]

Nationwide, nearly 75 percent of confirmed child maltreatment cases in 2019 involved neglect as defined by state statutes.[54] Parental substance use is the second most common reason, alleged in around 34 percent of child removal cases in 2019.[55] Serious forms of abuse, like physical and sexual abuse, are associated with a smaller portion of cases.

---

50 Alan J. Dettlaff and Reiko Boyd, "Racial Disproportionality and Disparities in the Child Welfare System: Why Do They Exist, and What Can Be Done to Address Them?" *The ANNALS of the American Academy of Political and Social Science*, vol. 692, no. 1 (2020): accessed October 24, 2022, doi:10.1177/0002716220980329.

51 Hyunil Kim, Christopher Wildeman, Melissa Jonson-Reid, and Brett Drake, "Lifetime Prevalence of Investigating Child Maltreatment Among US Children," *American Journal of Public Health* (2017): accessed October 24, 2022, doi:10.2105/ajph.2016.303545; US Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau, "The AFCARS Report: No. 27, Preliminary Estimates for FY 2019 as of June 23, 2020," 2020, https://www.acf.hhs.gov/sites/default/files/documents/cb/afcarsreport27.pdf (accessed October 24, 2022), p. 1.

52 Kim et al., "Lifetime Prevalence of Investigating Child Maltreatment Among US Children," pp. 274–280; Kathryn Maguire-Jack, Sarah A. Font, and Rebecca Dillard, "Child Protective Services Decision-Making: The Role of Children's Race and County Factors," *American Journal of Orthopsychiatry*, 90 (1) (2020): accessed October 24, 2022, doi:10.1037/ort0000388.

53 The legal definition of neglect used in the child welfare context is very different from the scientific definition of neglect which is characterized as the persistent absence of responsive caregiving that threatens development and well-being, especially in young children. *See*, National Scientific Council on the Developing Child, *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain: Working Paper No. 12*, 2012, https://developingchild.harvard.edu/resources/the-science-of-neglect-the-persistent-absence-of-responsive-care-disrupts-the-developing-brain/ (accessed October 24, 2022); Sarah Catherine Williams, Reva Dalela, and Sharon Vandivere, "In Defining Maltreatment, Nearly Half of States Do Not Specifically Exempt Families' Financial Inability to Provide," post to "Child Trends" (blog), February 24, 2022, https://www.childtrends.org/blog/in-defining-maltreatment-nearly-half-of-states-do-not-specifically-exempt-families-financial-inability-to-provide (accessed October 24, 2022).

54 Children's Bureau, "Child Maltreatment 2019," January 14, 2021, https://www.acf.hhs.gov/cb/report/child-maltreatment-2019 (accessed October 24, 2022).

55 Children's Bureau, "The AFCARS Report: No. 27," p. 2.



Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 6 of 12

More than four-fifths of all child removal cases were not based on physical abuse. Fewer than one out of ten involved sexual abuse.

## Child Welfare Involvement by the Numbers

Nearly 8 million children were referred to a child maltreatment hotline in 2019.[56] Nearly half of these reports were not selected for investigation or assessment by child protective services because they did not meet the requirements for a child maltreatment investigation.[57]

Of the 3 million children whose cases were investigated, more than 80 percent were found not to have been abused or neglected.[58]

More than 250,000 children entered the foster system each year from 2016 to 2019.[59] In 2019, there were nearly 61,000 children whose parents had their parental rights terminated. At the end of each year from 2016 to 2019, between 65,000 and 72,000 children whose parents' rights were terminated, also known as "legal orphans," were awaiting adoption, resulting in tens of thousands of children with severed family bonds and no permanency.[60]

| Table 1: Summary of Foster System During Fiscal Year 2019 | |
|---|---|
| **Number of children impacted by investigation** | 3,461,394 |
| **Number of children with substantiated allegations** | 651,513 |
| **Number of children with substantiated "neglect only" allegations** | 352,198 |
| **Number of children in the foster system** | 672,687 |

[56] Children's Bureau, "Child Maltreatment 2019: Summary of Key Findings," April 2021, https://www.childwelfare.gov/pubpdfs/canstats.pdf (accessed October 24, 2022), p. 2.

[57] Ibid.

[58] Ibid.

[59] Children's Bureau, "The AFCARS Report: No. 27," p. 1.

[60] Ibid.



Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 7 of 12

| | |
|---|---|
| Number of children who entered foster system in 2019 | 251,359 |
| Number of children whose parents' rights were terminated in 2019 | 60,873 |
| Number of children with parents' rights terminated awaiting adoption at the end of 2019 | 71,335 |
| Number of children adopted in 2019 | 66,035 |
| Number of children reunited with parent(s)/caretaker | 118,564 |
| Number of children reunited with parent(s)/caretaker in ‹6 months | 39,102 |
| Number of children legally emancipated | 20,816 |

Source: Human Rights Watch analysis of Adoption and Foster Care Analysis and Reporting System (AFCARS) FY 2019 data and National Child Abuse and Neglect Data System (NCANDS) Child File, FY 2019, Children's Bureau, Administration on Children, Youth and Families, Administration for Children And Families, US Department Of Health And Human Services, 2019.

## Most Reported Cases Involve Neglect, Not Abuse

Most child removals for maltreatment by the US child welfare system do not involve acts of physical abuse. More than 80 percent of the children who were removed from their families between 2015 and 2019 were due to other reasons.[61] Instead, the primary reason child welfare agencies remove children is neglect, followed by substance use, subjectively deemed to place the child at risk of harm.[62]

In public health terms, neglect is often characterized as the persistent absence of responsive caregiving that threatens development and well-being, especially in young children.[63] The legal definition of neglect used in the child welfare context is much broader. Child welfare laws typically define neglect as the failure by a parent or caregiver

---

[61] Children's Bureau, AFCARS Reports 23-27, FY2015-FY2019 data, available at "Adoption & Foster Care Statistics," https://www.acf.hhs.gov/cb/research-data-technology/statistics-research/afcars (accessed October 24, 2022).

[62] "Circumstances Associated with Child's Removal: Neglect 63%, Drug Abuse (Parent) 34%," Children's Bureau, "The AFCARS Report: No. 27," p. 2.

[63] National Scientific Council on the Developing Child, "The Science of Neglect."

to provide adequate food, clothing, shelter, medical care, or supervision for the child in ways that threaten the child's well-being. This definition is inextricably linked to poverty, and in practice opens the door to unjustified system intrusion by penalizing the kinds of compromises people living in poverty often must make,[64] as described further in this report.

In 2019, states reported nearly 75 percent of confirmed child maltreatment cases involved neglect as defined by state statutes.[65] Just under 18 percent involved physical abuse, and around 9 percent involved sexual abuse.[66] Some cases involved more than one factor.[67]

There is substantial variation among the states examined in this report regarding neglect findings. Neglect was a factor for 95.5 percent of the children for whom child welfare agencies substantiated maltreatment findings in New York, 88.9 percent of children in California, 74.8 percent of children in Oklahoma, and 39.5 percent of children in West Virginia.[68] These differences are in part due to the lack of standardization in the definitions of abuse or neglect (both as written and as applied), in states' methods for coding maltreatment types, and in reporting and coding in the national database.[69]

---

64 Kelley Fong, "Getting Eyes in the Home: Child Protective Services Investigations and State Surveillance of Family Life," *American Sociological Review*, vol. 85, no. 4 (2020): accessed on October 24, 2022, doi:10.1177/0003122420938460, pp. 610-638.

65 Children's Bureau, "Tables 3-9 Maltreatment Types of Victims 2019 (Categories)" in "Child Maltreatment 2019," p. 47.

66 Ibid.

67 Neglect made up 61 percent of cases where only one factor was identified. See, Human Rights Watch analysis of 2019 NCANDS Child File.

68 Ibid.

69 Department of Health and Human Services, Administration for Children and Families, Children's Bureau, "Children of Color in the Child Welfare System: Perspectives from the Child Welfare Community," 2003, https://www.childwelfare.gov/pubs/otherpubs/children/implications/ (accessed October 24, 2022).



Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 9 of 12

Table 2. Percentage of Maltreatment Allegations Coded as Neglect, by State

## Variation in State Coding of Maltreatment Allegations

Top and bottom 10 states according to the percentage of allegations coded as neglect, FY 2019. Percentage of all maltreatment allegations within state.

| State | Neglect or Deprivation of Necessities | Physical Abuse | Sexual Abuse |
|---|---|---|---|
| Montana | 98.1% | 0.8% | 0.5% |
| Kentucky | 91.5% | 5.0% | 1.4% |
| New York | 90.9% | 1.1% | 0.8% |
| Massachusetts | 87.9% | 8.8% | 2.4% |
| South Dakota | 87.7% | 8.7% | 2.5% |
| Indiana | 83.6% | 9.3% | 7.1% |
| Idaho | 83.3% | 16.6% | 0.1% |
| North Carolina | 82.9% | 7.1% | 4.2% |
| Arizona | 82.0% | 15.1% | 2.4% |
| Georgia | 81.5% | 7.5% | 1.6% |
| Delaware | 45.3% | 32.7% | 11.4% |
| Ohio | 45.2% | 41.4% | 9.5% |
| Oregon | 44.4% | 14.5% | 3.4% |
| Kansas | 40.4% | 27.1% | 8.4% |
| South Carolina | 39.3% | 28.3% | 3.3% |
| Alabama | 37.6% | 48.8% | 12.5% |
| Tennessee | 35.4% | 43.9% | 11.5% |
| Utah | 23.2% | 45.1% | 15.5% |
| Pennsylvania * | 4.8% | 68.3% | 20.7% |
| Vermont | 3.8% | 66.6% | 26.2% |

* Pennsylvania lists most neglect allegations in a separate category known as "General Protective Services." These allegations are not reported to the federal NCANDS database and so are not included here.
Note: Columns may not add up to 100 percent because the table only includes these three maltreatment types and excludes any others. Hawaii, Missouri, and Iowa excluded due to reporting anomalies.
Source: Human Rights Watch analysis of National Child Abuse and Neglect Data System (NCANDS) Child File, FY 2019.

### *Defining Neglect*

Legal definitions of neglect in federal and state laws and regulations are broad and often vague, and do not require establishing that a child has suffered physical or emotional harm.[70]

Federal laws provide the minimum standards for child abuse and neglect. The Child Abuse Prevention and Treatment Act defines child abuse and neglect as "any recent act or failure to act on the part of a parent or caregiver that results in death, serious physical or emotional harm, sexual abuse, or exploitation, or an act or failure to act which presents an imminent risk of serious harm."[71]

States have the authority and discretion to further define child abuse and neglect in civil statutes governing the child welfare system. States specify the conduct and omissions that must be reported and mandate policies and procedures for responding to allegations of child maltreatment. Criminal statutes define types of child maltreatment subject to criminal prosecution.[72] Due to differences between states, conduct defined as abuse and neglect in one state may not be actionable in another.[73]

All states include at least one poverty-related factor in their legal definition of child maltreatment.[74] These factors include inadequate food, clothing, shelter, medical care, hygiene, nutrition, and supervision. For example, California, New York, Oklahoma, and West Virginia all include failure to provide food, clothing, shelter, or supervision in their definition of neglect.[75] Caseworkers have broad discretion to interpret whether these

---

[70] Diane L. Redleaf, "Narrowing Neglect Laws Means Ending State-Mandated Helicopter Parenting: How Broad Neglect Laws Undermine Childhood Independence, and a Review of Legislative Efforts to Address It," *American Bar Association*, September 11, 2020, https://www.americanbar.org/groups/litigation/committees/childrens-rights/articles/2020/fall2020-narrowing-neglect-laws-means-ending-state-mandated-helicopter-parenting/ (accessed October 24, 2022).

[71] CAPTA Reauthorization Act of 2010, Public Law 111-320; 42 U.S.C. § 5101, Note (§ 3).

[72] Child Welfare Information Gateway, "Definitions of Child Abuse and Neglect," May 2022, https://www.childwelfare.gov/pubpdfs/define.pdf (accessed October 24, 2022).

[73] Frank Edwards, "Why U.S. States Vary In Their Responses To Child Abuse And Neglect," Scholars Strategy Network, April 5, 2017, https://scholars.org/contribution/why-us-states-vary-their-responses-child-abuse-and-neglect (accessed October 24, 2022), citing Frank Edwards, "Saving Children and Controlling Families: Punishment, Redistribution, and Child Protection," *American Sociological Review*, 81 (3) (2016): accessed October 24, 2022, doi:10.1177/0003122416638652, pp. 575–595.

[74] Williams et al., "In Defining Maltreatment, Nearly Half of States Do Not Specifically Exempt Families' Financial Inability to Provide."

[75] SCAN Policies Database, comparison of the state child abuse and neglect definitions and policies in California, New York, Oklahoma, and West Virginia, 2021, https://www.scanpoliciesdatabase.com/explore-



Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 11 of 12

factors present a risk to children that meets the state-defined threshold, leading to unnecessary family separation, as described below.

## Harm to Black Families

The child welfare system exists at the cross-section of entrenched economic inequality and systemic racism in the US. Income and wealth inequality in the US has steadily worsened since 1980.[76] Due to systemic racism and other factors, families of color disproportionally face economic hardships.[77] In 2018, Black children were more than three times as likely to be living in poverty as white children.[78]

The wealth gap between Black and white families in the US was the same in 2016 as it was in 1968, and data suggests that it has increased since the start of the Covid-19 pandemic.[79]

An extensive body of research has examined the factors contributing to these disparities.[80] Discriminatory and racist policies and practices rooted in the legacy of enslavement have subjected Black families to residential segregation, housing discrimination, discriminatory exclusion from employment opportunities, and limitations to social benefits and safety

---

data?state%5B1671%5D=1671&state%5B1699%5D=1699&state%5B1703%5D=1703&state%5B1716%5D=1716&domain=275&var=0 (accessed October 21, 2022).

[76] Juliana Menasce Horowitz, Ruth Igielnik, and Rakesh Kochhar, "Trends in income and wealth inequality," *Pew Research Center*, January 9, 2020, https://www.pewresearch.org/social-trends/2020/01/09/trends-in-income-and-wealth-inequality/ (accessed October 26, 2022); Aimee Picchi, "The new Gilded Age: 2,750 people have more wealth than half the planet," *CBS MoneyWatch*, December 7, 2021, https://www.cbsnews.com/news/wealth-inequality-billionaires-piketty-report/ (accessed October 26, 2022).

[77] Aditya Aladangady and Akila Forde, "Wealth Inequality and the Racial Wealth Gap," *FEDS Notes, Washington: Board of Governors of the Federal Reserve System*, October 22, 2021, accessed October 26, 2022, doi:10.17016/2380-7172.2861; Alliance for Children's Rights, "The Path to Racial Equity in Child Welfare: Valuing Family and Community," 2021, https://allianceforchildrensrights.org/wp-content/uploads/REJPS_summit_report.pdf (accessed October 26, 2022).

[78] Children's Defense Fund, "Child Poverty in America 2019: National Analysis," 2020, https://www.childrensdefense.org/wp-content/uploads/2020/12/Child-Poverty-in-America-2019-National-Factsheet.pdf (accessed October 26, 2022).

[79] Heather Long and Andrew Van Dam, "The black-white economic divide is as wide as it was in 1968," *Washington Post*, June 4, 2020, https://www.washingtonpost.com/business/2020/06/04/economic-divide-black-households/ (accessed October 26, 2022); Catarina Saraiva, "Black-White Wealth Gap Getting Worse, 160 Years of US Data Show," *Bloomberg*, June 7, 2022, https://www.bloomberg.com/news/articles/2022-06-07/black-white-wealth-gap-getting-worse-160-years-of-us-data-show#xj4y7vzkg (accessed October 26, 2022).

[80] Dettlaff and Boyd, "Racial Disproportionality and Disparities in the Child Welfare System: Why Do They Exist, and What Can Be Done to Address Them?" pp. 253–274.



Case 1:24-cv-00943-LAF-JGM Document 14-19 Filed 12/02/24 Page 12 of 12