**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**NO. 1:24-cv-00943**

| | |
|---|---|
| CIVIL RIGHTS CORP., <br><br> Plaintiff, <br><br> v. <br><br> JUDGE DORETTA L. WALKER, in her official capacity, and CLARENCE F. BIRKHEAD, in his official capacity, <br><br> Defendants. | **PROPOSED-INTERVENOR DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Proposed-Intervenor Defendant the GAL Program hereby responds in opposition to Plaintiff's motion to preliminarily enjoin Defendant Clarence F. Birkhead ("Sheriff Birkhead") from enforcing judicial orders.

Because Plaintiff gets the facts wrong, its motion (and underlying suit) is misplaced. Defendant Judge Doretta L. Walker does not order that all abuse, neglect, and dependency proceedings ("A/N/D Proceedings") in a day be closed to the public or to Plaintiff. Therefore, Sheriff Birkhead does not enforce any such orders. Instead, Judge Walker makes specific findings, on specific motions, in specific cases, about whether closure is warranted to protect the involved children and their interests. She does not violate the First Amendment in doing so. Thus, Plaintiff is unlikely to succeed on the merits of its claims.

In addition, Plaintiff has not satisfied the remaining elements for injunctive relief. The motion should be denied.

## STATEMENT OF FACTS

### I.     A/N/D proceedings generally

In North Carolina, a child's guardian ad litem ("GAL") is appointed at the commencement of an A/N/D Proceeding.  *See* N.C. Gen. Stat. § 7B-601(a).  The GAL's responsibilities include taking all appropriate actions to promote the child's best interest.  *See id.*; (Ex. A, Sotomayor Decl. ¶ 5).  If the GAL is not an attorney, an attorney advocate is appointed to represent the GAL and ensure that the child's legal rights are protected.  *See* N.C. Gen. Stat. § 7B-601(a).  GALs serve until the conclusion of the case.  *Id.*

In every A/N/D Proceeding, the attorney advocate consults with the GAL to independently assess whether closing the hearing would be in the child's best interests.  (*See* Sotomayor Decl. ¶ 10).  This determination is legislatively permitted once the trial court considers several factors, including the "benefit to the juvenile of confidentiality" and the "extent to which the confidentiality afforded the juvenile" under the North Carolina General Statutes would "be compromised by an open hearing."  N.C. Gen. Stat. § 7B-801(a); (*see also* Sotomayor Decl. ¶ 10).  If the GAL determines that closing a hearing is in the child's interests, then the GAL has a statutory obligation to advocate that the trial court order the hearing closed.  *See* N.C. Gen. Stat. §§ 7B-601(a), -801(a).

### II.    A/N/D Proceedings in Durham County District Court

In Durham County, there are currently two judges assigned to preside over A/N/D Proceedings.  (Ex. B, Love Decl. ¶ 11).  Each judge presides over 7 days of court within each month.  (*Id.*).  Each judge starts her 7-day assignment on a Thursday and handles

2

scheduling and administrative case matters on Thursday morning along with post-termination of parental rights hearings. (*Id.* ¶ 12). The Thursday morning sessions are remote Webex proceedings, while other sessions occur in person. (*Id.*). The courtroom is open to the public, but the parties and their attorneys are provided with a link to attend remotely. (*Id.*).

On Fridays and during the following week, the assigned judge typically will hold court in-person, while allowing for hybrid proceedings to accommodate a parent or caretaker who lives a distance away or a witness who may need to provide testimony remotely. (*Id.*). Those later sessions are the ones that address the merits of a case. (*Id.*).

A/N/D proceedings in Durham County are open to the public unless one of the parties makes a motion to close the courtroom pursuant to N.C. Gen. Stat. § 7B-801(a), (Sotomayor Decl. ¶ 6), and makes an argument as to why closing is necessary for that specific hearing, (Love Decl. ¶ 7). If the movant is a GAL, she generally notes the sensitive nature of the testimony or evidence that will be elicited (without discussing it in detail—which would defeat the purpose of the request. (Sotomayor Decl. ¶ 13).

The presiding judge hears the motion and makes findings on the record specific to the case on whether closure is warranted. (*Id.* ¶ 16.; *see also* D.E. 15 at 14, ¶ 35). This determination is based on the case file, which contains the relevant allegations (e.g., of abuse or neglect) and informs the judge of the type of sensitive information that will be discussed. (Sotomayor Decl. ¶ 13). Individual motions to close are made for specific cases and for specific hearings in that case—not for all cases calendared for a specific day. (*Id.*

3

¶ 14; Love Decl. ¶ 7).  If a motion to close the courtroom has not been made and granted, the court remains open.  (Love Decl. ¶ 7).

When the courtroom is closed, everyone who is not a party, attorney, appointed GAL, or witness for the case is required to leave the courtroom.  (*Id.* ¶ 9).  This restriction includes parties to other cases on the docket that day, GALs who are not appointed to the specific case, and GALs who are in the process of being trained.  (*Id.*).

When the judge orders the courtroom closed for a specific proceeding, the bailiff (a deputy sheriff) places a sign on the outside of the courtroom door that states: "Closed Hearing."  (*Id.* ¶ 8; Sotomayor Decl. ¶ 14).  When the hearing concludes, the bailiff removes the sign and reopens the courtroom for any other proceedings.  (Love Decl. ¶ 8; Sotomayor Decl. ¶ 14).

Following the hearing, the judge issues a written order memorializing the decision to close the courtroom.  (Sotomayor Decl. ¶ 16).  Typically, the party who made the motion drafts a proposed order, solicits review by the other parties, and provides it to the judge.  (*Id.*).  After making any changes, the judge then issues the written order, which is filed and served on the parties.  (*Id.*).

Although it moves for closure when necessary, it is not the GAL Program's preference that A/N/D proceedings be closed.  Indeed, "closures can be inconvenient for the GAL Program because it interferes with our ability to train new Guardian ad Litem volunteers, who are required to observe at least 3 hours of juvenile abuse, neglect, and dependency proceedings as part of their training."  (Love Decl. ¶ 10).

4

Nor is closure unwarranted. For example, the GAL Program is aware of instances in which confidential information about the children that it is appointed to represent has been publicized on the internet by advocacy groups. (*Id.* ¶ 14).

### III.  Specific proceedings in September 2023

Audio recordings[1] reveal the following about the A/N/D proceedings described by Plaintiff in its motion, along with other A/N/D proceedings conducted that week:

- On September 11, 2023, two cases were calendared. One was open to the public. In the other, a motion to close was made and granted.

- On September 12, 2023, four cases were calendared. No motions were made to close the courtroom, and all hearings were open to the public.

- On September 13, 2023, three cases were calendared. Two were open to the public. In the remaining case, a motion to close was made and granted.

- On September 14, 2023, four cases were calendared. One was open to the public. In each of the remaining cases, a motion to close was made and granted.

- On September 15, 2023, seven cases were calendared. The afternoon session was open to the public, and additional hearings were held via Webex. During the morning session, the attorneys and judge discussed closing the courtroom, and the judge ordered those not involved with the cases to leave the courtroom.

---

[1] These audio files are maintained by the Durham County Clerk of Superior Court in accordance with the Director of the Administrative Office of the Court's Rules of Recordkeeping for the Clerks of Superior Court. (Love Decl. ¶ 13).

5

(*Id.* ¶ 13).

## IV.    Procedural history

Plaintiff, an advocacy law firm, filed the Complaint in this matter on November 13, 2024, seeking declaratory and injunctive relief regarding Judge Walker's ability to close A/N/D proceedings to the public (and Sheriff Birkhead's ability to enforce such ordered closure).  (D.E. 1).

The GAL Program has moved to intervene as a defendant because its GALs regularly (and are statutorily obligated at times to) move for closure of A/N/D hearings to protect a child's interests.  (D.E. 42).  That motion to intervene remains pending.

Along with its Complaint, Plaintiff filed the instant motion for preliminary injunction.  (D.E. 12).  Plaintiff requests an order prohibiting Sheriff Birkhead "from violating its First Amendment right to access dependency court proceedings."  (*Id.* at 1).

## ARGUMENT

A preliminary injunction is an extraordinary remedy, and Plaintiff has not demonstrated a basis for that remedy here.  Plaintiff has other avenues to obtain the relief it seeks.  The law does not support Plaintiff's claims.  And issuing the requested injunction would only cause unnecessary confusion and endanger vulnerable children.  The Court should deny Plaintiff's motion.

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008).  It "should be granted only in those circumstances when the exigencies of the situation demand such relief."  *NAACP-Greensboro Branch v. Guilford*

6

*Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 530 (M.D.N.C. 2012) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003)).

Here, before the factual record has been developed, Plaintiff asks the Court for the extraordinary remedy of controlling when a law enforcement official may assist a specific state judge in closing her courtroom when she presides over cases she is statutorily allowed to close to the public. The "normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971); *see also O'Shea v. Littleton*, 414 U.S. 488, 500 (1974) (explaining that "an ongoing federal audit of state . . . proceedings" is "nothing less than" "the kind of interference that Younger v. Harris . . . sought to prevent"). There is no basis for that disfavored relief here, given the lack of exceptional circumstances or peculiar exigencies.

Moreover, Plaintiff has failed to satisfy the four elements required for an injunction: a likelihood of success on the merits, a definite prospect of irreparable harm, an imbalance of hardships, and the public interest supporting the injunction. *Pashby v. Dalia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiff has not satisfied any, but its failure to satisfy even one element warrants denial of the motion. *Frazier v. Prince George's County*, 86 F.4th 537, 544 (4th Cir. 2023).

## I. Plaintiff is unlikely to succeed on the merits because North Carolina's closure requirements exceed Plaintiff's requested relief, and no First Amendment right is implicated anyway.

Plaintiff has not met its burden of demonstrating a likelihood of success on the merits. The motion can be denied for that reason alone. *See id.* For starters, Plaintiff has

no injury because it requests relief that it can receive by other routes. On top of that, its First Amendment claim ventures too far afield to be supported. Either of these reasons dooms Plaintiff's case from the start and demonstrates why the extraordinary relief of a preliminary injunction is unwarranted.

### A. The First Amendment does not require public access to A/N/D hearings.

Plaintiff's attempt to impose First Amendment requirements on A/N/D proceedings cannot succeed. Neither history nor logic requires that the public receive unfettered access to the most intimate and sensitive details of traumatized children. Nor can such a conception of the First Amendment be squared with the amendment's original meaning.

The Supreme Court has limited the right of public access to only those court proceedings (1) that have a "tradition of accessibility" and (2) that "public access plays a significant role in the functioning of." *Press-Enter. Co. v. Superior Ct. (Press-Enter. II)*, 478 U.S. 1, 8 (1986) (quoting *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 605 (1982)). As a shorthand, the Supreme Court refers to these inquiries as the "tests of experience and logic." *Id.* at 9. Plaintiff's attempt to apply these tests to A/N/D proceedings comes up short.

The history test weighs heavily against Plaintiff. Numerous courts—state and federal—have held that "there is no overarching First Amendment right to unfettered access to juvenile court proceedings," particularly A/N/D proceedings. *Pack v. Kings Cnty. Hum. Servs. Agency*, 89 Cal. App. 4th 821, 832 (2001); *see also, e.g., Ky. Press Ass'n v. Kentucky*, 355 F. Supp. 2d 853, 864 (E.D. Ky. 2005) ("[J]uvenile proceedings and records

8

have been historically closed to the public."); *San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Superior Ct.*, 232 Cal. App. 3d 188, 197 (1991) ("[T]he history of juvenile courts is one of closed proceedings . . . ."); *Tower v. Leslie-Brown*, 167 F. Supp. 2d 399, 405 (D. Me. 2001) (recognizing the "traditional confidentiality of child protective proceedings"); *Nat. Parents of J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 780 So.2d 6, 9 (Fla. 2001) ("A presumption that juvenile proceedings be closed to the public is consistent with the history and tradition of the juvenile justice system and furthers the sound and practical purposes of that system."); *Briggman v. Burton*, No. 5:15CV00076, 2016 WL 5462840, at *5 (W.D. Va. Sept. 27, 2016) (recognizing that juvenile proceedings have been historically closed to the public in both criminal and non-criminal cases).

Against this long line of precedent, Plaintiff mentions centuries-old proceedings involving children, but only at a high level of generality. (*See* D.E. 13 at 11-12 (stating that chancery courts were "*generally* open to the public" and habeas proceedings were "*generally* resolved in open court" (emphasis added)). Even then, Plaintiff concedes that special solicitude was shown to children's privacy. (*Id.* at 11 (noting children were permitted to testify privately)). As for this country's history, Plaintiff can identify only three isolated, dependency-like cases that proceeded in open court. (*See id.* at 12).

By contrast, there is a well-established American tradition of keeping the details of abused minors confidential. Indeed, "[i]t would misrepresent the historical record to state that there is an 'unbroken, uncontradicted history' of open proceedings in cases involving the sexual abuse of minors." *Globe Newspaper*, 457 U.S. at 614 (Burger, J., dissenting)

9

(quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556 (1980)). As Plaintiff admits, this sort of abuse remains an unfortunate but significant part of A/N/D proceedings today. (D.E. 13 at 4). Thus, the historical record does not demonstrate the sort of "unbroken, uncontradicted" blanket openness in A/N/D proceedings that would support an unfettered First Amendment right to public access. *See Richmond Newspapers*, 448 U.S. at 556.

Moreover, as Plaintiff notes, modern A/N/D proceedings did not arise until near the turn of the twentieth century. (D.E. 13 at 12). Again, these more recent proceedings do not support a historical tradition of openness. By 1939, as Plaintiff concedes, at least six juvenile courts did not have statutorily presumed public access. (*Id.* at 13-14). And those states were the forerunners of a national trend that turned toward closing such hearings. (*Id.*). The supposed historical foundations of open access to juvenile proceedings are neither as long-standing nor as inviolable as Plaintiff would make them out to be.

But the biggest flaw in Plaintiff's historical approach is to completely discount delinquency proceedings. America's history of closing juvenile delinquency hearings is nearly undisputed. *See J.B.*, 780 So.2d at 9 ("It is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity." (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 107 (1979) (Rehnquist, J., concurring))). Because delinquency proceedings are different than A/N/D proceedings, Plaintiff asserts that this history does

not matter. But that assertion overlooks that the historical reasons for closing juvenile delinquency proceedings apply with greater strength to juvenile A/N/D proceedings. *See id.*; *San Bernardino*, 232 Cal. App. 3d at 200.

Delinquency cases are criminal proceedings. According to the Supreme Court, there are numerous reasons for criminal proceedings to remain open: to assure all concerned that "proceedings were conducted fairly," to discourage perjury and misconduct of participants, to provide "significant community therapeutic value," and to provide "an outlet for community concern, hostility, and emotion." *See Richmond Newspapers, Inc.*, 448 U.S. at 556. These "social values" are implicated just as much when a child commits a crime as when an adult does. *San Bernardino*, 232 Cal. App. 3d at 200-01, 208. Yet from the conception of the juvenile system, America has chosen to subordinate those values to the goal of achieving a positive outcome for youth offenders, recognizing "that publicity, with its attendant stigma, generally impedes integration of a youth into the community." *Id.* at 198.

If children who have been charged with crimes receive such special privacy protection, even more should extend to children who are victims and forced into A/N/D proceedings through no fault of their own. *See J.B.*, 780 So.2d at 9 (recognizing that juvenile proceedings are "fundamentally different from an adult criminal trial" because the "foundation of the juvenile system is to 'preserv[e] and promot[e] the welfare of the child,'" (quoting *Schall v. Martin*, 467 U.S. 253, 263 (1984)). Like "delinquency proceedings, the dependency proceeding is intended to be rehabilitative—not punitive."

11

*San Bernardino*, 232 Cal. App. 3d at 200. Underlying the formation of both proceedings was "the belief that publicity from public proceedings was inconsistent with and would undermine rehabilitation which led to private hearings." *Id.* at 199. Rehabilitation is further aided in both cases by "protecting the minor victim from further trauma and embarrassment which might result when the child is compelled to testify in public." *Id.* at 200. "[P]rivate hearings in dependency proceedings assist in that process no less so than in delinquency proceedings." *Id.*; *see also J.B.*, 780 So.2d at 9 (noting that "protecting the child from stigma, publicity, and embarrassment and promoting rehabilitation" applies equally as powerfully to the termination-of-parental-rights context as to the delinquency context).

The long history of keeping information confidential in juvenile proceedings, in addition to the rest of the historical record, demonstrates that the First Amendment right to public access does not apply to A/N/D proceedings. In other words, Plaintiff's theory fails the test of experience.

Plaintiff's theory also flounders under the logic test.

To begin with, confidentiality in A/N/D proceedings advances critical policy goals. There "can be little doubt that the embarrassment, emotional trauma and additional stress placed on the minor by public proceedings and the publicity engendered by public proceedings may well interfere with the rehabilitation and reunification of the family." *San Bernardino*, 232 Cal. App. 3d at 200; *see also* David Finkelhar & Charles Putnam, *Protecting the Privacy of Child Crime Victims*, 17(2) APRI (2004) (explaining that

12

publicizing abuse causes victims embarrassment and shame, which are sources of trauma, and can lead to increased risk of bullying and longer recoveries). Even "[c]hildren who must face their peers in school might be subject to special pressures" if a matter is made public. *N.J. Div. of Youth & Fam. Serv. v. J.B.*, 576 A.2d 261, 269 (N.J. 1990). States have a legitimate interest "in protecting child victims from undue trauma and humiliation, facilitating the rehabilitation of families, and encouraging people to report child abuse and neglect by keeping their identities confidential." *Tower*, 167 F. Supp. 2d at 405 (citations omitted). And states have an "overriding interest in, among other things, protecting the child from stigma, publicity, and embarrassment and promoting rehabilitation." *J.B*, 780 So.2d at 9.

Plaintiff's counterarguments do not outweigh this "overriding interest." *Id.* For example, while A/N/D proceedings involve adjudications without a jury, juvenile delinquency cases do not involve juries either. *See United States v. Duboise*, 604 F.2d 648, 648 (10th Cir. 1979) ("The Juvenile Delinquency Act does not, of course, permit trial by a jury."). But despite serious consequences being adjudicated in juvenile delinquency cases, that does not overcome the tradition of keeping those proceedings closed. The same rationale applies even more forcefully in A/N/D proceedings, where there are not only serious consequences but also significant hardship and trauma on innocent children. The least that can be done for those children is to extend the same protections they would receive if instead of being a victim they were a delinquent.

Plaintiff's other arguments invoke the same abstract social values that the Supreme Court first identified as applying to criminal cases in *Richmond Newspapers*. 448 U.S. at 556. And true, public exposure can in certain circumstances improve court functions and minimize bias. But once again, each of these general arguments for why A/N/D proceedings should be public applies equally well to juvenile delinquency proceedings, or any other court proceeding for that matter. And none of them take into account the special considerations that come into play when a child's life and rehabilitation are on the line.

Moreover, in conducting the logic test, the Supreme Court has instructed courts to examine "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8-9. "[W]hile the [juvenile] system has been criticized for its failings, at no time has the Supreme Court indicated that one of the reasons for its deficiencies is the lack of open proceedings. To the contrary the court has criticized the system for not maintaining adequately the confidentiality purportedly promised by the juvenile system." *San Bernardino*, 232 Cal. App. 3d at 204.

As a result, courts that have weighed the general benefits Plaintiff identifies against the specific harm in having an innocent child's most sensitive details publicized for the world have repeatedly found that logic weighs against public access. *See, e.g.*, *Ky. Press*, 355 F. Supp. 2d at 864 ("Rather than playing a significant positive role in the functioning of juvenile proceedings, opening juvenile proceedings would frustrate the purpose of juvenile court." (cleaned up)); *San Bernardino*, 232 Cal. App. 3d at 204-05 ("With the welfare of minors at stake, we are reluctant to impose the strict standard for closure required

14

for a First Amendment right unless compelled to do so by the United States Supreme Court."); *J.B.*, 780 So.2d at 9 ("A presumption that juvenile proceedings be closed to the public . . . furthers the sound and practical purposes of that system."); *see also Tower*, 167 F. Supp. 2d at 405 (noting that courts "have found that the balance tipped in favor of denying public access when publicity would jeopardize either children caught up in the dispute or the child protective process itself"). That logic is persuasive. This Court should adopt it as well.

Finally, there is an independent counterbalance in A/N/D proceedings that is not present in criminal ones. Specifically, every A/N/D proceeding includes a GAL, who has no bias in the case but is appointed solely to watch over the child's best interest. There is no such non-interested party in criminal prosecutions. The appointment of an unbiased third party further mitigates against Plaintiff's concerns of an unchecked system.

For all these reasons, Plaintiff has failed to satisfy the logic test as well.

As an additional consideration, Plaintiff's theory about a constitutional right of access to A/N/D proceedings is inconsistent with the First Amendment's original meaning. History does not show "that the framers were concerned with assuring press access" when they designed the First Amendment. Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 933 (1992); *see also* Lillian R. BeVier, *An Informed Public, an Informing Press: The Search for a Constitutional Principle*, 68 Cal. L. Rev. 482, 500 (1980). To the contrary, public access "traditionally has not been included in our notions of free expression." Amy Jordan, *The Right of Access: Is There A Better Fit*

*Than the First Amendment?*, 57 Vand. L. Rev. 1349, 1358 (2004). The Supreme Court has instructed that the "object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it." *Lake Cnty. v. Rollins*, 130 U.S. 662, 670 (1889). In accordance with that instruction, this Court should not extend an ahistorical concept of public access when no "binding precedent" requires it. *United States v. Rife*, 33 F.4th 838, 843-44 (6th Cir. 2022) (refusing to extend the ahistorical substantial effects test when Supreme Court jurisprudence did not require it).

* * *

The fact that numerous courts have rejected the same arguments Plaintiff raises in this case demonstrates that the theory is far from an obvious winner. Against that backdrop, Plaintiff has not demonstrated the sort of "clear showing" that is necessary for preliminary injunctive relief. *Winter*, 555 U.S. at 22.

### B. Even if the First Amendment applies, Plaintiff cannot show imminent injury because its requested relief is available through other means.

Even if there is a First Amendment right to publicly access A/N/D proceedings, there is no reason to grant Plaintiff an injunction for relief to which it already has access. Plaintiff requests that Sheriff Birkhead be enjoined from closing A/N/D proceedings unless the trial court makes case-specific, on-the-record findings about closure. (*See* D.E. 12 at 1). But what Plaintiff requests is already available. Indeed, it is provided for by statute.

"An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action." *Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) (quoting *Bloodgood v. Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986)).

16

In other words, when a plaintiff fails to show that the alleged harm is likely to happen, no injunction will issue. For example, in *Norfolk*, an injunction was improper where, despite the plaintiff claiming that a strike was imminent, the facts did not support such a claim. *See id.* Similarly, here, Plaintiff has not shown on either the facts or the law that its alleged harm is actually likely.

Start with the applicable statutory scheme. By law, A/N/D hearings are open by default. *See* N.C. Gen. Stat. § 7B-801(a). The only time a hearing is closed is if the court makes a determination that closure is necessary given the following five factors:

> (1) The nature of the allegations against the juvenile's parent, guardian, custodian or caretaker;
>
> (2) The age and maturity of the juvenile;
>
> (3) The benefit to the juvenile of confidentiality;
>
> (4) The benefit to the juvenile of an open hearing; and
>
> (5) The extent to which the confidentiality . . . will be compromised by an open hearing.

*Id.* This procedure provides a case-specific, narrowly tailored mechanism to ensure that court is closed only when necessary to serve a compelling government interest. Supposedly, that is all Plaintiff requests. (*See* D.E. 12 at 1).

To be clear, (as discussed above) the First Amendment does not require public access to A/N/D hearings. But even if it did, Plaintiff has not demonstrated actual harm because the procedures required by statute exceed the minimum threshold established by the Supreme Court in right-to-access cases. Specifically, the Supreme Court has recognized that courts can close otherwise-open proceedings if "closure is essential to

17

preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. II*, 478 U.S. at 9. North Carolina's statutory scheme is in accord with this test.

First, the statutory scheme only permits courts to be closed for a compelling government interest. As the Supreme Court has recognized, a state's interest in "safeguarding the physical and psychological well-being of a minor . . . is a compelling one." *Globe Newspaper*, 457 U.S. at 607. Here, North Carolina limits closures to only those A/N/D hearings in which the child will "benefit" from "confidentiality." *See* N.C. Gen. Stat. § 7B-801(a)(3). Thus, North Carolina ensures that A/N/D hearings are only closed when doing so advances a compelling government interest.

Second, the Supreme Court has made clear that a procedure is narrowly tailored when the court "determine[s] on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Globe Newspaper*, 457 U.S. at 608. In criminal cases, for example, courts can close hearings after they consider "the minor victim's age, psychological maturity and understanding, the nature of the crime, [and] the desires of the victim." *Id.* These considerations align with the ones identified in North Carolina's statutory scheme. *See* N.C. Gen. Stat. § 7B-801(a)-(b). If such considerations are narrowly tailored enough to close criminal proceedings—where the right to public access is at its zenith—then they are sufficient to close A/N/D proceedings.

Accordingly, even if the First Amendment mandates public access to A/N/D proceedings, North Carolina's closure process, as enforced by Sheriff Birkhead, does not violate that requirement.

Nor do Plaintiff's allegations about the need for appealable, written orders warrant injunctive relief. (*See* D.E. 12 at 1). The trial court in A/N/D proceedings normally issues orders with specific findings that justify closure. (Sotomayor Decl. ¶ 16). If the trial court does not for some reason, Plaintiff is already aware of an available method for litigating this issue in state court: a petition for mandamus. *See C.R. Corps v. Walker*, No. P23-757 (N.C. Ct. App. Feb. 21, 2024) (order granting Plaintiff's petition). Indeed, Plaintiff has already used that procedure to obtain written orders in specific cases. *See id.* There is no reason, then, for Plaintiff to seek an injunction from a federal court in an attempt to interfere with and control state-court proceedings. This tactic is dubious at best. *See Morrow v. Winslow*, 94 F.3d 1386, 1392 (10th Cir. 1996) ("[A] federal plaintiff should not be permitted the luxury of federal litigation of issues presented by ongoing state proceedings.").

Additionally, many of Plaintiff's allegations are simply incorrect as a factual matter. As described above, the trial court was not sua sponte and selectively removing Plaintiff from A/N/D proceedings. To the contrary, on September 13 and 14, the courtroom was only closed for specific A/N/D hearings when a specific motion was made and granted. (Love Decl. ¶ 13). Multiple other A/N/D hearings were heard on those days, and they remained open to the public. (*Id.*). As for September 15th, Plaintiff admits that court was only closed after a motion was made. (D.E. 13 at 7). But that was only for the morning session; the remainder of the A/N/D hearings conducted on September 15 were open. (Love Decl. ¶ 13).

Both North Carolina's statutory scheme as well as the record before the Court confirm that Plaintiff has not shown the threat of actual injury. Instead, Plaintiff is already able to access what it claims to need an injunction for. And to the extent Plaintiff quibbles with any of the facts, this sort of "factual uncertainty can support a conclusion that the first *Winter* factor isn't met" as a plaintiff in that situation has "only shown that his success on the merits is possible, not likely." *Frazier*, 86 F.4th at 545.

Because "Plaintiff has not shown that [its] constitutional rights have been violated" or that it has suffered "any actual injury from the alleged violations," the motion for preliminary injunction should be denied. *Lee v. Kersey*, No. 1:23CV1065, 2024 WL 3445276, at *7 (M.D.N.C. May 24, 2024), *adopted by* 2024 WL 3442379 (M.D.N.C. July 17, 2024).

## II. Plaintiff is not likely to suffer irreparable harm absent an injunction.

Plaintiff's irreparable harm arguments overlook the most important requirement: likelihood. The mere "possibility" of harm is not enough. *Winter*, 555 U.S. at 22. Rather, irreparable harm must be "actual and imminent" absent injunctive relief. *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (cleaned up). Plaintiff has not demonstrated such a likelihood here.

Plaintiff hinges its request for an injunction against Sheriff Birkhead on the possibility of Judge Walker's orders interfering with Plaintiff's "plans to courtwatch again in Durham County in January 2025." (D.E. 13 at 8). But Judge Walker is not scheduled to preside over any A/N/D proceedings in January. (D.E. 35-1 at 2). Accordingly, there is

no actual or imminent threat of harm, even accepting Plaintiff's merits argument. Instead, Plaintiff's alleged harm is similar to the possible strike in *Norfolk*, which the court found was more conjecture than reality and thus too insubstantial to support injunctive relief. *See* 164 F.3d at 856.

Moreover, even if Plaintiff were to belatedly put forward facts tending to show that its members intend to travel across the country at later dates, Plaintiff has not shown that it is more than a mere possibility that Sheriff Birkhead will enforce a hypothetical, future, unconstitutional order. Plaintiff must "demonstrate that future violations of the constitutional rights of the organization and its members are *likely* to occur," via showing, rather than speculating, "(1) that it is likely that they again will find themselves in the same or similar circumstances giving rise to the allegedly unconstitutional conduct; *and* (2) that it is likely that they again will be subjected to the allegedly unconstitutional conduct.'" *NAACP. v. Brackett*, 130 F. App'x 648, 652 (4th Cir. 2005) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

Here, the record before the Court shows that Judge Walker does not order (and therefore Sheriff Birkhead does not enforce) closures in most or even a significant number of cases. In fact, Plaintiff recites instances of proceedings presided over by Judge Walker at which court was *not* closed for all A/N/D hearings, and therefore Plaintiff's alleged rights could not have been violated under any theory. (D.E. 13 at 6-8; *see also* Love Decl. ¶ 13). Despite Plaintiff's assumption that "the removals were not limited incidents pertaining to specific unusual cases on the docket," (D.E. 13 at 7), the opposite is true, (Love Decl. ¶ 13;

21

Sotomayor Decl. ¶¶ 8-11). Because these were limited incidents, Plaintiff has not shown either that its members will *likely* be in the same circumstances again or that they will *likely* be subjected to the conduct that they allege to be unconstitutional.

The cases cited by Plaintiff recognize these principles. In *Elrod v. Burns*, "[i]t [wa]s clear . . . that First Amendment interests were either threatened or in fact being impaired *at the time relief was sought*." 427 U.S. 347, 373 (1976) (plurality opinion) (emphasis added). No such circumstances exist here, where Plaintiff's fears rest on the hypothetical—and unlikely—fear that Judge Walker would close a proceeding in January despite her not being on the calendar. Similarly, this Court affirmed a permanent injunction following a bench trial when there was a genuine "threatened injury" of "license revocation," *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011), as opposed to the conjectured possibilities Plaintiff presents in this case.

Further, by Plaintiff's own admission, the organization's members have been able to observe some court proceedings, particularly where AOC officials were present. (D.E. 13 at 7-8). Accordingly, the harm is not so imminent or so unavoidable as would justify the "extraordinary" relief of a preliminary injunction. *See Munaf*, 553 U.S. at 689.

Because Plaintiff has not demonstrated a likelihood of irreparable harm, its motion should be denied for that reason as well.

III. **The hardships tip in Defendants' favor, making an injunction against the public interest.**

The final two *Winter* factors, "the balance of the equities and the public interest," "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338,

22

365-66 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Affecting how judicial proceedings are conducted, based on a preliminary determination, is not in the public's interest and causes a hardship to the government.  *See id.*  That is yet another basis to deny Plaintiff's motion.

In addition, the relevant hardship and public interest balancing has in large part already been made by North Carolina's legislature.  Children endure a significant hardship when sensitive, personal information about their abuse and neglect is publicized to the world.  *See San Bernardino*, 232 Cal. App. 3d at 200.  Recognizing that fact, the General Assembly has determined that children's interest in their privacy at A/N/D proceedings is an important public interest.  *See* N.C. Gen. Stat. § 7B-801(a) ("[T]he court in its discretion shall determine whether the hearing or any part of the hearing shall be closed to the public . . . ."); *see also id.* §§ 7B-302 (requiring "[a]ll information" received by the department of social services . . . be held in strictest confidence"), -601(c) ("[N]o disclosure of any information or reports shall be made to anyone except by order of the court or unless otherwise provided by law."), -2901 (providing that juvenile records "shall be withheld from public inspection" and "may be examined only by order of the court").  The General Assembly further mandated that the trial court consider the child's specific desire for privacy in making that determination.  *See id.* § 7B-801(b)**.**

There is a strong public interest in protecting children by closing proceedings to protect private and sensitive information. *Globe Newspaper*, 457 U.S. at 607.  This interest can hardly be disputed.  *See, e.g.*, *Tower*, 167 F. Supp. 2d at 405 (deferring to the

23

"legislative judgment that the State of Maine has an interest in maintaining the confidentiality of child protective proceedings"); *San Bernardino*, 232 Cal. App. 3d at 205 ("[T]he states should remain free to continue their exploration for a system best-suited for addressing the problems encountered by our youth.").

When weighing whether an injunction is warranted, this Court consider that strong public interest. With the factual record before the Court, the hardships that would be imposed by the requested injunction and its negative impact on the established public interest further counsel that Plaintiff's motion be denied.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's Motion for Preliminary Injunction.

This the 24th day of January, 2025.

FOX ROTHSCHILD LLP

/s/ Kip D. Nelson
Kip D. Nelson
N.C. Bar No. 43848
knelson@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
230 N. Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5200

Nathan W. Wilson
N.C. Bar No. 58248
nwilson@foxrothschild.com

24

434 Fayetteville Street, Suite 2800
Post Office Box 27525 (27611)
Raleigh, NC 27601
Telephone:  (919) 755-8700

*Attorneys for Proposed Intervenor-Defendant*

## CERTIFICATE OF WORD COUNT

In accordance with LR 7.3(d), the undersigned hereby certifies that the foregoing brief is less than 6,250 words, as reported by the word count feature of the word processing software.

This 24th day of January, 2025.

/s/ Kip D. Nelson
Kip D. Nelson