# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL RIGHTS CORP.,      )
                                      )
          Plaintiff,      )
                                      )
         v.               )       1:24CV943
                                        )
JUDGE DORETTA L. WALKER,   )
in her official capacity, and     )
CLARENCE F. BIRKHEAD,     )
in his official capacity,        )
                                        )
         Defendants.    )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on multiple motions. Plaintiff Civil Rights Corp. ("CRC") has filed a Motion for Preliminary Injunction and Request for Hearing (Docket Entry 12), a Motion for Leave to File Proposed Response to Defendant-Intervenor's Motion to Intervene (Docket Entry 72), and a Motion for Initial Pretrial Conference (Docket Entry 81). The North Carolina Administrative Office of the Courts ("AOC") has filed a Motion to Intervene on behalf of its Office of Guardian ad Litem Services. (Docket Entry 41.) Defendants Sheriff Birkhead and Judge Walker, as well as proposed intervenor-defendant AOC ("Defendants"), have all filed motions to dismiss for lack of subject matter jurisdiction and failure to state a claim. (Docket Entries 43, 65, and 67.) Finally, the First Amendment

Clinic at Duke Law School and others have filed a Motion for Leave to File Brief of Amici Curiae. (Docket Entry 34.) The matters have been briefed and are ripe for disposition.

For the reasons laid out in this opinion, the Court grants the Motion for Leave to File Brief of Amici Curiae and CRC's Motion for Leave to File Proposed Response to Defendant-Intervenor's Motion to Intervene. However, the Court denies CRC's Motion for Initial Pretrial Conference without prejudice pending the Court's final decision on Defendants' motions to dismiss. Additionally, the undersigned recommends that the Motion to Intervene be granted, the motions to dismiss be denied, and the Motion for Preliminary Injunction and Request for Hearing be denied.

## I. BACKGROUND

CRC is a non-profit civil rights organization. (Compl. ¶ 12, Docket Entry 1; Docket Entry 74 at 8[1].) CRC is concerned that neglect, abuse, and dependency ("dependency") courts "disproportionately monitor poor families." (Docket Entry 74 at 8-9.) CRC therefore sends attorneys to watch dependency hearings "in order to learn more about the court system and how it operates, including how legal standards are applied and how judges make discretionary decisions in these cases." (Compl. ¶ 64.)

Defendant Judge Walker is a judge in Durham County who adjudicates dependency cases. (*Id.* ¶ 13.) CRC attorneys attempted to watch dependency hearings in Judge Walker's courtroom on nine separate days throughout 2023 and 2024. (*Id.* ¶¶ 26, 30; *see also* Docket Entry 58 at 10.) However, on seven of those days, Judge Walker prevented CRC attorneys

_____

[1] Unless otherwise noted, all citations in this opinion to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2

from watching by closing the court to the public. (Compl. ¶ 26.) The court closure orders were allegedly never justified by any specific findings.[2] (*Id.*) After multiple closure orders, the bailiffs allegedly escorted CRC out of the courtroom but allowed other members of the public to remain.[3] (*Id.* ¶ 33.) CRC alleges its attorneys were never disruptive. (*Id.* ¶ 27.)

On the two days when CRC attorneys were allowed to remain, the circumstances were "unusual." (*Id.* ¶ 30.) One involved only virtual hearings, where CRC's attorneys could not be identified; the other was a day when officials from AOC were present. (*Id.* ¶ 30.)

CRC plans to continue to send attorneys to watch dependency hearings in Durham County and alleges that their continued exclusion would violate CRC's First Amendment right of access as a member of the public. (*Id.* ¶¶ 9, 32, 80, 83.) CRC has therefore brought a suit under 42 U.S.C. § 1983 against Judge Walker in her official capacity for prospective declaratory relief. (*Id.* ¶ 81.) CRC has also brought a § 1983 claim against Defendant Sheriff Birkhead—the sheriff of Durham County, whose bailiffs staff Judge Walker's courtroom—in his official capacity for prospective injunctive and declaratory relief. (*Id.* ¶ 84.) CRC seeks a qualified

_____

[2] N.C. Gen. Stat. § 7B-801(a) allows a dependency court judge to close a hearing after considering several factors, including the nature of the allegations, the age and maturity of the child, and the benefits of a closed hearing. Declarations from CRC attorneys filed in support of CRC's motion for a preliminary injunction state that Judge Walker only summarily cited these factors in her decisions to close hearings. (Docket Entry 15 ¶¶ 27, 35; Docket Entry 18 ¶¶ 23, 32.)

[3] In support of its motion for a preliminary injunction, CRC filed declarations from CRC personnel that describe these incidents in greater detail. They state that, on multiple occasions, Judge Walker asked them who they were and why they were attending before ordering them out. (Docket Entry 15 ¶¶ 20-21, 25; Docket Entry 17 ¶ 26; Docket Entry 18 ¶¶ 8-11; Docket Entry 19 ¶¶ 6-7, 14-16.) Additionally, they state that a Guardian ad Litem once asked for a blanket ban on CRC attorneys attending hearings (Docket Entry 15 ¶ 25), and that Judge Walker once stated that other people watching the hearings could remain while CRC attorneys were made to leave (*id.* ¶ 28).

3

right of access, not an absolute one; it believes that the First Amendment requires judges to find a compelling state interest specific to the facts of a particular case before closing a hearing.[4]  (*Id.* ¶ 80; *see also* Docket Entry 74 at 14-15, 17.)

## II.     AOC'S MOTION TO INTERVENE

AOC has moved to intervene as a defendant as a matter of right, or, alternatively, as a permissive intervenor.  (Docket Entry 41.)  CRC opposes AOC's intervention as a matter of right, but consents to permissive intervention so long as the Court imposes certain conditions on AOC, such as that AOC avoid duplicating the existing defendants' briefing and discovery requests.  (Docket Entry 57.)  Judge Walker has filed a reply arguing that such conditions would be inappropriate and CRC has filed a motion for leave to respond to Judge Walker's arguments.  (Docket Entries 70 and 72.)

Having considered CRC's proposed response brief (Docket Entry 72-1), the Court grants CRC's motion for leave to file a response to Judge Walker.  Furthermore, the undersigned recommends that AOC be allowed to intervene as a matter of right[5] because AOC has an interest that could be impaired by this litigation, and that interest is not adequately

---

[4] CRC argues that if this right were recognized, judges could still close hearings "as needed to protect important privacy interests" (Docket Entry 74 at 17) but also points out that most dependency cases involve issues of neglect, not physical or sexual abuse (Docket Entry 13 at 10-11).

[5] If the Court instead finds that AOC cannot intervene as a matter of right, the undersigned recommends the Court still allow permissive intervention.  "Whether to allow permissive intervention is within the sound discretion of the district court."  *Students for Fair Admissions Inc. v. Univ. of N. Carolina*, 319 F.R.D. 490, 494 (M.D.N.C. 2017) (citing *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003)).

4

represented by the existing parties. The undersigned does not recommend that the Court impose conditions on AOC's intervention.

Rule 24 "provides that a court must permit anyone to intervene who, (1) on timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest." *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (citation modified) (quoting Fed. R. Civ. P. 24(a)(2)). CRC does not contest the timeliness of AOC's motion, and in any case, the motion was filed before this Court ruled on any threshold issues. AOC's motion to intervene is therefore timely. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir. 1989) ("A reviewing court should look at how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene.").

What CRC does contest is whether (1) AOC has an interest that could be impaired by this litigation, and (2) whether the existing defendants—Judge Walker and Sheriff Birkhead— adequately represent that interest. (*See* Docket Entry 42 at 7-12; Docket Entry 57 at 8-17; Docket Entry 69 at 2-10.) The undersigned resolves both questions in AOC's favor below.

### A. Interest

AOC has an interest that could be impaired by this litigation. An interest, for Rule 24 purposes, is a "significantly protectable interest," not a "value interes[t]"; "the movant must stand to gain or lose by the direct legal operation of the district court's judgment." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547-M, 2024 WL 4349904, at

5

*2 (E.D.N.C. Sept. 30, 2024) (citation modified) (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971); *Diamond v. Charles*, 476 U.S. 54, 66 (1986); *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991)). Whether an interest might be impaired by the litigation is a liberal standard; any "practical disadvantage" will suffice. *See Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 121 (4th Cir. 1981); *see also Francis v. Chamber of Com. of U.S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973).

Here, AOC contains the Office of Guardian ad Litem Services. N.C. Gen. Stat. § 7B-1200. Guardians ad Litem ("GALs") serve as advocates for juveniles in dependency court; they have the statutory responsibility "to protect and promote the best interests of the juvenile." N.C. Gen. Stat. § 7B-601(a). GALs may move to close dependency hearings, as AOC argues they did during some of the hearings CRC tried to access. (Docket Entry 42 at 8-9.) If CRC's suit succeeds, GALs may find themselves less easily able to close hearings. Thus, AOC "stand[s] to gain or lose by the direct legal operation" of this litigation, *see Republican Nat'l Comm.*, 2024 WL 4349904, at *2, because GALs will be "practical[ly] disadvantage[ed]" if their requests for closure must pass a First Amendment threshold, *Newport News Shipbuilding*, 646 F.2d at 121.

### B. Adequate Representation

AOC's interest is not adequately represented by the existing parties. The Fourth Circuit has traditionally held that, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented." *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976). However, the Supreme Court recently described this presumption as applying "only when

6

interests overlap fully. . . . Where the absentee's interest is similar to, but not identical with, that of one of the parties, that normally is not enough to trigger a presumption of adequate representation." *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 196-97 (2022) (citation modified); *see also Trbovich v. United Mine Workers of America*, 404 U.S. 528, 529 (1972) (Sectary of Labor sued union regarding improper election; union member could intervene as plaintiff because their individual interest in the fairness of the election was distinguishable from Secretary's broad public policy interest). Additionally, the Supreme Court recently held that government actors should be allowed to intervene more frequently than private ones. *See Berger*, 597 U.S. at 197. ("[A] State's chosen representatives should be greeted in federal court with respect, not adverse presumptions.").

Here, no presumption of adequacy exists because AOC's interest is not identical with the interests of Judge Walker and Sheriff Birkhead. AOC is solely focused on GALs' interest in closing hearings, and not, for example, the interests of parents, which Judge Walker must consider. Moreover, AOC is a government intervenor seeking to defend the interest given to it by statute. *See* N.C. Gen. Stat. § 7B-601(a) (requiring GALs "to protect and promote the best interests of the juvenile"). Therefore, under *Berger*, AOC's interest is not adequately represented by the existing parties.

\* \* \*

For the above reasons, the undersigned concludes that AOC has a right to intervene in this case. Additionally, the undersigned does not recommend that the Court impose any conditions on AOC's intervention. "It seems very doubtful . . . that the court has the right to make significant inroads on the standing of an intervenor of right." *United States v. Arch Coal,*

7

*Inc.*, No. CIV.A. 2:11-0133, 2011 WL 2493072, at *13 (S.D.W. Va. June 22, 2011) (quoting 7C Charles A. Wright et al., *Federal Practice and Procedure* § 1922 (3rd ed. 2011)). Moreover, AOC's GALs frequently appear before Judge Walker in court; requiring that AOC confer with Judge Walker before filing its briefing could therefore create the appearance of impropriety.

For the above reasons, the Court should allow AOC to intervene as a matter of right without imposing any conditions on AOC's intervention.

### III. *AMICI CURIAE*

The Court grants the motion for leave to provide briefing of *amici curiae* from the First Amendment Law Clinic at Duke University and multiple other organizations. (Docket Entry 34.) Granting such motions is within the Court's discretion. LR 7.5(b). "Ultimately, the question [of whether to grant a motion for leave to file amicus briefing] is one of utility: a motion for leave to file an amicus curiae brief should not be granted unless the court deems the proffered information timely and useful." *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 1046313, at *1 (M.D.N.C. Apr. 7, 2022) (citation modified).

Here, the proposed *amici* offer useful briefing. CRC's success—both at the preliminary injunction stage and later—turns on whether the First Amendment creates a qualified right of access to dependency proceedings. To show that such a right exists, CRC must prove (1) a history of public access to dependency hearings, and (2) that dependency hearings benefit from openness. *See Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986). Many of the proposed *amici* are scholars who study juvenile and family law issues, making them well-positioned to speak to the history and policy benefits of opening dependency courts. (Docket Entry 34 at 6-7.) And indeed, the proposed *amici* briefing

8

contains historical and policy information not found in CRC's briefing, such as information about dependency courts' trend toward closure in the 1920s. (Docket Entry 34-1 at 20-21.) Accordingly, the Court concludes that the proposed *amici*'s briefing is "desirable" and "relevant to the disposition of the case," LR 7.5(b), and therefore grants their motion.

## IV.    MOTIONS TO DISMISS

Sheriff Birkhead, Judge Walker, and AOC have filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim. (Docket Entries 43, 65, and 67.) Sheriff Birkhead argues that CRC's claim against him should be dismissed due to quasi-judicial immunity, lack of standing, and failure to state a claim upon which relief may be granted. (Docket Entry 44 at 11-26.) Judge Walker contends that CRC's claim against her should be dismissed based on judicial immunity, sovereign immunity, abstention doctrines, lack of standing, lack of ripeness, the Court's discretionary power to dismiss claims for declaratory relief, and CRC's failure to state a claim. (Docket Entry 66 at 4-22.) Finally, AOC contends that the Court should dismiss CRC's claims against Judge Walker and Sheriff Birkhead for reasons of standing, *Rooker-Feldman* abstention, and CRC's failure to state a claim. (Docket Entry 68 at 5-23.) The undersigned does not recommend that the Court dismiss CRC's claims for any of these reasons.

### A.  Judicial Immunity

Judicial immunity does not shield Judge Walker from CRC's suit. "Section 1983, as amended in 1996" by the Federal Courts Improvement Act (FCIA), immunizes judges from suits for monetary and injunctive relief, but "does not immunize judges against civil actions

for declaratory relief."[6]  *Clay v. Osteen*, No. 1:10CV399, 2010 WL 4116882, at \*4 (M.D.N.C. Oct. 19, 2010) (Dixon, M.J.) *rec. adopted* No. 1:10CV399 (M.D.N.C. Nov. 17, 2010) (Schroeder, J.); *Just. Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 763 (8th Cir. 2019) ("Currently, most courts hold that the amendment to § 1983 does not bar declaratory relief against judges.") (collecting cases); *Perlmutter v. Varone*, 645 F. App'x 249, 251 (4th Cir. 2016) (unpublished) (finding judicial immunity applied because plaintiffs did not request any equitable relief).

Here, because CRC asks only for prospective declaratory relief against Judge Walker (Compl. ¶ 81), judicial immunity is inapplicable.  Judge Walker argues that closing a hearing is a "judicial ac[t]." (Docket Entry 66 at 12-13; Docket Entry 76 at 8.)  But even if this were true, it would be immaterial.  As the caselaw above shows, judicial acts are not immune from suits for prospective declaratory relief.  *See Clay*, 2010 WL 4116882, at \*4.  Judge Walker is not entitled to judicial immunity.

---

[6] This rule dates back to *Pulliam v. Allen*, where the Supreme Court held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." 466 U.S. 522, 541-42 (1984); *see also Timmerman v. Brown*, 528 F.2d 811, 813-14 (4th Cir. 1975) (allowing equitable relief against judges).  Congress largely nullified *Pulliam* and *Timmerman* by amending § 1983 to prohibit "action[s] brought against a judicial officer for an act or omission taken in such officer's judicial capacity." FCIA, Pub. L. 104-317, § 309(c), 110 Stat. 3847, 3853 (1996).  However, the amendment left open an exception for situations where "a declaratory decree was violated or declaratory relief was unavailable." *Id.*  Thus, the amendment impliedly communicated that declaratory relief against judges remained available. *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197-98 (3d Cir. 2000) (explaining why both the text and legislative history of Section 1983 support claims for declaratory relief against judges).

10

### B. Quasi-Judicial Immunity

Sheriff Birkhead claims that quasi-judicial immunity shields him from CRC's suit because his bailiffs removed CRC from dependency hearings on Judge Walker's orders. (Docket Entry 44 at 11-14.)  The undersigned disagrees for multiple reasons.

The first reason is that CRC's suit against Sheriff Birkhead in his official capacity is actually a suit against Durham County, and counties are not entitled to quasi-judicial immunity.[7]  "[O]fficial capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent[.]"  *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982); *accord. Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 287 n.5 (4th Cir. 2021).  The caselaw is clear that North Carolina sheriffs are agents of their county.  *Harter v. Vernon*, 101 F.3d 334, 338-43 (4th Cir. 1996); *Gantt v. Whitaker*, 203 F. Supp. 2d 503, 508-09 (M.D.N.C. 2002) *aff'd* 57 F. App'x 141 (4th Cir. 2003).  And "municipalities do not enjoy immunity from suit . . . under § 1983."  *Frazier v. Prince George's Cnty., Maryland*, 140 F.4th 556, 566 (4th Cir. 2025) (finding district court erred in giving a county quasi-judicial immunity). Thus, given that CRC sued Sheriff Birkhead, an agent of the county, in his official capacity, Sheriff Birkhead is not entitled to quasi-judicial immunity.

---

[7] Multiple courts outside the Fourth Circuit have reached this same conclusion based on the same principles.  *E.g., Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009); *Alkire v. Irving*, 330 F.3d 802, 810-11 (6th Cir. 2003); *De Luna v. Hidalgo Cnty., Texas*, No. CV M-10-268, 2011 WL 13282104, at *4 (S.D. Tex. June 24, 2011); *see also VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000).  *But see Stafne v. Zilly*, 820 F. App'x 594, 595-96 (9th Cir. 2020) (unpublished); *Conklin v. Anthou*, 495 F. App'x 257, 264 (3d Cir. 2012).

The second reason that quasi-judicial immunity does not shield Sherrif Birkhead is that his bailiffs allegedly enforce Judge Walker's orders, meaning they act in an executive rather than a judicial capacity. While the Fourth Circuit has not addressed this specific scenario, the Ninth Circuit has found that a sheriff enforcing a judge's eviction orders was a "quintessential executive branch official" performing an act of enforcement, not adjudication, and was therefore not entitled to quasi-judicial immunity. *See Moore v. Urquhart*, 899 F.3d 1094, 1104-05 (9th Cir. 2018) ("[E]xercising the power to break down someone's door, enter their home, and carry their belongings to the sidewalk is a quintessentially executive function, not a judicial one."). Here, CRC alleges that Sheriff Birkhead's bailiffs escort CRC attorneys from the courtroom (*see* Compl. ¶¶ 14, 29, 33), which would amount to a "quintessentially executive function, not a judicial one." *See Moore*, 899 F.3d at 1105. Sheriff Birkhead cannot receive quasi-judicial immunity for an executive act.

### C. Sovereign Immunity

The undersigned next concludes that sovereign immunity does not shield Judge Walker from this suit because CRC's claim falls within *Ex parte Young*'s exception, as other courts have held under similar facts.

Under the Eleventh Amendment, this Court has no power to hear a suit against a state brought by a citizen. U.S. Const., amend. XI; *Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001). However, over a century ago, *Ex parte Young* carved out an exception: federal courts may "issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law[.]" *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). And in the many years since *Ex parte*

12

*Young*, suits against state judges for equitable relief have become a repeated, if uncommon, part of federal law. *E.g.*, *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) (finding "prospective injunctive relief" is available against judges; no discussion of sovereign immunity); *Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 736-37 (1980) (upholding suit by consumer organization against Virginia Supreme Court and its chief justice challenging court disciplinary rules; no sovereign immunity because the Virginia Court could initiate disciplinary proceedings, an enforcement act). Although Congress largely nullified *Pulliam* with the FCIA, it impliedly left open the option to sue judges for prospective declaratory relief. *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197-98 (3d Cir. 2000) (finding § 1983's exception for suits where a declaratory decree was violated implies the availability of a declaratory judgment against a judge).

Here, CRC's suit sits comfortably within a long line of cases that have found sovereign immunity inapplicable to judges sued for prospective declaratory relief, many of which involved First Amendment claims similar to the one CRC brings here.[8] *See, e.g., C.R. Corps v. LaSalle*, 741 F. Supp. 3d 112, 145 (S.D.N.Y. 2024) (sovereign immunity did not prohibit suit for public access to hearing and records), *appeal docketed sub nom. Civil Rights Corps v. Cushman*, No. 24-2251 (2d Cir. Aug. 28, 2024); *Condon v. Haley*, 21 F. Supp. 3d 572, 578 (D.S.C. 2014) (sovereign immunity did not bar claim against probate judge issuing marriage licenses);

---

[8] There is an outlier: *Bishop v. Funderburk* found that sovereign immunity barred a suit that sought public access to how state appellate judges had voted to decide a case in which the plaintiff was not a party. *See* No. 3:21-CV-679-MOC-DCK, 2022 WL 1446807, at *4-*5 (W.D.N.C. May 6, 2022). However, *Bishop* is distinguishable because it found the relief its plaintiff requested was not genuinely prospective, *id.*, unlike the relief requested here.

13

*Kentucky Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 862 (E.D. Ky. 2005) (judge had no sovereign immunity in suit for public access to hearings and records); *Martin v. Burgess*, No. 4:23-CV-03228, 2024 WL 4520131, at *3 (S.D. Tex. Oct. 17, 2024) (sovereign immunity would not shield judges from equitable relief); *Briggman v. Burton*, No. 5:15CV00076, 2016 WL 5462840, at *4 (W.D. Va. Sept. 27, 2016) (assuming without deciding that sovereign immunity would not bar claim for prospective declaratory relief against judge); *Johnson Newspaper Corp. v. Morton*, No. CIV-85-1168E, 1988 WL 19306, at *1 (W.D.N.Y. Mar. 4, 1988) (sovereign immunity cannot shield judge from prospective relief) *rev'd on other grounds*, 862 F.2d 25 (2d Cir. 1988). Sovereign immunity therefore does not bar CRC's claim against Judge Walker for prospective declaratory relief regarding access to dependency hearings.

Judge Walker's arguments to the contrary are unpersuasive. Judge Walker points out that *Ex parte Young* did not envision its ruling being used to offer equitable relief against judges; in fact, it called such judgments "a violation of the whole scheme of our government." *See* 209 U.S. at 163. However, "*Ex parte Young* had a particular type of injunction in mind: one that would restrain a state court from acting or from exercising jurisdiction in a case." *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 912 (8th Cir. 2022) (citation modified); *see Ex parte Young*, 209 U.S. at 163 ("[T]he right to enjoin . . . a state official . . . does not include the power to restrain a court from acting in any case brought before it[.]"). Here, CRC does not seek to prevent Judge Walker from exercising her jurisdiction. *Ex parte Young* therefore provides no basis for dismissing CRC's claim against Judge Walker.

Judge Walker also suggests that *Whole Woman's Health v. Jackson* controls. (Docket Entry 66 at 10.) *Whole Woman's Health* involved a Texas Statute that allowed private individuals to

14

sue abortion providers for injunctions and damages. 595 U.S. 30, 35-36 (2021). The abortion providers sought to enjoin a state court judge from hearing those cases, *id.* at 36, but the Supreme Court remanded in part with instructions to dismiss their claim, in part based on sovereign immunity, *id.* at 38-43.

However, *Whole Woman's Health* is distinguishable in two ways.[9] First, *Whole Woman's Health* based its holding in part on the principle that, "[i]f a state court errs in its rulings . . . the traditional remedy has been some form of appeal." *Id.* at 39. Here, North Carolina law does not allow CRC to appeal Judge Walker's orders excluding its attorneys from dependency hearings. *See* N.C. Gen. Stat. §§ 7B-1001, 7B-1002. Second, *Whole Woman's Health* held that its plaintiffs' claim against a judge did not satisfy Article III's "case and controversy" requirement because the abortion providers were only adverse to the private parties who sued them, not the judge who adjudicated their suit. *See Whole Woman's Health*, 595 U.S. at 39-40; *see also Argen v. Att'y Gen. New Jersey*, No. 21-2571, 2022 WL 3369109, at *5 (3d Cir. Aug. 16, 2022) (non-party may be genuinely adverse to judge); *Weigel v. Maryland*, 950 F. Supp. 2d 811, 832 (D. Md. 2013) (not allowing suit to prevent state court judge from applying certain case

---

[9] In addition to the reasons for distinguishing *Whole Woman's Health* given above*, Whole Woman's Health* clearly did not understand itself as issuing a categorical ban on suits against judges. Rather, it stated that *Ex parte Young* "does not *normally* permit federal courts to issue injunctions against state-court judges" because "[*u*]*sually*, those individuals do not enforce state laws as executive officials might." *Id.* at 39 (emphasis added). Accordingly, other courts have found *Whole Woman's Health* inapplicable to First Amendment right of access cases against judges. *See Courthouse News*, 48 F.4th at 912 (construing *Whole Woman's Health* as "[f]ar from laying out an absolute rule"); *LaSalle*, 741 F. Supp. 3d at 145 (state judge was "not correct that *Ex parte Young* cannot be applied to judges and court officials . . . pursuant to the Supreme Court's holding in *Whole Woman's Health*"), *appeal docketed sub nom. Civil Rights Corps v. Cushman*, No. 24-2251 (2d Cir. Aug. 28, 2024).

law because the judge could "neither commence nor threaten to commence proceedings"). Here, CRC is not a party in a case adjudicated by Judge Walker, but rather a member of the public who Judge Walker allegedly excludes from the courtroom due to CRC's advocacy on child dependency issues. (*See* Compl. ¶¶ 23-33.) CRC is therefore genuinely adverse to Judge Walker. For these reasons, *Whole Woman's Health* does not bar CRC's suit.[10]

Judge Walker next argues that "the Eleventh Amendment bars declaratory relief that functions as an advisory opinion seeking to dictate how a state official must act in future situations," and cites three cases for support: *Green v. Mansour*, *McCray v. Maryland Department of Transportation*, and *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy*. (Docket Entry 66 at 10.) But these cases all involved only retrospective relief. *See Green*, 474 U.S. 64, 73 (1985); *McCray*, 741 F.3d 480, 482-83 (4th Cir. 2014); *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. 139, 141-47 (1993). In reality, "the Eleventh Amendment does not preclude private individuals from bringing suit against State officials for prospective . . . declaratory relief," like CRC's claim here. *See Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001).

Judge Walker then argues that *Ex parte Young* requires an "ongoing" violation, which, she suggests, is distinguishable from an "anticipated" one. (Docket Entry 66 at 11-12; Docket

---

[10] This conclusion aligns with the Fourth Circuit's interpretation of *Whole Women's Health*. In *Frazier v. Prince George's County*, the Fourth Circuit interpreted *Whole Woman's Health* to stand for the rule that "Article III's requirement of a justiciable controversy is not satisfied where a judge acts in their adjudicatory capacity rather than as an enforcer or administrator." 140 F.4th 556, 562 (4th Cir. 2025) (citation modified). "A judge's role is adjudicative when the judge acts as they would in any other case by finding facts and determining law in a neutral and impartial judicial fashion." *Id.* (citation modified). Here, because CRC is not a party in a case before Judge Walker, Judge Walker makes no "findings of fact" or "determin[ations] [of] law" regarding CRC. *See Frazier*, 140 F.4th at 562. For this reason, Judge Walker does not act in an adjudicatory capacity toward CRC, making CRC adverse to Judge Walker.

16

Entry 76 at 7.) But the cases she cites create no such rule. *See Green*, 474 U.S. at 73; *Ashcroft v. Mattis*, 431 U.S. 171, 171-73 (1977). To the extent Judge Walker's argument here is an argument against standing, this Recommendation deals with it elsewhere. *See infra*, Section IV.E.1 (explaining why CRC's future injury is sufficiently certain to confer standing).

Finally, Judge Walker argues that "*Ex Parte Young* does not apply where relief would require a federal court to oversee state procedures on an ongoing basis." (Docket Entry 66 at 12; Docket Entry 76 at 7-8.) Again, the cases she cites are inapposite. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (finding *Ex Parte Young* does not allow suits against state officials for violating state law, not federal law); *Republican Party of N. Carolina v. Martin*, 980 F.2d 943 (4th Cir. 1992) (discussing the political question doctrine, not sovereign immunity). To the extent Judge Walker is arguing for abstention, this opinion addresses that argument elsewhere. *See infra*, Section IV.D.2 (explaining why CRC's requested relief does not require an ongoing audit of state courts).

For the above reasons, sovereign immunity does not shield Judge Walker from CRC's suit.

### D. Abstention

Judge Walker argues that both *Younger v. Harris*, 401 U.S. 37 (1971), and *O'Shea v. Littleton*, 414 U.S. 488 (1974), require the Court to abstain. (Docket Entry 66 at 4-8; Docket Entry 76 at 2-5.) AOC argues for *Rooker-Feldman* abstention. (Docket Entry 68 at 11-14; Docket Entry 78 at 11-12; *see also D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923)). As explained below, abstention is not warranted here.

17

## 1. *Younger*

First, the undersigned concludes that *Younger* abstention would be improper here because CRC has no interest in the outcome of any pending state case with which this case would interfere. *Younger* requires federal courts to abstain from interfering with "a parallel, pending state criminal proceeding," and in some cases a parallel civil proceeding. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). However, "[t]he Supreme Court has been explicit that *Younger* abstention is impermissible absent any pending proceeding in state tribunals." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021) (citation modified).

For *Younger* abstention to be appropriate, the federal and state proceedings do not necessarily need to involve the exact same parties, but the federal parties do need to have either "a substantial stake in the outcome of the state proceeding" or "interests [that] are intertwined with the parties in the state proceeding." *Glob. Impact Ministries v. Mecklenburg Cnty.*, No. 3:20-CV-00232-GCM, 2021 WL 982333, at *3 (W.D.N.C. Mar. 16, 2021). For example, in *Courthouse News Serv. v. Harris*, a suit for timely public access to case filings, the District of Maryland found that *Younger* abstention would be improper because the court was "unaware of any pending State judicial proceedings concerning" the filing system. *See* No. CV ELH-22-0548, 2022 WL 17850125, at *25 (D. Md. Dec. 22, 2022). The court reached that decision even though the case's outcome would presumably affect the availability of filings in currently pending cases. *See id.*

Here, CRC has no interest in the outcome of any pending state case with which this case would interfere. CRC's position is identical to that of the plaintiff in *Courthouse News Serv. v. Harris*: while the rule created by CRC's suit may affect public access to currently pending

18

cases, CRC has no interest in any of those cases specifically. *Younger* therefore provides no basis for abstention here.

## 2. *O'Shea*

Next, *O'Shea* abstention would be improper here, first, because CRC is not requesting injunctive relief against a court, and second, because the relief CRC requests does not rise to the level of an ongoing audit of state courts.

*O'Shea* held that federal courts should abstain from granting relief that would constitute an "ongoing federal audit" of certain state court proceedings. 414 U.S. 488, 490-92, 500 (1974); *e.g., Courthouse News Serv. v. Schaeffer*, 429 F. Supp. 3d 196, 207 (E.D. Va. 2019). The Fourth Circuit limits *O'Shea* abstention to claims for injunctive relief against courts, not declaratory relief, and not injunctive relief against executive officers. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021) (news service sued state court clerks for unnecessarily delayed access to civil complaints; *O'Shea* was inapposite because the district court granted only declaratory relief); *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 334 (4th Cir. 2022) (*O'Shea* was inapposite because "[t]he district court can offer meaningful relief solely by monitoring executive action").

Here, CRC seeks only declaratory relief from Judge Walker and injunctive relief from Sheriff Birkhead—an executive officer of the county—so *O'Shea* is inapposite. However, even if *O'Shea* were not ruled out by the category of relief sought, it would be inapplicable due to the lack of intrusiveness of that relief. CRC seeks recognition of the public's alleged First Amendment right of presumptive access to child dependency hearings. For decades now, courts have recognized such a right for state criminal and civil proceedings, and it does not

19

appear to have resulted in an ongoing audit of state courts. *Cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982); *Am. C.L. Union v. Holder*, 673 F.3d 245, 252 (4th Cir. 2011). Therefore, *O'Shea* does not require abstention.

### 3. *Rooker-Feldman*

*Rooker-Feldman* abstention would also be improper here. *Rooker-Feldman* abstention "is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see, e.g., Hulsey v. Cisa*, 947 F.3d 246, 249-51 (4th Cir. 2020). Here, CRC does not seek retroactive relief from a specific judgment against it, but rather prospective relief regarding the public's right to access hearings. Thus, *Rooker-Feldman* does not apply.

AOC nevertheless argues that *Rooker-Feldman* extends to the CRC's suit, relying on the Third Circuit Court of Appeal's decision to abstain in *Boyce v. Dembe*, 47 F. App'x 155 (3d Cir. 2002). (Docket Entry 68 at 12-13.) But *Boyce*'s plaintiff effectively sought federal review of a state court contempt judgment against her. *See Boyce*, 47 F. App'x at 156-57. *Boyce* also expressly distinguished its decision from that of a case declining to apply *Rooker-Feldman* where "solely prospective relief" was sought. *Id.* at 160. Because CRC neither seeks review of a state court judgment against it nor requests retroactive relief, *Boyce* is inapposite. Therefore, *Rooker-Feldman* abstention would be inappropriate here.

### E. Standing

All three defendants claim that CRC lacks standing. The undersigned disagrees.

20

"Article III standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Fed. Trade Comm'n v. Ross*, 74 F.4th 186, 192 (4th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)) (citation modified). CRC has demonstrated all three.

### 1. Injury

CRC has sufficiently alleged an injury. To create standing, a plaintiff's injury "must be both concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), as revised (May 24, 2016) (citation modified). "Even a widely shared interest, where sufficiently concrete, may count as an injury in fact." *Doe v. Pub. Citizen*, 749 F.3d 246, 263 (4th Cir. 2014) (citation modified). In *Public Citizen*, the Fourth Circuit held that the First Amendment right to access court records "is widely shared among the press and the general public alike, such that anyone who seeks and is denied access to judicial records sustains an injury." 749 F.3d at 263 (finding consumer advocacy groups had standing to claim first amendment right to access sealed court records).

Here, CRC alleges denial of its First Amendment right to access dependency hearings. (Compl. ¶¶ 80, 83.) No Defendant has given the undersigned any reason to believe that the right of public access to hearings should be treated any differently than the right of public access to records, which yields a cognizable injury when denied. *Pub. Citizen*, 749 F.3d at 263. Indeed, it is difficult to see how Defendants' arguments on this issue could succeed without implying that past cases involving a right to access hearings were improperly decided by the Supreme Court. *E.g., Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982)

(finding the press, as a member of the public, had a First Amendment right to access a criminal trial). CRC has therefore sufficiently alleged an injury for standing purposes.

Sheriff Birkhead attempts to avoid this issue by arguing that, unlike the plaintiffs in prior public access cases, CRC has no injury because there is no First Amendment right to access dependency courts. (Docket Entry 44 at 14-15.) This cannot be correct. A plaintiff's "standing to bring a case does not depend upon its ultimate success on the merits underlying its case." *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589, 593 (4th Cir. 2025) (citation modified) (finding the correctness of plaintiff's legal theory was irrelevant to whether plaintiff had standing). Whether a First Amendment right of public access might plausibly exist in this context is an appropriate inquiry in a 12(b)(6) analysis, *see infra*, Section IV.H.2, not a standing analysis.

Judge Walker and AOC both argue that CRC's risk of future harm is too uncertain to create standing for prospective relief. (Docket Entry 68 at 10; Docket Entry 76 at 6; Docket Entry 78 at 10). The undersigned disagrees. "[S]tanding requirements are somewhat relaxed in First Amendment cases, particularly regarding the injury-in-fact requirement." *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019), as amended (Jan. 9, 2019) (finding students previously arrested for disorderly conduct at school faced substantial risk of future arrest because they continued to attend school). Here, CRC alleges that Judge Walker closed every hearing CRC attorneys attempted to attend, other than two under unusual circumstances. (Compl. ¶ 26.) CRC also alleges that Judge Walker has, on multiple occasions, had CRC removed from her courtroom even when other members of the public have been allowed to remain. (*Id.* ¶¶ 27-28, 33.) Finally, CRC alleges that it plans to continue to attempt to watch

dependency hearings. (*Id.* ¶ 32.) These allegations suggest a reasonably high probability that, absent relief from this court, Judge Walker will deny CRC access to dependency hearings again in the future in a manner that may violate CRC's potential right of access. Indeed, the probability of future harm here seems much higher than it was in *Davison*, where students' mere presence at school placed them at risk of future arrest under a disorderly conduct law. *See* 912 F.3d at 678. CRC has therefore alleged sufficient risk of future harm to claim prospective relief.

Judge Walker and AOC also argue that CRC cannot establish injury because it voluntarily chose to expend resources on sending attorneys to unsuccessfully watch dependency court. (Docket Entry 66 at 14-15; Docket Entry 68 at 10.) They are correct that "standing cannot be established on the sole basis of an organization's uncompelled choice to expend resources." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396-97 (4th Cir. 2024). But CRC does not allege standing on the grounds that the closed dependency hearings forced it to make expenditures in line with its organizational mission. Rather, CRC alleges that the closed dependency hearings violated its First Amendment right to presumptive access as a member of the public. (Compl. ¶¶ 80, 83.) As explained previously, such a violation is a cognizable injury for standing purposes.

## 2. Causation

CRC has also sufficiently alleged causation. Satisfaction of the causation element "necessitates only that the alleged injury be fairly traceable to the complained-of action." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 315 (4th Cir. 2013) (citation modified). Here, CRC has alleged that its injury was traceable to both Judge Walker, who orders CRC attorneys

23

out of the courtroom, and Sheriff Birkhead's bailiffs, who escort CRC attorneys from the courtroom. (Compl. ¶ 33.)

Here, CRC's injury is clearly traceable to Judge Walker's exclusion of CRC from dependency hearings. However, Sheriff Birkhead argues that CRC "cannot demonstrate that its alleged injuries were caused by [Sheriff] Birkhead" because his bailiffs merely follow Judge Walker's orders, preventing them from being the "proximate cause" of CRC's injury. (Docket Entry 44 at 15-18.) The undersigned disagrees. Courts should not "wrongly equate" the causation requirement for standing with the "proximate cause standard [of] tort law." *Libertarian Party of Virginia*, 718 F.3d at 315. Additionally, discretion is not a requirement for causation. *See Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014) (standing existed for same-sex couples to sue the clerk of court for denying them marriage licenses; clerk had no discretion to issue the licenses under Va. Code § 20-45.2 (1997) (repealed 2020)). Thus, whether Sheriff Birkhead's bailiffs are the proximate cause of CRC's injury or whether they lack discretion to act differently is irrelevant. Either way, CRC's injuries are traceable to the bailiffs' role in enforcing Judge Walker's closure orders.

### 3. Redressability

Finally, CRC has sufficiently alleged that the relief it seeks will redress its future injury. "To satisfy redressability, a plaintiff must demonstrate it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 188 (M.D.N.C. 2020) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)). The undersigned has already explained why CRC may seek injunctive relief from Sheriff Birkhead and declaratory relief

24

from Judge Walker. *See supra*, Section IV.A.-C. This relief, should CRC receive it, is likely to allow CRC to access dependency hearings.[11]

CRC has therefore met all three elements required for standing.

### F. Ripeness

CRC's claims are ripe. "A claim should be dismissed for lack of ripeness if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Clayland Farm Enters., LLC v. Talbot Cnty., Maryland*, 672 F. App'x 240, 244 (4th Cir. 2016). The undersigned has already explained that CRC's future injury is reasonably likely. *See supra*, Section IV.E.1. All that remains to do here is to explain why the cases Judge Walker cites to the opposite effect are unpersuasive.

Judge Walker points out that *Kentucky Press Association* found claims for public access to juvenile hearings were unripe because the plaintiffs had not yet pursued the issue in state court. (Docket Entry 66 at 16.) But in that case, the plaintiffs did not challenge discretionary closures of presumptively open hearings. *See Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 507 (6th Cir. 2006). Instead, *Kentucky Press Association* involved a challenge of a Kentucky statute that, the plaintiffs alleged, excluded the public from juvenile hearings. *Id.* The Sixth Circuit pointed out that less exclusive interpretations of the statute were possible, and that if a state court found such interpretations were correct, it "would transform [plaintiff's] constitutional

---

[11] AOC argues that because CRC alleges no "deficiencies in [the] statutory procedures" Judge Walker must follow to close the courtroom, the "requested relief of new procedures would not actually 'redress' the First Amendment injury alleged." (Docket Entry 68 at 10.) But AOC cites no law supporting this statement, and the undersigned found none. To the extent that AOC's argument is that CRC should have challenged the statute giving Judge Walker discretion to close hearings, that argument is addressed elsewhere. *See infra*, Section IV.H.2.iii.

25

claim." *Id.* at 509. The Six Circuit therefore dismissed the case to give the state court a chance to articulate the statute's scope. *Id.* at 508-11. The Sixth Circuit's reasoning has no bearing on this case, where CRC challenges no statute.

Judge Walker similarly argues that *Huffman v. Pursue* found "federal courts should not interfere when state courts can resolve constitutional issues themselves." (Docket Entry 66 at 16.) But *Huffman* was not about ripeness; it was about *Younger* abstention, which the undersigned has already dealt with. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975); *supra*, Section IV.D.1.

For the above reasons, the Court should find that CRC's claims are ripe.

## G. Discretionary Dismissal of Declaratory Relief

Federal courts have discretion to dismiss claims for declaratory relief like CRC's claim against Judge Walker. *See* 28 U.S.C. § 2201(a); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 278 (1995). However, the undersigned concludes that dismissal would not be appropriate here.

The Fourth Circuit requires that district courts consider two sets of factors when deciding whether to hear a claim for declaratory relief. *See Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998). The first set has to do with whether the case will clarify the legal relations of the parties; the second set has to do with whether hearing the claim is consistent with principles of federalism. *See id.* Here, the clarification-related factors weigh strongly in favor of hearing the case, while the federalism-related factors weigh, at most, weakly against it. The Court should therefore hear this case.

26

### 1. Clarification-Related Factors

The clarification-related factors weigh strongly in favor of hearing CRC's case because the case will clarify CRC's rights. A claim "should not be used to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998) (citation modified). Courts applying this rule ask whether a declaratory judgment (1) "will serve a useful purpose in clarifying and settling the legal relations in issue," and (2) "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (citation modified).

Here, CRC claims a qualified right to access dependency hearings. (Compl. ¶¶ 34-36.) Judge Walker claims CRC has no such right and has denied CRC the access it seeks. (*Id.* ¶¶ 26-32; Docket Entry 66 at 17.) No other court has decided, or is in the process of deciding, whether CRC or Judge Walker is correct. Thus, hearing CRC's claim "will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *See Aetna*, 139 F.3d at 422. This set of factors weighs strongly in favor of hearing CRC's claim.

### 2. Federalism-Related Factors

The federalism-related factors weigh weakly, if at all, against hearing CRC's claim. When a declaratory judgment would affect the judgments of state courts, district courts must consider "federalism, efficiency, and comity." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998). Generally, courts consider this set of factors when a related case is pending in a state court. *See, e.g., Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 202 (4th Cir.

2019) (describing these factors as appropriate "when an ongoing proceeding in state court overlaps with the federal case"); *Gressette v. Sunset Grille, Inc.*, 447 F. Supp. 2d 533, 538 (D.S.C. 2006) (electing to hear a claim for declaratory relief because no pending parallel state court action existed). However, although a lack of a pending parallel state court action is a "significant factor" in favor of hearing a claim for declaratory relief, "it is not dispositive." *Aetna*, 139 F.3d at 422-23 (upholding a district court's decision not to hear a case with no pending parallel state action because North Carolina law required the plaintiff to exhaust their administrative remedies before bringing the case in state court).

Here, the comity factor weighs against hearing CRC's claim. If the Court eventually rules in CRC's favor on the merits, the effect may be that state dependency judges must justify their decisions to close court by invoking a compelling state interest or be held in violation of the U.S. Constitution. This, in a sense, would involve federal courts telling state courts what the state courts must do, a violation of the principle of comity.

The federalism factor's weight is more neutral. While federal courts ought not to interfere unnecessarily with state courts, it is also the duty of federal courts, where jurisdiction exists, to uphold rights guaranteed by the U.S. Constitution. *Cf. Green v. Mansour*, 474 U.S. 64, 68 (1985) ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause."). Additionally, as already discussed in the context of abstention doctrines, this case does not involve an attempt to interfere with any specific pending state case, and there is no indication that CRC must first exhaust its remedies at the state level.

Finally, the efficiency factor weighs in favor of hearing this case. Even if this Court were to dismiss CRC's claim for discretionary relief against Judge Walker, it would still be

28

obligated to hear CRC's claim for injunctive relief against Sheriff Birkhead. Moreover, CRC would likely refile its claim against Judge Walker in state court. Thus, it is more efficient for this Court to hear CRC's claim against Judge Walker than to dismiss it.

Altogether, the federalism-related factors weigh, at most, weakly against hearing CRC's claim. Given this, and given that the clarification-related factors weigh strongly in favor of CRC's claim, the Court should not discretionarily dismiss CRC's claim for declaratory relief against Judge Walker.

### H. Failure to State a Claim

All Defendants have filed motions under Rule 12(b)(6) arguing that CRC's suit should be dismissed for failure to state a claim. Sheriff Birkhead argues that CRC fails to state a claim against him under *Monell v. Department of Social Services*. (Docket Entry 44 at 15-18.) All Defendants contend that CRC has not stated a § 1983 claim against them under the First Amendment. (Docket Entry 44 at 18-26; Docket Entry 66 at 17-21; Docket Entry 68 at 14-23; Docket Entry 76 at 9-12; Docket Entry 78 at 1-9.) The undersigned disagrees on both counts.

A 12(b)(6) motion prompts a court to consider whether allegations in a complaint are sufficient to state a plausible claim. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Factual allegations must be "enough to raise a right to relief above the speculative level." *Id.* at 555 (citation modified). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Walters v. McMahen,* 684 F. 3d 435, 439 (4th Cir. 2012) (quoting *Twombly,* 550 U.S. at 570). The "court accepts all well-pled facts as true

29

and construes these facts in the light most favorable to the plaintiff, but does not consider legal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009) (citation modified).

### 1. *Monell*

#### i. *Monell*'s Applicability

CRC's claim against Sheriff Birkhead must pass the test from *Monell v. Department of Social Services* for municipal liability under § 1983. "[O]fficial capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent[.]" *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *accord. Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 287 n.5 (4th Cir. 2021). If the officer is an agent of the state, they may receive sovereign immunity from § 1983 claims so long as *Ex parte Young* does not apply. *E.g., Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996). But if the officer is an agent of a municipality, the suit against them must instead satisfy the *Monell* test. *E.g., Dawkins v. Staley*, No. 1:22-CV-299, 2023 WL 1069745, at *6 (M.D.N.C. Jan. 27, 2023) (applying *Monell* to claims against an employee of a county department of social services in their official capacity).

Here, the law is clear: Sheriff Birkhead is an agent of Durham County. *See Harter v. Vernon*, 101 F.3d 334, 338-43 (4th Cir. 1996) (finding North Carolina sheriffs are agents of their county); *Gantt v. Whitaker*, 203 F. Supp. 2d 503, 508-09 (M.D.N.C. 2002) (explaining why *Harter* remains good law despite intervening Supreme Court cases), *aff'd*, 57 F. App'x 141 (4th Cir. 2003); *Atkinson v. Godfrey*, 100 F.4th 498, 509 (4th Cir. 2024) (prescribing the *Monell* test

30

for a claim against a North Carolina sheriff). And the fact that CRC is seeking only prospective relief does not make any difference: "*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 39 (2010).

CRC's claim against Sheriff Birkhead must therefore satisfy *Monell*.

### ii.    Stating a Claim Under *Monell*

CRC requested leave to amend its Complaint should the Court find *Monell* applies. (Docket Entry 58 at 16-17.) The undersigned concludes that this is not necessary. CRC's complaint already has what it takes to survive a motion to dismiss for failure to state a claim under *Monell*.[12]

*Monell* forbade courts from holding a municipality liable under § 1983 for the acts of its employees. *See* 436 U.S. 658, 691 (1978). A municipality is liable only if it "follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). A plaintiff can prove a custom or practice by proving "persistent and widespread practices of municipal officials which although not authorized by written law, are so permanent and well-settled as to have the force of law." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (citation modified). Plaintiffs must allege sufficient "duration and frequency of the practices" to show the municipal policymaker has "actual or constructive knowledge" of them. *Id.* at 1387. "Constructive knowledge may be evidenced by the fact that the practices have been so

---

[12] If the Court declines to adopt the undersigned's recommendation to find CRC has already stated a plausible claim under *Monell*, the undersigned recommends the Court grant CRC leave to amend its complaint to meet *Monell*'s requirements.

widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Id.*

This is a high hurdle at the merits stage. But at the 12(b)(6) stage, a plaintiff survives so long as they make any allegations of a custom, policy, or practice that go beyond "labels and conclusions" or "formulai[c] recit[ation] [of] the elements" of their claim. *See Owens*, 767 F.3d at 403. "The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Id.* (finding plaintiff stated a claim under *Monell* where they merely alleged that cases and motions yet to be discovered would evidence multiple constitutional violations by police). This is because a court must "draw all reasonable inferences in favor of the plaintiff" at the 12(b)(6) stage. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). An allegation of three or more constitutional violations is generally sufficient to state a claim under *Monell*. *See, e.g., Hoffman v. Montgomery Cnty.*, No. CV GLS 21-2727, 2023 WL 375178, at *5 (D. Md. Jan. 24, 2023) (finding an allegation of three constitutional violations was sufficient state a claim under Monell); *Booker v. City of Lynchburg*, No. 6:20-CV-00011, 2021 WL 519905, at *4 (W.D. Va. Feb. 11, 2021) (four constitutional violations was sufficient).

Here, drawing all reasonable inferences in favor of CRC, the Court should conclude that CRC has alleged a sufficient number and flagrancy of constitutional violations to state a plausible claim under *Monell*. CRC alleges its attorneys were excluded from the courtroom on seven separate days (Compl. ¶ 26) and that the bailiffs were involved in this exclusion "multiple" times, including by escorting CRC attorneys out of the courtroom, "patrolling the courtroom to ascertain the identity of members of the public who are present, including Civil Rights Corps," and "hanging a 'CLOSED HEARING' sign on the courtroom door after Civil Rights

32

Corps personnel are excluded." (*Id.* ¶ 33.) Moreover, CRC alleges that Judge Walker "never" made a particularized finding that a child would be harmed before excluding CRC (*id.* ¶ 8) and multiple times "a Deputy Sheriff escorted Civil Rights Corps staff from their seats and past various other individuals who were unaffiliated with the particular proceedings but permitted to remain" (*id.* ¶ 33). These allegations make it at least plausible that the bailiffs' violations were sufficiently "persistent," "widespread," and "flagrant" to give Sheriff Birkhead actual or constructive knowledge of them. *See Spell*, 824 F.2d at 1386-87. As a result, CRC is not making a mere conclusory statement when it later alleges that Sheriff Birkhead has a "policy and practice of enforcing exclusion orders" from Judge Walker to "deprive [CRC] of the right of access to court proceedings secured by the First Amendment to the U.S. Constitution." (Compl. ¶ 83.)

For the above reasons, CRC has made sufficient *Monell* allegations to survive Sheriff Birkhead's motion to dismiss.

### 2. First Amendment

CRC has plausibly alleged that a First Amendment right to access dependency hearings exists. The Fourth Circuit has recognized a right of public access to civil proceedings, including civil trials and certain civil filings. *Am. C.L. Union v. Holder*, 673 F.3d 245, 252 (4th Cir. 2011). For a plaintiff to show that this right extends to a specific context, the plaintiff must prove (1) a nationwide[13] "tradition of accessibility" regarding the proceeding, and (2)

---

[13] "[T]he experience test . . . does not look to the particular practice of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States." *El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993); *accord. United States v. Byrd*, No. CIV.A. RDB-14-186, 2015 WL 2374409, at *2 n.5 (D. Md. May 15, 2015).

33

that "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986). This is often referred to as the "experience and logic" test. *See id.* at 9. CRC has alleged extensive facts supporting its position on both prongs. (Compl. ¶¶ 34-64.)

### i. Experience Prong

CRC has plausibly alleged that dependency hearings have a tradition of accessibility. CRC alleges that:

> 37. The "experience" prong of the *Press-Enterprise* test is met because dependency proceedings historically have been open to the press and general public. The history of dependency proceedings reflects a general trend of openness, including a recognition, from the start, of the importance of presumptive public access.

> 38. Chancery courts in the 1600s and 1700s heard cases involving what we now called dependency issues, such as cases involving children who were wards of the state due to parental abuse or neglect. Records show that proceedings involving minors and the state's intervention in their care were open to the public both in English Chancery court and in early American courts.

> 39. North Carolina's modern dependency proceedings—along with most modern dependency proceedings in the United States—can trace their origins to the first specialized juvenile court in the United States, which was established in Cook County, Illinois. The Cook County juvenile court, which at the time had jurisdiction over both delinquency and dependency cases, was established in 1899 as a presumptively open court.

> 40. Moreover, the contemporaneous legislative records and newspapers reflect an active debate about the value of public access versus total secrecy. During the debate surrounding the 1899 enabling statute, some advocates fought to close the courts entirely to anyone who did not have a direct interest in the pending case. These advocates proposed a "secret hearings" clause to the bill. Their proposal drew immediate and strenuous

34

backlash. Critics of this proposal were concerned that closing courts would allow the government to avoid public scrutiny of, and accountability for, its decisions to separate families—and even profit off that separation.

41. Concerns about closing the courts were driven primarily by a backlash against the Orphan Trains and the Children's Aid Society, which are widely accepted as precursors to the modern day foster system. In other words, the most vocal proponents of presumptively open courts were those who feared what would happen not to children accused of crimes but rather to the impoverished children who became wards of the state after their parents were deemed unfit in dependency proceedings.

42. The night before legislative hearings on the bill, for example, the *Chicago Inter-Ocean* ran a front-page story opposing closed hearings in the strongest terms. The article noted that closed hearings would prevent families and the press from exposing the wrongful takings of children from loving, albeit poor, families, as well as "the anguish of a mother whose child was being taken from her[.]"

43. Persuaded by concerns about the government taking children from their parents behind closed doors and demands for transparency and accountability, Illinois legislators removed the "secret hearings" clause. The bill then passed unanimously on the last day of the legislative session.

44. Those who supported open juvenile courts thus prevailed, and the earliest juvenile courts had open hearings and public records. Courts remained open to the public in the following decades. Photographs of the Cook County Juvenile Court in 1905 . . . show packed proceedings, with many individuals in attendance, and news reports from the early decades of the 1900s show that press coverage of dependency hearings was commonplace.

45. Eventually, most states adopted the Illinois statutory language, including the provisions relating to public court access. As of 1939, the majority of states had dependency proceedings that were presumptively open to the public. And even in states with statutes that formally closed hearings, or that gave judges discretion to close hearings, the public was often permitted to observe these proceedings in practice.

35

46. North Carolina, specifically, enacted a juvenile court law in 1919, which provided that while courts "may" close hearings, they were presumptively open to the public. North Carolina newspapers during this time period reported on juvenile cases and provided accounts of open hearings.

47. Judges presiding over dependency proceedings across the United States quickly adapted to their public nature, even using the media as a way to enhance the courts' legitimacy and to educate the public about what the judges saw as the benefits of these courts. 48. In the late 1960s and 1970s, there was a move to restrict public access to dependency proceedings. Some states passed laws that presumptively closed dependency proceedings to the public, or closed them completely without providing any mechanism for the public to seek access. However, even in this period, courts that were nominally "closed" did permit public access. For example, the Illinois juvenile court supposedly "closed" its hearings in 1965, but it still permitted public access to the press. And throughout the country, judges often permitted teachers, counselors, clergy, extended family members, and other members of the public to attend proceedings.

49. This experiment with closed dependency proceedings in some states did not last long. In the 1980s, many states that had closed their dependency courts began reopening them reaffirming the value of public access upon which the dependency court system was originally built. Oregon led the shift in 1980, with Michigan and New York following soon after, and Minnesota in 1998.

50. Reflecting this trend toward openness, the National Council of Juvenile and Family Court Judges, an organization that "identifies problems within our nation's juvenile and family courts and formulates ways of improving practice in order to enhance justice," issued a resolution in 2005 in support of presumptively open hearings. The Council acknowledged that "the public has a legitimate and compelling interest in the work of our juvenile and family courts" and stated that presumptively "open court proceedings will increase public awareness of the critical problems faced by juvenile and family courts and by child welfare agencies in matters involving child protection, may enhance accountability in the conduct of these proceedings by lifting the veil of secrecy which surrounds them, and may

36

ultimately increase public confidence in the work of the judges of the nation's juvenile and family courts."

51. In other words, except for a period in the 1960s and 1970s when closure occurred in some courts, there has been a long and broad history of public access to dependency proceedings in this country. The value of openness in these proceedings has been widely discussed and publicly acknowledged for decades. Even when some states chose to presumptively close their courts, those closure policies were confined to specific jurisdictions, were unevenly enforced, and did not last long.

52. The history of access to dependency courts in North Carolina is not a history of closure to the public, but rather a history of general openness to the public. Notwithstanding Defendants' unconstitutional practice, state law still provides for a presumption of open courts, and the legislative history of the relevant statute shows that courts. N.C. Gen. Stat. Ann. § 7B-801; *see also* N.C. const. Art. I § 18; *Virmani v. Presbyterian Health Services Corp.*, 350 N.C. 449, 463 (1999) (the "necessary and inherent power of the judiciary" to close court proceedings "should only be exercised" when "required"). According to state law and policy, decisions to close the courts for a particular court proceeding are supposed to be made on a case-by-case basis. Moreover, appeals of dependency cases are heard in open court in North Carolina, and oral arguments are fully available to the public.

(Compl. ¶¶ 37-52 (footnotes and photograph omitted).)   In summary, these allegations adequately assert that dependency courts and their historical equivalents have been open in multiple jurisdictions from before the American Revolution to the present day.   Such assertions plausibly allege that dependency hearings have been historically open.

Defendants' arguments to the contrary are not persuasive.[14]  AOC characterizes CRC's allegations as involving only "centuries-old proceedings involving children, [and] only at a high

---

[14] In addition to Defendants' counterarguments considered above, Defendants also offer allegations regarding the history of dependency hearings that reinterpret or contradict

level of generality." (Docket Entry 68 at 19.) Judge Walker similarly characterizes CRC's allegations as a "few isolated episodes or policies from centuries past where certain observers were occasionally allowed to attend juvenile court hearings." (Docket Entry 76 at 9.) These characterizations overlook the fact that CRC's allegations include national trends and speak to proceedings as far back as the 1600s and as recent as the present day. (Compl. ¶¶ 37-52.) Such allegations plausibly suggest a history of access.

AOC also contends that CRC must demonstrate an "unbroken" tradition of public access, which CRC has not. (Docket Entry 78 at 2.) This misstates the law. *Press-Enterprise* relied on a trend of proceedings being only "generally" open. *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 25 n.6 (1986). And as AOC acknowledges, the Fourth Circuit has found a right to access proceedings that were only "typically" open. *See In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986). Here, CRC's factual allegations make it at least plausible that dependency hearings have typically been open to the public.

### ii. Logic Prong

The undersigned also concludes that CRC plausibly alleges that public access plays a significant positive role in the functioning of dependency hearings. CRC alleges that:

- "As the Supreme Court and the Fourth Circuit have recognized, court-watching is a crucial civic activity that assures the public that the proceedings are fair." (Compl. ¶ 54)

CRC's allegations. For example, Sheriff Birkhead argues that most states' dependency hearings are currently closed. (Docket Entry 44 at 24-25.) But even if this is true—and CRC provides reason to doubt that it is (Docket Entry 58 at 17)—it is a fact that the Court would consider in an eventual merits analysis, not at this stage. "When considering a motion to dismiss, the Court generally considers only what the plaintiff has alleged; a defendant's allegations are immaterial." *Hudson v. SNVA*, LLC, No. CV TJS-21-2617, 2022 WL 3134424, at *2 (D. Md. July 28, 2022); *see also Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2062 (2025) ("Because this case comes to us on a motion to dismiss, we take as true the well-pleaded facts in the plaintiff's complaint . . . and do not consider evidence beyond that pleading.").

38

- "[T]he Supreme Court has explained that public access is especially critical to the democratic need to hold public officials accountable through observation in courtrooms without juries present—such as dependency proceedings." (*Id.* ¶ 55.)

- "Public access to dependency proceedings [would] permit[t] an informed public to identify ways in which the system is not meeting its purposes and to propose reforms that will better protect children and families." (*Id.* ¶ 57.)

- Open hearings have been demonstrated to have positive effects both in child dependency and other contexts. (*Id.* ¶¶ 60-61.)

- "[P]ublic access can prevent arbitrary or unreasonable decisions." (*Id.* ¶ 62.)

- Stakeholders recognize the benefits of public access to dependency hearings. (*Id.* ¶¶ 75-77.)

- Judges can mitigate concerns regarding child privacy via other methods than total closure. (*Id.* ¶ 78.)

These allegations easily clear the plausibility bar to show that "public access plays a significant positive role in the functioning of" dependency hearings. *See Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986).

Defendants' arguments to the contrary are immaterial insofar as they allege that CRC is empirically wrong, *see Hudson v. SNVA*, LLC, No. CV TJS-21-2617, 2022 WL 3134424, at *2 (D. Md. July 28, 2022) (courts do not consider defendants' factual allegations on a 12(b)(6) motion), and unpersuasive insofar as they allege that CRC's allegations are implausible. Defendants repeatedly point out that dependency hearings "involve minors, allegations of abuse or neglect, and sensitive family dynamics" (*e.g.*, Docket Entry 76 at 11), but this mere fact is not enough to make it implausible that a qualified right of access would be beneficial. As CRC points out, courts have recognized the benefits of public access to proceedings involving minors in other contexts. *See, e.g., Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,

39

457 U.S. 596, 607-08 (1982) (finding that the First Amendment prohibits mandatory closure of testimony from minor victims of sex crimes).

AOC additionally argues that CRC's allegations regarding public access increasing public knowledge and confidence "could be said about any judicial proceeding." (Docket Entry 78 at 6.) "If increased public accountability and knowledge were all the logic prong required," AOC says, "then there would have been no reason for the Supreme Court to recognize it as a separate factor." (*Id.* at 7.) But CRC alleged multiple facts specific to dependency hearings, such as that open dependency hearings have yielded public benefits in certain states (Compl. ¶ 60) and have been embraced by stakeholders (*id.* ¶¶ 75-77).

For these reasons, the undersigned recommends the Court find that CRC alleged sufficient facts to state a plausible First Amendment claim for a qualified right to access dependency hearings.

### iii.    Defendants' Other First Amendment Arguments

AOC argues that this Court need not accept CRC's historical and policy-related pleadings as true at this stage. (Docket Entry 78 at 2.) For support, AOC cites *New York State Rifle & Pistol Association v. Bruen*, where the Supreme Court reviewed a 12(b)(6) motion to dismiss a Second Amendment challenge to a gun law. 597 U.S. 1 (2022). In that case, the Supreme Court "engage[d] in independent historical analysis, not constrained by the plaintiff's factual allegations." (Docket Entry 78 at 2 (citing *Bruen*, 597 U.S. at 25-26, 41 (2022).) But the Supreme Court is "not technically bound by the Federal Rules of Civil Procedure." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). This Court has no such freedom. It therefore must accept CRC's well-pled facts as true and construe them in the light most

favorable to CRC at this stage in the proceedings. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009); *see also Zink v. Lombardi,* 783 F.3d 1089, 1112-13 (8th Cir. 2015) (finding prisoners failed to state a claim under *Press-Enterprise* because they "fail[ed] to allege a tradition of accessibility"). The undersigned did so above and found CRC's claims stated a plausible claim under both the experience and logic prongs of the *Press-Enterprise* test.

AOC also argues that "[h]istory does not show 'that the framers were concerned with assuring press access [to judicial proceedings] when they designed the First Amendment.'" (Docket Entry 68 at 23; Docket Entry 78 at 8-9.) This argument is not persuasive. The Supreme Court and the Fourth Circuit have both held that a First Amendment right of public access to court proceedings exists, and that courts must apply *Press-Enterprise*'s experience and logic test to determine whether that right is implicated by a particular proceeding. *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986); *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 171 (4th Cir. 2024). This Court cannot ignore binding precedent. The correct inquiry here is whether the right of access exists under *Press-Enterprise*'s experience and logic test, and CRC has alleged sufficient facts to plausibly succeed on both of those prongs.

Judge Walker argues that to state a claim for relief, CRC must challenge the North Carolina statute giving her discretion to close dependency hearings, which CRC has not done here. (Docket Entry 66 at 21-22; Docket Entry 76 at 7-8; *see also* N.C. Gen. Stat. § 7B-801.) But both the Supreme Court and the Fourth Circuit have held that challenging an exercise of discretion under a statute is not the same as challenging a statute. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 n.4 (1980) (finding a First Amendment challenge to a judge's court

41

closure order was solely a challenge of the judge's exercise of discretion under a statute, not a challenge of the statute itself); *Tyrone, Inc. v. Wilkinson*, 410 F.2d 639, 643 (4th Cir. 1969) ("[A]n attack on lawless exercise of authority in a particular case is not an attack upon the constitutionality of a statute conferring the authority.") (quoting *Phillips v. United States*, 312 U.S. 246, 252 (1941)); *see also Henderson Amusement, Inc. v. Good*, 172 F. Supp. 2d 751, 757 (W.D.N.C. 2001) (quoting *Phillips* for the same rule), *aff'd*, 59 F. App'x 536 (4th Cir. 2003) *abrogated on other grounds by Gantt v. Whitaker*, 203 F. Supp. 2d 503, 508-09 (M.D.N.C. 2002). Thus, CRC appropriately challenges Judge Walker's exercise of discretion by claiming that excluding CRC from dependency hearings violated the First Amendment.[15]

Judge Walker and AOC argue that other courts have found no First Amendment right to dependency hearings. (Docket Entry 66 at 18-19; Docket Entry 68 at 15; Docket 78 at 4.) But the only federal[16] opinion to hold so was *Briggman v. Burton*, No. 5:15CV00076, 2016 WL

---

[15] Judge Walker relies on *Simmons v. Conger* for the rule that "[o]ne cannot allege a constitutional violation by a judge, who was doing precisely what a statute permits him to do, without challenging the constitutionality of the statute under which he was acting." 86 F.3d 1080, 1086 (11th Cir. 1996). But *Simmons* is not persuasive because it contradicts both the Supreme Court and Fourth Circuit precedents cited above. Indeed, Judge Barkett's concurring opinion in *Simmons* pointed out that its holding was not reconcilable with *Richmond Newspapers v. Virginia*. *See* 86 F.3d at 1086-88 (Barkett, J., concurring).

[16] In addition to *Briggman*, there are three state court cases that found no right of access to dependency or dependency-like hearings. However, they are not persuasive for similar reasons as *Briggman*: They relied on the history of juvenile delinquency rather than dependency hearings, they did not specify the level of historical briefing provided by their plaintiffs, and they are contradicted by the cases cited above that did find a right of access. *See San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Superior Ct.*, 232 Cal. App. 3d 188, 197-205 (Ct. App. 1991) (finding the logic element of the *Press-Enterprise* test weighed in favor of a right of access to dependency hearings, but the history element weighed against it); *In re T.R.*, 52 Ohio St. 3d 6, 17 (1990 (finding the logic and history prongs both weigh against access)) *abrogated on other grounds by State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, 177 Ohio St. 3d 174 (finding the Ohio constitution creates a right of access to juvenile proceedings even where the First

42

5462840, at *5 (W.D. Va. Sept. 27, 2016).[17] *Briggman* is not persuasive for three reasons. First, *Briggman*'s complaint did "not allege that juvenile court proceedings have been historically open to the public."[18] *Id.* at *5. Thus, although *Briggman* went on to find no tradition of access to dependency hearings, its historical analysis was both unnecessary to its holding and not informed by briefing from the parties. Second, the relief *Briggman*'s plaintiff sought involved access to all proceedings in "Juvenile and Domestic Relations District Courts." *Id.* at 1. Accordingly, the *Briggman* court's historical analysis looked at juvenile proceedings broadly, including juvenile delinquency hearings, which CRC does not claim a right to access here. *See id.* at *5. Third, other courts disagree with *Briggman*. *See New Jersey Div. of Youth & Fam. Servs. v. J.B.*, 120 N.J. 112, 120-29 (1990) (finding a First Amendment right to access dependency hearings exists as an extension of the right to access civil hearings); *Falconi v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 543 P.3d 92, 96-99 (Nev. 2024) (finding a right to access child custody proceedings because both the logic and history prongs weigh in favor), *cert. denied sub nom. Minter v. Falconi*, 145 S. Ct. 445 (2024).

---

Amendment does not); *Nat. Parents of J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 780 So. 2d 6, 8-11 (Fla. 2001) (finding no right to access termination of parental rights proceedings because neither the experience nor long logic weigh in favor).

[17] Other federal cases cited by Defendants involve juvenile delinquency hearings, not dependency hearings. *E.g., Kentucky Press Ass'n v. Kentucky*, 355 F. Supp. 2d 853, 864 (E.D. Ky. 2005).

[18] Indeed, *Briggman*'s complaint contained no allegations about the history of dependency proceedings whatsoever. *See* Amended Complaint at 1-12, *Briggman v. Burton*, No. 5:15CV00076, 2016 WL 5462840 (W.D. Va. Sept. 27, 2016).

The caselaw on this issue therefore remains "unsettled." *Rogers v. Gaston*, No. 6:19-CV-03346-RK, 2021 WL 4943741, at *14 (W.D. Mo. Oct. 22, 2021) (finding a right of public access to dependency hearings was unsettled for qualified immunity purposes); *see also Rhoads v. Guilford Cnty.*, N. Carolina, 751 F. Supp. 3d 590 (M.D.N.C. 2024) (assuming without deciding that a right of public access to dependency hearings exists). And given the caselaw does not settle the issue, the correct inquiry at this stage is, again, whether CRC pleaded sufficient facts to state a plausible claim under the *Press-Enterprise* test. The undersigned concludes that CRC has done so.

## V. MOTION FOR PRELIMINARY INJUNCTION

The Court next turns to CRC's Motion for Preliminary Injunction and Request for Hearing. (Docket Entry 12.) CRC seeks to prevent Sheriff Birkhead's bailiffs from excluding CRC attorneys from dependency hearings absent a specific finding that the state has a compelling interest in closing the hearing and no less restrictive alternatives are available. (*Id.* at 1.) The Court should not grant CRC's motion for a preliminary injunction because CRC has not shown likely success on the merits of its First Amendment claim.[19]

To receive a preliminary injunction, a plaintiff must show "(1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) equity favors granting preliminary relief; and (4) preliminary relief is in the public interest." *Salomon &*

---

[19] Judge Walker also contests standing in her response to CRC's motion for a preliminary injunction. (Docket Entry 51 at 17.) To the extent that an additional standing issue exists due to the higher standard of proof required here than at the motion to dismiss stage, *see Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 514-15 (4th Cir. 2025), the undersigned need not resolve whether CRC has met that higher standard. Even assuming CRC has, its motion should fail for the reasons given above.

*Ludwin, LLC v. Winters*, 150 F.4th 268, 273 (4th Cir. 2025). To show likely success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation modified); *accord. Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 660 (M.D.N.C. 2024).

To eventually succeed here, CRC will need to prove that (1) dependency hearings have a history of openness, and (2) openness benefits dependency hearings. *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986). In the previous 12(b)(6) analysis, the undersigned determined that CRC has plausibly shown that it can satisfy both prongs. *See supra*, Section IV.H.2. But "the plausibility threshold for a Rule 12(b)(6) motion . . . is lower than the likelihood of success standard for preliminary injunctions." *Democracy N. Carolina v. Hirsch*, No. 1:23-CV-878, 2024 WL 1415113, at \*9 (M.D.N.C. Apr. 2, 2024). And CRC's evidence for the first prong—that dependency courts have a history of openness—remains insufficiently detailed at this juncture for the undersigned to say that CRC's ultimate success is likely. (*See* Docket Entry 13 at 16-22.)

CRC offers ample evidence that the early equivalents of dependency courts were mostly open through 1939; however, once CRC begins describing the latter half of the twentieth century, its historical evidence becomes much less specific. (*See* Docket Entry 13 at 16-20; Docket Entry 14-13; Docket Entry 20 ¶¶ 7-15.) CRC's declaration from historian David Tanenhaus only asserts that "some" states closed dependency hearings in the 1960s, followed by a "trend to return to openness" in the 1980s and an eventual resolution in favor of openness by the National Council of Juvenile and Family Court Judges. (Docket Entry 20 ¶¶ 16-18.) Tanenhaus further specifies that the states that re-opened their dependency proceedings

45

included Oregon, Michigan, New York, Florida, and Minnesota. (*Id.* ¶¶ 17; *see also* Docket Entry 25 ¶ 15, Docket Entry 26 ¶¶ 7-8.) CRC then tells us that North Carolina has had a presumption of openness since 1919, (Docket Entry 62 at 8 (citing *An Act to Create Juvenile Courts in North Carolina*, N.C. Gen. Assemb., ch. 97, § 243 (1919); S.B. 1532, N.C. Gen. Assemb. § 22 (1997); N.C. Gen. Stat. § 7B-801)), and that the New Jersey, Pennsylvania, and Ohio state courts recognize a right of public access (Docket Entry 13 at 21 (citing *New Jersey Div. of Youth & Fam. Servs. v. J.B.*, 120 N.J. 112, 127 (1990); *In re M.B.*, 819 A.2d 59 (Pa. Super. Ct. 2003); *State ex rel. Cincinnati Enquirer v. Bloom*, -- NE. 3d --, 2024 WL 4536350 (Ohio Oct. 22, 2024)). In summary, CRC's historical evidence shows that most dependency proceedings were open through 1939, after which some states closed proceedings and others did not, resulting in at least nine states using a presumption of openness today, adopted at various times. (*See* Docket Entry 13 at 16-22.)

Without a more developed record, the undersigned cannot say that CRC is likely to meet the *Press-Enterprise* test's requirements. For example, it is unclear how accessible dependency hearings were in the forty-one states CRC does not mention throughout the latter half of the twentieth century and the early twenty-first century. *Press-Enterprise* demands a showing of nationwide openness, not just openness in some jurisdictions. *See El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) ("[T]he experience test . . . does not look to the particular practice of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States."); *accord. United States v. Byrd*, No. CIV.A. RDB-14-186, 2015 WL 2374409, at *2 n.5 (D. Md. May 15, 2015); *see also Cap. Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 296 (M.D.N.C. 2015) ("Many courts

46

have also denied a motion for preliminary injunction where the plaintiff has failed to make a 'clear showing' of likelihood of success on the merits due to an undeveloped record.").

Given that it is not yet clear whether CRC has a qualified right to access dependency hearings, it is also not yet clear that CRC can prove the remaining factors necessary for a preliminary injunction—i.e., that irreparable harm will result from the continued denial of CRC's qualified right, that equity favors an injunction upholding CRC's qualified right, or that recognizing the qualified right is in the public interest. *See Glob. Bioprotect LLC v. Viaclean Techs., LLC*, No. 1:20CV553, 2021 WL 848710, at *6 (M.D.N.C. Mar. 5, 2021) ("The remaining three preliminary injunction factors flow directly from a likelihood of success on the merits and a corresponding entitlement to relief.").

For the above reasons, the undersigned recommends the Court deny CRC's motion for a preliminary injunction. Given the undersigned reached this conclusion based on CRC's written submissions, CRC is not entitled to a hearing.[20]

## VI. MOTION FOR INITIAL PRETRIAL CONFERENCE

The Court denies CRC's motion for an initial pretrial conference without prejudice. (Docket Entry 81.) "In deciding whether to stay discovery pending resolution of a pending motion, the Court inevitably must balance the harm produced by a delay in discovery against

---

[20] "A hearing for a preliminary injunction is not required when no disputes of fact exist and the denial of the motion is based upon the parties' written papers." *Gibson v. Frederick Cnty., Maryland*, No. CV SAG-22-1642, 2022 WL 17068095, at *2 (D. Md. Nov. 16, 2022); *see also* 11A Mary Kay Kane & Alexandra D. Lahav, *Federal Practice and Procedure (Wright & Miller)* § 2949 (2025) ("Even if a party desires to present testimony, several federal courts have held that when there is no factual controversy the trial court has discretion to issue an order on written evidence alone, without an oral hearing."). Here, even assuming CRC's written submissions are true, CRC falls short of showing likely success on the merits of its First Amendment claim, so a hearing would be neither useful nor appropriate.

the possibility that the motion will be granted and entirely eliminate the need for such discovery." *M.P.T. Racing, Inc. v. Bros. Rsch. Corp.*, No. 1:22-CV-334, 2022 WL 19355619, at *1 (M.D.N.C. June 30, 2022). Here, the balancing test counsels against scheduling the pretrial conference. The evidence CRC requires is historical and policy-related evidence, which is not the sort of evidence likely to become less available with time. Additionally, a final ruling on Defendants' motions to dismiss would be appropriate before beginning discovery. Moreover, Defendants have not yet filed their Answers to CRC's Complaint.

For the above reasons, the Court finds that there is good cause for deferring the scheduling of an initial pretrial conference. The Court will deny CRC's motion for a pretrial conference without prejudice pending the Court's final decision on Defendants' motions to dismiss.

## VII. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that the Motion for Leave to File Brief of Amici Curiae (Docket Entry 34) be **GRANTED**, that Civil Rights Corp.'s Motion for Leave to File Proposed Response to Defendant-Intervenor's Motion to Intervene (Docket Entry 72) be **GRANTED**, and that Civil Rights Corp.'s Motion for Initial Pretrial Conference (Docket Entry 81) be **DENIED** without prejudice.

Furthermore, **IT IS HEREBY RECOMMENDED** that the Motion to Intervene from the North Carolina Administrative Office of the Courts (Docket Entry 41) be **GRANTED**, and that the North Carolina Administrative Office of the Courts on behalf of its Office of Guardian ad Litem Services be permitted to proceed in this action as Defendant-Intervenor.

**IT IS FURTHER RECOMMENDED** that the motions to dismiss from Sheriff Birkhead, Judge Walker, and the North Carolina Administrative Office of the Courts (Docket Entries 43, 65, and 67) be **DENIED**, and Civil Rights Corp.'s Motion for Preliminary Injunction and Request for Hearing (Docket Entry 12) be **DENIED**.

/s/  Joe L. Webster
United States Magistrate Judge

October 30, 2025
Durham, North Carolina