## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL RIGHTS CORPS,

        Plaintiff,

    v.

JUDGE DORETTA L. WALKER, in her official capacity, and CLARENCE F. BIRKHEAD, in his official capacity,

        Defendants.

Case No.: 1:24-cv-943

## PLAINTIFF'S OBJECTION TO ORDER, MEMORANDUM OPINION, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY OF ARGUMENT...................1

II. SUMMARY OF FACTS AND LAW..............................6

III. STANDARD OF REVIEW...................................9

IV. OBJECTIONS..........................................10

    A.    Plaintiff Is Entitled to a Preliminary Injunction and the R&R Erred in Requiring Evidence of Public Access to Dependency Proceedings in the Modern Era. ...................10

        1.    The Historical Evidence of Public Access to Dependency Proceedings Is Overwhelming and Unrebutted. ...........................12

        2.    Later Practice Does Not Outweigh the Historical Tradition. ......................19

        3.    CRC Also Showed That Public Access Improves the Functioning of Dependency Proceedings. ................................23

        4.    CRC Has Established the Other Prerequisites for Preliminary Injunctive Relief. ..................................25

    B.    The Report and Recommendations Incorrectly Analyzes Plaintiff's Right to Injunctive Relief Against Defendant Birkhead. ...............27

V. CONCLUSION..........................................33

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Atkinson v. Godfrey*,
   100 F.4th 498 (4th Cir. 2024) ...........................31

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ...........................30

*Cal. First Amend. Coal. v. Woodford*,
   299 F.3d 868 (9th Cir. 2002) ........................5, 21

*Courthouse News Serv. v. Schaefer*,
   2 F.4th 318 (4th Cir. 2021) ......................4, 8, 23

*Davis v. City of Camden*,
   657 F. Supp. 396 (D.N.J. 1987) .........................31

*Del. Coal. for Open Gov't, Inc. v. Strine*,
   733 F.3d 510 (3d Cir. 2013) ............................14

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) ...........................13

*Elrod v. Burns*,
   427 U.S. 347 (1976) ....................................26

*Evers v. Custer Cnty.*,
   745 F.2d 1196 (9th Cir. 1984) ..........................31

*Ex parte Young*,
   209 U.S. 123 ....................................6, 28, 29

*Fireman's Fund Ins. Co. v. City of Lodi*,
   302 F.3d 928 (9th Cir. 2002) ...........................30

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ...........................22

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ...........................26

*Globe Newspaper Co. v. Superior Ct.*,
   457 U.S. 596 (1982) ............................8, 15, 24

ii

*Johnson v. Bergland*,
  586 F.2d 993 (4th Cir. 1978) ............................26

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) ...........................27

*Los Angeles County v. Humphries*,
  562 U.S. 29 (2010) .................................31, 32

*McMillian v. Monroe County*,
  520 U.S. 781 (1997) ....................................28

*McNeil v. Cmty. Prob. Servs., LLC*,
  945 F.3d 991 (6th Cir. 2019) .......................28, 32

*Monell. Guill v. Allen*,
  No. 1:19CV1126, 2023 WL 6159978 (M.D.N.C. Sep.
  21, 2023) ..............................................30

*Monell v. New York City Department of Social
  Services*,
  436 U.S. 658 (1978) ....................................27

*Moore v. Urquhart*,
  899 F.3d 1094 (9th Cir. 2018) ..........................32

*N.Y.C.L. Union v. N.Y.C. Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) ............................14

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ...........................26

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986) ..................................passim

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) .............................8, 12, 14

*Rushford v. New Yorker Mag., Inc.*,
  846 F.2d 249 (4th Cir. 1988) ...........................14

*Schultz v. Alabama*,
  42 F.4th 1298 (11th Cir. 2022) .........................30

*Spell v. McDaniel*,
  824 F.2d 1380 (4th Cir. 1987) ..........................31

iii

*Strebe v. Kanode*,
   783 F. App'x 285 (4th Cir. 2019) ........................10

*United States v. Raddatz*,
   447 U.S. 667 (1980) ....................................10

*Virginia Off. for Prot. & Advoc. v. Stewart*,
   563 U.S. 247 (2011) ....................................28

*Waller v. Georgia*,
   467 U.S. 39 (1984) .....................................23

*In re Washington Post Co.*,
   807 F.2d 383 (4th Cir. 1986) ...........................10

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................10, 11

**STATE CASES**

*In re Barbee*,
   19 Wash. 306 (1898) ....................................17

*Brinster v. Compton*,
   68 Ala. 299 (1880) .....................................17

*Ex parte Crouse*,
   4 Whart. 9 (Pa. 1839) ..................................17

*Henson v. Walts*,
   40 Ind. 170 (1872) .....................................17

*People ex rel. Brooklyn Indus. Sch. Ass'n v.
   Kearney*,
   21 How. Pr. 74 (N.Y. Sup. Ct. 1861) ...................17

*People ex rel. O'Connell v. Turner*,
   55 Ill. 280 (1870) .....................................17

*San Bernardino Cnty. Dep't of Pub. Soc. Servs. v.
   Superior Court*,
   232 Cal. App. 3d 188 (1991) ...........................23

*Stann v. Levine*,
   636 S.E. 2d 214 (N.C. Ct. App. 2006) ...................1

*United States ex rel. Young v. Imoda*,
  4 Mont. 38 (1881) ..................................17

**FEDERAL STATUTES**

28 U.S.C. § 636(b)(1) ....................................10

42 U.S.C. § 1983 .....................................passim

**STATUTES – OTHER**

*An Act to Create Juvenile Courts in North
  Carolina*, N.C. Gen. Assemb., ch. 97, § 243
  (1919) ..............................................21

N.C. Gen. Stat. § 7B-506(b) ...........................6, 13

N.C. Gen. Stat. § 7B-801 ..............................22, 29

N.C. Gen. Stat. § 7B-804 ..............................6, 13

N.C. Gen. Stat. § 7B-805 ..............................6, 13

N.C. Gen. Stat. § 7B-901(a) ...........................6, 13

N.C. Gen. Stat. § 7B-1100(3) ..............................6

N.C. Gen. Stat. § 7B-1112 .............................6, 13

N.C. Gen. Stat. § 17E-1 ..................................29

N.C. Gen. Stat. § 162-16 .................................29

H.B. 382, 2011 N.C. Laws S.L. 2011-295 (N.C. 2011) .......22

**OTHER AUTHORITIES**

Edward Jenks, *The Book of English Law* (1929) .............16

Gilbert Cosulich, *Juvenile Court Laws of the
  United States* (1939) .................................18

Gilbert Geis, *Publicity and Juvenile Court
  Proceedings*, 30 Rocky Mountain L. Rev. 101
  (1958) ..............................................18

v

National Council of Juvenile Court Judges,
  *Juvenile Court Judges Directory & Manual* (1963) .......19

Neil Cogan, *Juvenile Law, Before and After the
  Entrance of "Parens Patriae"*, 22 S.C. L. Rev.
  147 (1970) ...........................................15

Paul Halliday, *Habeas Corpus* (2010) .....................16

Ransom H. Tyler, *Commentaries on the Law of
  Infancy* (1882) ......................................17

Ruth Wallis Herndon & John E. Murray, eds.,
  *Children Bound to Labor* (2009) .....................16

Vernon Palmer, *Comparative Reflections on English
  and French Equity Powers*, 73 Tul. L. Rev. 1287
  (1999) ...............................................15

W.J. Jones, *Elizabethan Court of Chancery* (1967) .........16

William Forsyth, *A Treatise on the Law Relating to
  the Custody of Infants* (1850) .......................15

## I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Families facing allegations of abuse or neglect confront one of the most profound exercises of state power: "dependency proceedings" in which children can be forcibly separated from their parents and parental rights can be terminated.  So fundamental is the ability to raise one's own children—and the reciprocal right of children to be raised by their parents—that courts refer to the termination of parental rights as the "civil death penalty."  *Stann v. Levine*, 636 S.E. 2d 214, 220 n.9 (N.C. Ct. App. 2006) (citation omitted).  Yet there is mounting evidence that this power is being unfairly exercised against thousands of families, especially poor families and families of color, due to poor representation, due process violations, a state apparatus too eager to take children from the family home, and almost unfettered judicial discretion.  Moreover, this "civil death penalty" is often exercised in secret, behind literal closed doors, because some judges routinely use blanket orders to exclude the public—or even just critics—from their courtrooms.

Plaintiff Civil Rights Corps ("CRC") is a non-profit, civil rights organization seeking to secure its First

1

Amendment right to observe North Carolina courts hearing dependency cases. CRC's efforts to observe proceedings before Judge Doretta Walker have been stymied by courtroom exclusion and closure orders targeting CRC, despite the historical tradition in the United States (and England before it) of presumptive public access to all civil proceedings, including dependency proceedings, and despite North Carolina's own laws reflecting this Anglo-American history of openness.

While children have legitimate privacy interests that can justify certain measures to control access to, or dissemination of, particularly sensitive information, Defendants issue and enforce blanket exclusion orders targeting CRC's lawyers, without even considering less restrictive alternatives. Courtrooms that are open to the public have been suddenly closed when CRC's lawyers are recognized. CRC's lawyers have even been required to leave while other people, also uninvolved in the pending dependency case, have been permitted to remain. These targeted exclusions raise serious questions about Defendants' purported justifications for their conduct.

After being excluded from hearing after hearing in

2

Judge Walker's courtroom for over a year, CRC sued seeking declaratory relief against Judge Walker who issues the exclusion orders and declaratory and injunctive relief against Sheriff Clarence Birkhead who enforces those orders. CRC filed a preliminary injunction motion asking that Birkhead be enjoined from enforcing closure orders against CRC unless—in keeping with the First Amendment—the judge makes case-specific, on-the-record findings, reviewable by a higher court, that (1) closure is essential to serve a compelling government interest that outweighs the benefits of public access; and (2) closure is narrowly tailored to serve that interest, and (3) there are no less restrictive alternatives to complete closure. *See* Dkt. 12. Following CRC's motion, Defendants Walker and Birkhead filed separate motions to dismiss the case. *See* Dkt. 43, 65. The North Carolina Administrative Office of the Courts ("AOC") then moved to intervene and filed its own motion to dismiss. *See* Dkt. 41, 67.

Magistrate Judge Webster entered a Report and Recommendation (Dkt. 89) ("R&R") on October 30, 2025, that carefully analyzes the myriad procedural and jurisdictional defenses raised in Defendants' everything-but-the-kitchen-

3

sink motions.  *See* Dkts. 43, 65, and 67.  The R&R correctly rejected all the arguments raised by the defendants in their three motions to dismiss.  The R&R also carefully analyzed the issues raised in CRC's motion for a preliminary injunction.

The R&R errs in just two narrow, but critical, aspects. First, the R&R erred in finding that CRC had not established a likelihood of success on the merits of its claim that the First Amendment provides a qualified right of access to dependency hearings.  Under the Supreme Court's *Press-Enterprise* test, the right of access depends on (1) whether proceedings have "historically been open to the press and general public"; and (2) whether "public access plays a significant positive role in the functioning of the particular process in question," *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 326 (4th Cir. 2021). Although the R&R found that CRC had provided "ample" unrebutted evidence of public access to such proceedings from Colonial times through at least 1939, the R&R expressed concern about the "less specific" evidence on access in some states after the 1950s.  This is the only basis provided in the R&R for denying the preliminary

4

injunction, and it was error.  We are aware of no court that has interpreted the *Press-Enterprise* test to mean that centuries of historical tradition of public access can be trumped by later legislative restrictions.  The entire point of the *Press-Enterprise* test, after all, is to strike down contemporary access restrictions that are inconsistent with historical tradition.  *See, e.g., Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002) (the public nature of executions before 1937 established a First Amendment right of access despite broad legislative restrictions on public access from 1940s through 2002).  Once this legal error is corrected, there is no bar to the issuance of a preliminary injunction.  As the R&R itself suggests, CRC has satisfied all of the other elements of the preliminary injunction test, including likelihood of success.

Second, the R&R erroneously concludes that Birkhead is categorically a county actor who can be liable for injunctive relief under Section 1983 only under a *Monell* theory of municipal liability.  Under long-standing equitable principles expressed in *Ex parte Young*, however, the Court has authority to enjoin Birkhead regardless of

5

whether he is a state or county actor. 209 U.S. 123 (1908). For purposes of an injunction, this Court need not decide whether the Sheriff acts for the state or county when he excludes CRC, because regardless of how he is classified, he can be enjoined for violating CRC's presumptive right of access to the courtroom, as with any government official committing any federal constitutional violation.

## II. <u>SUMMARY OF FACTS AND LAW</u>

In North Carolina, as in other states, dependency cases are civil proceedings, initiated by the government, conducted in courthouses before judges, involving formal adversarial hearings and bench trials with evidence, counsel, legal and factual arguments, and resulting in formal decisions appealable to the courts of appeal. *See, e.g.*, N.C. Gen. Stat §§ 7B-1112, 7B-506(b), 7B-804, 7B-805, 7B-901(a). Although dependency proceedings affect the most fundamental liberty interests of parents and children—the legal right to be a family—judges have broad discretion to determine the "best interests of the juvenile." *See, e.g.*, N.C. Gen. Stat. § 7B-1100(3).

Since 2023, CRC has been investigating dependency cases

in Durham County. Dkt. 13 at 6 ("Mot.").  CRC began its investigation due to concerns from Durham community members about children being harmed from family separations in dependency proceedings that are ostensibly supposed to help them.  This is consistent with a growing body of research into the harms caused by dependency proceedings.  *Id.* at 4.

In North Carolina some of these courts routinely operate in secret, with advocates, journalists, law students, and community members excluded from hearings without explanation.  This shroud of secrecy obscures the judicial process and decision-making despite the growing alarm of scholars and community members that the system disproportionately devastates cash-strapped families and communities of color.  Poverty, not physical or sexual abuse, is the single strongest predictor of an investigation by the government.  It is not uncommon for a child to be taken because a family had its SNAP benefits reduced or a single mother is unable to find affordable childcare.  In North Carolina alone, the state removes about 5,000 children from their homes every year.  And once a child has been put in court proceedings, it is often impossible for activists, legislators, or community members

to monitor what happens to that child and why. Instead, families can endure *years* of uncertainty and insecurity regarding their children while court cases proceed in secret: the community excluded from the courtroom and prevented from learning how statutory and constitutional law are applied, how decisions are made, or even what those decisions are.

As the Supreme Court and the Fourth Circuit have recognized, courtwatching is a crucial civic activity that assures the public that proceedings are fair. Open proceedings "discourage[] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). Such "access allows the public to 'participate in and serve as a check upon the judicial process.'" *Courthouse News*, 2 F.4th at 327 (quoting *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 606 (1982)).

CRC has tried to observe dependency matters in Judge Walker's courtroom no fewer than nine times—September 13, 14, and 15, 2023; December 14, 2023; February 15, 2024; March 13, 2024; April 4, 2024; and August 5 and 6, 2024—traveling to Durham from outside the state during the one

8

week per month the Judge hears dependency cases.  *See generally* Dkt. 15 ("Rossi Decl."); Dkt. 16 ("Cloud Decl."); Dkt. 17 ("Richardson Decl."); Dkt. 18 ("White Decl."); Dkt. 19 ("Wattar Decl.").

As the R&R acknowledges, CRC was excluded from the courtroom in almost every instance.  On multiple occasions, the courtrooms were open to the public until CRC was recognized.  Richardson Decl. ¶¶ 23-28; White Decl. ¶ 26-33.  In some cases, Defendants excluded *only* CRC while allowing other members of the public to remain.  Rossi Decl. ¶ 28; White Decl. ¶ 24-25; R&R at 22.  The only times CRC could observe was when CRC was not recognized or when officials from the state administrative office of the courts attended.  Cloud Decl. ¶¶ 20-28; Wattar Decl. ¶¶ 17-21; Richardson Decl. ¶¶ 6-22.  In no instance did Judge Walker make findings of fact to demonstrate that closure was necessary, or that less restrictive alternatives were inadequate.  *Cf. Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986).

## III. <u>STANDARD OF REVIEW</u>

The recommendation of a magistrate judge on a dispositive issue is subject to *de novo* review if

9

objections are made.  *United States v. Raddatz*, 447 U.S. 667, 673 (1980); *Strebe v. Kanode*, 783 F. App'x 285, 287 (4th Cir. 2019) (preliminary injunction motions are dispositive orders under 28 U.S.C. § 636(b)(1)).

## IV.  <u>OBJECTIONS</u>

### A.  <u>Plaintiff Is Entitled to a Preliminary Injunction and the R&R Erred in Requiring Evidence of Public Access to Dependency Proceedings in the Modern Era.</u>

CRC seeks a preliminary injunction to vindicate its qualified First Amendment right to access dependency proceedings.  To obtain a preliminary injunction, CRC must establish that "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In terms of likelihood of success, the existence of a First Amendment right of access depends on (1) the "historical tradition" of public access and (2) "the function of public access in serving important public purposes."  *In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986); *see also* R&R at 33-34.

While CRC agrees with much of the R&R's analysis of the

10

preliminary injunction motion, the R&R erred in one respect: in concluding that the "historical tradition" test requires a showing of access in the modern period in addition to a historical tradition of access.  The R&R correctly finds that CRC provided "ample evidence" that dependency hearings (and their equivalents) "were mostly open through 1939."  R&R at 45.  The R&R notes, however, that the evidence of openness in "the latter half of the twentieth century" is "much less specific" and that some states started restricting access after the 1950s.  *Id.* at 45-46.  On this sole basis, the R&R concludes both that CRC has not yet demonstrated a likelihood of success and that the other preliminary injunction factors are not satisfied. *Id.* at 47.  But the First Amendment right of access turns on the "historical tradition," not on whether governments restrict access in recent decades.  Indeed, a historical tradition of access followed by recent restrictions is precisely where the First Amendment comes into play. Moreover, even if modern practice were relevant, CRC presented unrebutted evidence that the tide has been turning back towards broadening access to dependency proceedings since the 1980s.  In short, out of the

11

centuries of public access to these types of proceedings, only a handful of recent decades deviated from that tradition. These facts should satisfy even a test that gives weight to modern practice.

The Court should correct this error. And because this error was the sole basis for recommending against granting the motion, the Court should issue the preliminary injunction vindicating CRC's presumptive right to attend dependency hearings so it, and the public, can scrutinize the operation of courts in these cases that affect the most fundamental rights of thousands of families a year.

### 1. The Historical Evidence of Public Access to Dependency Proceedings Is Overwhelming and Unrebutted.

As the R&R correctly found, the "historical tradition" test focuses on whether proceedings were historically "generally" or "typically" open. R&R at 38. An "unbroken" tradition of public access is not required. *Id.* In the seminal case *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. at 565-69, the Supreme Court relied on a history of "presumptive" openness in pre-Colonial England, Colonial America, and the early Republic. The Court found it sufficient that proceedings were "presumptively open" at

12

"the time when our organic laws were adopted."  No evaluation was needed of later practice.  Similarly, in *Press-Enterprise Co. v. Superior Court*, 478 U.S. at 10-11, contemporary practice is mentioned only in passing.  The Supreme Court focused instead on 19th century history, including the Aaron Burr trial of 1807 and the 1850 Field Code.  Cases that focus on recent experience concern proceedings *without* a historical tradition of openness.  *See, e.g., Detroit Free Press v. Ashcroft,* 303 F.3d 681, 701 (6th Cir. 2002) (examining history since 1882 of administrative deportation proceedings). Where a historical tradition of public access exists, it is sufficient regardless of recent development.

Plaintiff is unaware of any court holding that the kind of unrebutted historical evidence CRC has marshalled here fails the historical tradition test.  The hearings at issue here are, after all, adversarial civil proceedings in a courtroom, before a judge, concerning fundamental rights, with lawyers making legal arguments and presenting evidence, and resulting in formal decisions appealable to higher courts.  *See, e.g.*, N.C. Gen. Stat §§ 7B-1112, 7B-506(b), 7B-804, 7B-805, 7B-901(a).  These are precisely the

13

kind of proceedings—contested, adversarial, civil proceedings, in a courtroom, with lawyers before a judge— that have long been public in the Anglo-American tradition: "[p]roceedings in front of judges in courthouses have been presumptively open to the public for centuries." *Del. Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 518 (3d Cir. 2013); *Richmond Newspapers*, 448 U.S. at 580 n.17 ("historically both civil and criminal trials have been presumptively open")

Federal courts have thus uniformly held that civil litigation in courts before judges is open to the public: "all the [] circuits that have considered the issue have come to the same conclusion"—the First Amendment provides "a qualified right of access . . . to civil trials and to their related proceedings and records." *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (finding First Amendment right of access to civil trials). That dependency proceedings involve sensitive issues relating to the potential neglect or abuse of children does not sufficiently distinguish them from this tradition of a First Amendment presumptive right of

14

access to civil proceedings.  The Supreme Court has held that the First Amendment right of access applies even to criminal trials of sexual offenses against children; courts can impose safeguards to protect the privacy of children involved but those privacy interests do not eliminate the right of access.  *Globe Newspaper*, 457 U.S. at 607-08.

With respect specifically to dependency proceedings and their equivalents, there is also an unrebutted record of centuries of public access through at least the mid-20th century.  Starting in at least 1696, cases resolving parental rights were handled in chancery court or habeas proceedings in England and the United States.  *See* Neil Cogan, *Juvenile Law, Before and After the Entrance of "Parens Patriae"*, 22 S.C. L. Rev. 147, 166 (1970) (beginning in 1696, English chancery courts handled cases involving the "Care and Direction" of infants); William Forsyth, *A Treatise on the Law Relating to the Custody of Infants* 54 (1850) ("the question of custody arises chiefly on returns to writs of habeas corpus").  These proceedings—like all civil proceedings—generally took place in "open court."  *See, e.g.*, Vernon Palmer, *Comparative Reflections on English and French Equity Powers*, 73 Tul. L. Rev. 1287,

15

1297 (1999) ("English Chancellors operated an open court and pronounced reasons for their decrees."); W.J. Jones, *Elizabethan Court of Chancery* 54, 208 (1967) (similar proposition). Habeas proceedings were also public. Paul Halliday, *Habeas Corpus* 53-54 (2010) (between 1500 and 1800, the vast majority of writs were heard in open court). One of few "exceptions to the rule of open court" was to permit children to testify privately "in cases involving decency or morality." Edward Jenks, *The Book of English Law* 92 (1929).

In Colonial America, the poor laws, modeled on English poor laws, permitted government officials to sue to remove children from their families for neglect and place them in indentured servitude or apprenticeship. *See* Ruth Wallis Herndon & John E. Murray, eds., *Children Bound to Labor* 1-9 (2009). All thirteen colonies used this system (called "binding out") to address children deemed at risk with their families. *Id.* at 23-25. Though the details varied by colony and local custom, these proceedings took place during presumptively open sessions of court and were reported in order books (early public volumes that published all the work of the courts) just like any other

16

matter.  *Id.* at 153 n.8, 187 n.12.

By the 19th century, habeas had become a prominent vehicle for adjudicating such matters in the United States. *See* Forsyth, *Treatise* at 54; Ransom H. Tyler, *Commentaries on the Law of Infancy* 285 (1882) (similar).  Numerous cases from various states during this period detail child neglect proceedings, including the taking of testimony at public hearings.  *See, e.g., Ex parte Crouse*, 4 Whart. 9 (Pa. 1839) (held in open session of state Supreme Court); *United States ex rel. Young v. Imoda*, 4 Mont. 38 (1881) (same); *People ex rel. Brooklyn Indus. Sch. Ass'n v. Kearney*, 21 How. Pr. 74 (N.Y. Sup. Ct. 1861) (publicly detailing trial proceedings and taking of testimony) *Henson v. Walts*, 40 Ind. 170, 171 (1872) (same); *Brinster v. Compton*, 68 Ala. 299 (1880) (same); *In re Barbee*, 19 Wash. 306 (1898) (same); *People ex rel. O'Connell v. Turner*, 55 Ill. 280 (1870) (reported on by the Chicago Tribune, *see* Dkt. 14-12);

The presumptive right of access continued even after states established juvenile courts at the turn of the 20th century to handle matters previously handled in chancery or habeas, as detailed in the declaration submitted by

17

Professor David Tanenhaus, a prominent historian of the Progressive Era. *See* Dkt. 20 ("Tanenhaus Decl."). In 1939, the leading treatise on juvenile proceedings, Gilbert Cosulich's *Juvenile Court Laws of the United States* (1939), explained that in 42 of 48 states, dependency proceedings were statutorily presumed public. *Id.* at 49-51. In 20 of those jurisdictions, the judges did not even have discretion to close proceedings. *Id.* Dependency proceedings remained generally open until around the mid-1950s. *See* Gilbert Geis, *Publicity and Juvenile Court Proceedings*, 30 Rocky Mountain L. Rev. 101, 116 (1958) (reporting that Cosulich's "comprehensive survey" "still reflect[ed] the state of affairs"); *see also* Tanenhaus Decl. at 3-7.

The record here contains no contrary historical evidence. Instead, Defendants cited cases regarding the history of public access to juvenile *delinquency* proceedings for minors accused of criminal conduct, rather of than civil dependency proceedings regarding parental rights. R&R 43-44. As the R&R correctly concluded, those cases are not persuasive or relevant because they did not analyze the historical evidence CRC presented here of

18

public access to civil dependency proceedings.  *Id.*

### 2. Later Practice Does Not Outweigh the Historical Tradition.

Unable to dispute the historical tradition, Defendants cite modern practice.  The R&R similarly relies on access restrictions in some states after the 1950s to recommend denial of the preliminary injunction.  R&R at 45-46.

It is true that in the 1960s many states changed centuries of historical practice and passed laws restricting public access to dependency hearings. Tanenhaus Decl. at 7-8.  By 1963, half the states had passed laws that required closed hearings, and by the 1970s, a majority restricted access.  *See* National Council of Juvenile Court Judges, *Juvenile Court Judges Directory & Manual* 4-10 (1963).  This trend soon reversed course. Starting in the 1980s, states slowly began reverting to historical tradition.  Tanenhaus Decl. at 7-8.  By 2005, the National Council of Juvenile and Family Court Judges issued a resolution supporting presumptive access, because "the public has a legitimate and compelling interest in the work of our juvenile and family courts" and public access may "enhance accountability in the conduct of these proceedings by lifting the veil of secrecy which surrounds

19

them." *See* Dkt. 24 ¶ 11 ("Blitzman Decl."); Ex. B, Dkt. 24-2.

At present, a minority of states have statutes requiring presumptively closed dependency proceedings. Some 21 states maintain presumptively open dependency hearings; another three states plus Washington, D.C. allow members of the bar and the press to attend; and five states allow the parties to request public hearings or grant courts discretion to hold public hearings. *See* App'x A (table of state laws).

But whatever restrictions legislatures have imposed since the 1960s, the "historical tradition" test focuses on whether proceedings were historically "generally" or "typically" open. R&R at 38. An "unbroken" tradition of public access is not required. *Id.* Moreover, the relevant question here is the *historical tradition*. Plaintiff is unaware of any court that has held that a historical tradition of public access, like the record here, was trumped by the subsequent policy choices of state legislatures. The entire point of the First Amendment analysis of *Press-Enterprise*, after all, is to strike down contemporary access restrictions that conflict with

20

historical traditions of public access.

For example, *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002), concerned the right of public access to executions.  The court of appeals found that until 1937, "[e]xecutions were fully open events in the United States" but thereafter states began restricting access, although some states allowed press to attend.  *Id.* at 875–76.  California itself, whose practices were at issue, allowed news media to attend even though it excluded the public.  *Id.* at 876.  The court of appeals did not defer to the restrictions imposed by legislatures between 1937 and 2002.  Instead, the court found the pre-1937 tradition of public access sufficient under the *Press-Enterprise* test, explaining that the overall "historical tradition strongly supports the public's First Amendment right to view" executions, despite the later legislative restrictions.  *Id.*

The same is true of dependency proceedings.  After an extensive history of public access until the 1950s, many other states—but far from all—began to limit access to dependency proceedings.  North Carolina itself has maintained presumptively open dependency proceedings

21

throughout its history.  *See, e.g.*, *An Act to Create Juvenile Courts in North Carolina*, N.C. Gen. Assemb., ch. 97, § 243 (1919) (establishing presumptively open dependency proceedings); N.C. Gen. Stat. § 7B-801 (maintaining policy of presumptive openness, as amended most recently by H.B. 382, 2011 N.C. Laws S.L. 2011-295 (N.C. 2011)).  Just as in *Woodford*, historical tradition prevails over later legislative restrictions.

If this case had been filed just before state practice began to shift, the R&R would have been compelled to find a First Amendment qualified right of access.  It makes no sense to conclude that later state statutes—which would have been unconstitutional when passed—somehow repealed that constitutional right.  *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("A law's existence can't be the source of its own constitutional validity").  Nor does it make any sense to suggest that if a dozen or so states were to now revert to the historical tradition, then the First Amendment right of access would suddenly rematerialize.  For the historical tradition test to provide a consistent answer across time, it must focus on *history*, and not on recent practice.

22

### 3. CRC Also Showed That Public Access Improves the Functioning of Dependency Proceedings.

"[P]ublic access plays a significant positive role in the functioning of" dependency proceedings. *Press-Enterprise Co.*, 478 U.S. at 8. The nature of the proceedings, which take place without a jury and involve the adjudication of the most fundamental of rights, demand scrutiny. Mot. at 16-17. Particularly in such circumstances, public access "allows the public to … serve as a check upon the judicial process—an essential component in our structure of self-government." *Courthouse News*, 2 F.4th at 327. For that reason, the Supreme Court acknowledged that justification of court closures "will be rare." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

Where community members, scholars, and other courts have criticized court practices for their dysfunction and bias, as has happened to dependency court practices, scrutiny is especially warranted. Mot. at 17-18; *San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Superior Court*, 232 Cal. App. 3d 188, 201 (1991); Dkt. 27 ¶ 3 ("Trivedi Decl."); Dkt. 22 ¶ 2 ("Potts Decl."); Dkt. 21 ¶¶ 2, 7-21 ("McDaniel Decl."). Public access will also educate the public, enhance community confidence in the

23

dependency system, and help interrupt any implicit or explicit biases in court proceedings. Mot. at 18-19; Dkt. 25 ¶¶ 21-28 ("Spinak Decl.") (describing positive changes in New York after opening dependency hearings, including a dramatic decline in family separations); Dkt. 23 ¶¶ 10-13, 15-17 ("Simonson Decl.") (describing reforms resulting from courtwatching efforts in Illinois, Louisiana, New York).

Defendants do not contest any of these facts. Instead, they repeat the mantra that children's privacy is paramount. *See, e.g.*, Dkt. 49 at 23-24 ("Birkhead Opp."); Dkt. 51 at 15-16 ("Walker Opp."); Dkt. 52 at 14-15 ("AOC Opp."). But as the R&R notes, the mere fact that these proceedings involve sensitive issues does not negate the benefits of public scrutiny. R&R at 39. *See also Globe Newspaper,* 457 U.S. at 607-08 (finding a presumptive right of public access even in cases concerning sexual crimes against minors). Indeed, the sensitive and important nature of these proceedings *increases* the importance of public supervision and scrutiny. CRC and the scholars, advocates, and community members who support CRC's lawsuit also care deeply about protecting children. That is why they seek access to the courtroom—to ensure that children's

24

rights and interests are protected and that children are not being unnecessarily ripped from their families.  And that is why CRC emphasizes that there is only a *qualified* right of public access to such proceedings, with courts retaining the ability to close proceedings if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"  *Press-Enterprise*, 478 U.S. at 13-14 (citation omitted).  To protect the privacy of children, courts have a range of tools such as prohibiting disclosure of names or specific facts; closing particularly sensitive portions of hearings; forbidding recording; redacting  transcripts; and sealing specific documents.  *See* Spinak Decl. ¶ 31.  What the First Amendment does not permit, however, is blanket closures of proceedings, closures without an articulated justification specific to the case, or most obviously closures that target civil rights lawyers.

### 4.   CRC Has Established the Other Prerequisites for Preliminary Injunctive Relief.

Once CRC's likelihood of success on the merits is recognized, the rest of the preliminary injunction analysis strongly weighs in CRC's favor.  CRC is "likely to suffer

25

irreparable harm"; (iii) "the balance of hardships tips in [CRC's] favor"; and (iv) "the injunction is in the public interest."  *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

First, the deprivation of constitutional rights is alone sufficient to establish irreparable harm, *Elrod v. Burn*s, 427 U.S. 347, 373 (1976) (plurality opinion), especially where First Amendment rights are concerned. Here, CRC's First Amendment rights were violated each time its staff were removed from Judge Walker's courtroom without an opportunity to be heard and on-the-record findings justifying court closure.  And, as the R&R concluded, CRC has shown that it is likely to face future violations whenever it tries to observe proceedings in Judge Walker's courtroom.  R&R at 22-23.  "Violations of [F]irst [A]mendment rights constitute per se irreparable injury."  *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978).

Second, the balance of hardships and the public interest weigh in favor of "upholding constitutional rights."  *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).  The proposed injunction imposes no

26

hardship on Defendants because Defendants cannot claim harm from being required to comply with the Constitution. *See Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). Additionally, Defendants' interests in protecting juvenile privacy can be accommodated through constitutional means, *see supra* at p.25, and therefore do not outweigh the public interest in vindicating First Amendment rights, see Spinak Decl. ¶ 31.

The preliminary injunction should issue.

**B.  The Report and Recommendations Incorrectly Analyzes Plaintiff's Right to Injunctive Relief Against Defendant Birkhead.**

Although the R&R thoroughly and correctly rejects Defendants' welter of jurisdictional and procedural defenses, the R&R errs in concluding that Birkhead is a county actor as a categorical matter and that he can be enjoined *only* under the test established for municipal liability in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). R&R at 30. While Birkhead can be liable under *Monell*, it is critical to clarify that Birkhead can also be enjoined as an enforcement official— regardless of whether he is deemed a state actor[1] or county

_____

[1] Even if it were relevant to determine whether Birkhead

27

official—pursuant to Section 1983 and the equitable principles set forth in *Ex parte Young.*

*Ex parte Young* clarifies that federal courts can enjoin ongoing or imminent violations of the federal constitution under color of state law by *anyone*—regardless of whether they work for the state, county, or federal government. 209 U.S. 123 (1908); 42 U.S.C. § 1983. Injunction liability attaches to any officials "clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce . . . an unconstitutional act." 209 U.S. at 156. These officials "may be enjoined . . . from such action" under Section 1983 as long as they have "some connection

acts for the state or county, whether an official works for the county or state for purposes of Section 1983 liability cannot be answered in a "categorial" manner. *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997). The R&R relied in error on cases that applied an arm-of-the-state analysis to determine whether a defendant sued for damages had sovereign immunity. R&R at 30. These cases are irrelevant because CRC does not seek damages and so sovereign immunity does not apply, even if Birkhead acts for the state. *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). A sheriff who enforces unconstitutional state-court orders can easily be deemed to act for the state when doing so. *McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 994-95 (6th Cir. 2019). But this is not an issue here because whether Birkhead is a county actor or state actor, he can be enjoined from violating constitutional rights under color of state law.

28

with the enforcement of the act." *Id.* at 156-57.

*Ex parte Young* further establishes that sovereign immunity is no bar to injunction liability, so even if Birkhead is classified as a state actor, an injunction may issue. *Id.* And if the Sheriff is classified as a county actor, CRC need not satisfy *Monell*'s requirements because local officials can be enjoined for ongoing or imminent violations of the federal constitution. *Ex parte Young*, 209 U.S. 123; 42 U.S.C. § 1983. Injunctive claims against officers acting under color of state law are not transmogrified into *Monell* claims merely because the officer might be considered a municipal official.

Regardless of whether he is a state or county actor, Birkhead easily meets the test for injunctive relief as an enforcement official. He admits that North Carolina state law requires him and his deputies to enforce the judicial orders at issue here. Dkt. 44 at 11, 13, 18 ("Birkhead Mot. to Dismiss"); *see also* N.C. Gen. Stat. § 17E-1; N.C. Gen. Stat. § 162-16. The exclusion orders themselves are also issued under state law. N.C. Gen. Stat. § 7B-801. That is sufficient to subject Birkhead to injunctive relief.

29

This Court recently held, for example, that an injunction can be sought under *Ex parte Young* against the Alamance County Sheriff for enforcing allegedly unconstitutional bail orders, without implicating *Monell*. *Guill v. Allen*, No. 1:19CV1126, 2023 WL 6159978, *35-36 (M.D.N.C. Sep. 21, 2023). Similarly, in *Schultz v. Alabama*, the Court of Appeals explained that a sheriff can be enjoined under *Ex parte Young* without satisfying the requirements of *Monell* where plaintiffs did not "seek to impose municipal liability" but instead sought only to enjoin an official who enforced bail orders. 42 F.4th 1298, 1315 (11th Cir. 2022). *See, also e.g., Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 957 (9th Cir. 2002) (reinstating official capacity claims against municipal officers—"classic *Ex parte Young* defendants"—after concluding the claims were not duplicative of the claim against the city and without discussing *Monell*); *Bostic v. Schaefer*, 760 F.3d 352, 372 n.3 (4th Cir. 2014) (enjoining a city clerk from enforcing unconstitutional state marriage laws pursuant to *Ex parte Young* without discussing *Monell*).

To be sure, Sherriff Birkhead can also be liable under

30

*Monell*.  But the R&R applied the incorrect standard: to prove a claim under *Monell*, CRC need not show a particular number and flagrancy of violations to prove a county policy.  R&R at 32.  All *Monell* requires is that the Sheriff has a policy of enforcing state-court orders. *Spell v. McDaniel*, 824 F.2d 1380, 1385-87 (4th Cir. 1987) (describing custom and policy *Monell* liability); *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203-04 (9th Cir. 1984) (holding a municipality is liable under *Monell* even when following state law); *Davis v. City of Camden*, 657 F. Supp. 396, 402 (D.N.J. 1987) (same).  Here, where Birkhead himself concedes he is merely enforcing state law, a *Monell* policy should be easily established.  Birkhead Mot. to Dismiss at 11.

The cases relied upon by the R&R involve Fourth Amendment failure-to-train or "condonation" claims against municipalities—entirely different claims requiring a different showing.  R&R at 30-31; *Atkinson v. Godfrey*, 100 F.4th 498, 502-03 (4th Cir. 2024) (failure to train).  The R&R's citation to *Los Angeles County v. Humphries*, is also irrelevant because that case simply stands for the proposition that *Monell* applies to suits against

31

municipalities regardless of whether the plaintiff seeks an injunction or damages. 562 U.S. 29, 30-33, 39 (2010).

Ultimately, Birkhead is not a county actor as a categorical matter, and is subject to injunctive liability regardless of whether he is acting for the state or the county, and regardless of whether he has his own policy. If Birkhead acts for the state when he enforces unconstitutional orders, he can be enjoined pursuant to the plain text of Section 1983; sovereign immunity is no bar to injunctive relief. If he acts for the county, he can also be enjoined under *Ex parte Young* for injunctive relief. Finally, he can be liable as a municipal actor for both injunctive relief and damages under *Monell*. As Judge Sutton explained in upholding a preliminary injunction against a Tennessee county sheriff similarly sued for enforcing unconstitutional state-court orders:

> The short answer is that the plaintiffs can sue the sheriff, and it makes no difference whether he acts for the State or the county. If he acts for the State, *Ex parte Young* permits this injunction action against him. If he acts for the county, neither sovereign immunity, qualified immunity, nor any other defense stands in the way at this stage of the case.

*McNeil*, 945 F.3d 991 at 994-95. *See also Moore v.*

32

*Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) ("Actions under *Ex parte Young* can be brought against both state and county officials . . . so it is unnecessary for us to resolve the parties' dispute over whether the Sheriff acts on behalf of [the county or state] when he executes writs of restitution.")

In other words, the R&R reached the right outcome—the Sheriff can be enjoined—but unnecessarily assumed that CRC must satisfy the *Monell* standard.  The Court should affirm the conclusion regarding Birkhead's liability but correct the R&R's analysis and explain, as Judge Sutton did, that he can be enjoined whether he is a state or county actor, without satisfying *Monell*.

## V.    <u>CONCLUSION</u>

For these reasons, the Court should adopt the R&R's recommendation to deny Defendants' and Putative-Intervenor's Motions to Dismiss.  But the Court should grant CRC's motion for a preliminary injunction and allow CRC to proceed on its theory of Section 1983 liability against Birkhead without requiring CRC to meet the strictures of *Monell*.

33

Dated:  December 4, 2025          Respectfully submitted,


                                  */s/ Christopher J. Heaney*
                                  Christopher J. Heaney (SBN
                                  46095)
                                  Law Office of Christopher J.
                                  Heaney
                                  P.O. Box 37028
                                  Raleigh, North Carolina
                                  27627

                                  */s/ Rohit K. Singla*
                                  Rohit K. Singla (*specially
                                  appearing*)
                                  rohit.singla@mto.com
                                  Shannon Aminirad (*specially
                                  appearing*)
                                  shannon.aminirad@mto.com
                                  Aditi N. Ghatlia (*specially
                                  appearing*)
                                  aditi.ghatlia@mto.com
                                  MUNGER, TOLLES & OLSON LLP
                                  560 Mission Street
                                  San Francisco, California
                                  94105-2907
                                  (415) 512-4000

                                  Ariella H. Park (*specially
                                  appearing*)
                                  Ariella.Park@mto.com
                                  Sarah M. Pfander (*specially
                                  appearing*)
                                  Sarah.Pfander@mto.com
                                  MUNGER, TOLLES & OLSON LLP
                                  350 South Grand Avenue, 50th
                                  Floor
                                  Los Angeles, California
                                  90071-3426
                                  Telephone: (213) 683-9100
                                  Facsimile: (213) 687-3702

                                  *Attorneys for Plaintiff*

34

**CERTIFICATE OF WORD COUNT**

Pursuant to Civil Local Rule 72.4, I hereby certify that the text of this brief contains 6,234 words, including headings and footnotes.  In making this certification, I have relied on the word count of Microsoft Word, used to prepare the brief.

Dated:  December 4, 2025          Respectfully submitted,

*/s/ Rohit K. Singla*
Rohit K. Singla (*specially appearing*)
rohit.singla@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California
94105-2907
(415) 512-4000

35

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:24-cv-943**

CIVIL RIGHTS CORPS,

Plaintiff,

v.

JUDGE DORETTA L. WALKER, in
her official capacity; and
CLARENCE F. BIRKHEAD, in his
official capacity,

Defendants.

Case No.: 1:24-cv-943

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following: **Judge Doretta L. Walker, Clarence F. Birkhead,** and proposed intervenor **North Carolina Administrative Office of the Courts.**

36

Dated:  December 4, 2025          Respectfully submitted,

*/s/ Rohit K. Singla*
Rohit K. Singla (*specially
appearing*)
rohit.singla@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California
94105-2907
(415) 512-4000

37