IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CIVIL RIGHTS CORPS,<br><br>Plaintiff,<br><br>v.<br><br>JUDGE DORETTA L. WALKER in her official capacity and SHERIFF CLARENCE F. BIRKHEAD in his official capacity,<br><br>Defendants,<br><br>v.<br><br>NORTH CAROLINA ADMINISTRATIVE OFFICE OF THE COURTS on behalf of OFFICE OF GUARDIAN AD LITEM SERVICES,<br><br>Intervenor-Defendant. | ) | 1:24-cv-943 |

**MEMORANDUM OPINION AND ORDER**

Lindsey A. Freeman, United States District Judge.

Civil Rights Corps ("CRC") brings this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 against Durham County District Judge Doretta L. Walker ("Judge Walker") and Durham County Sheriff Clarence F. Birkhead ("Sheriff Birkhead"). CRC seeks declaratory and injunctive relief to abate future court-closure orders likely to be issued by Judge Walker and enforced by Sheriff Birkhead's bailiffs that remove CRC's attorneys from Judge Walker's courtroom during child dependency hearings. According to CRC,

those court-closure orders violate its qualified First Amendment right to view Judge Walker's child dependency hearings. During the pendency of this lawsuit, the North Carolina Administrative Office of the Courts ("NCAOC," and collectively with the other defendants, "Defendants") sought to intervene as a defendant on behalf of its guardian ad litem program to defend Judge Walker's court-closure orders.

On October 25, 2025, Magistrate Judge Joe L. Webster[1] issued an Order, Memorandum Opinion, and Recommendation (the "Recommendation") recommending denial of CRC's motion for a preliminary injunction and denial of Defendants' motions to dismiss. *See Civ. Rts. Corp. v. Walker*, No. 1:24-cv-943, 2025 WL 3899824, at *1 (M.D.N.C. Oct. 30, 2025) ("*CRC I*"). The parties subsequently objected to much of the Recommendation. *See* Dkts. 92-95. Although the Court deviates from the Recommendation's analysis at points, it discerns no error with the Recommendation's conclusions.

The Recommendation, Dkt. 89, will be ADOPTED WITH MODIFICATIONS. Defendants' objections, Dkts. 92-94, are OVERRULED. CRC's objections, Dkt. 95, are also OVERRULED. Defendants' motions to dismiss, Dkts. 43, 65, 67, are DENIED. And CRC's motion for a preliminary injunction, Dkt. 12, is DENIED. No party objects to Judge Webster's recommendation that this Court grant NCAOC's motion to intervene. *See CRC*

[1] Judge Webster retired from this Court in February 2026 after fourteen years of service. The Court thanks him for his able service to this District and the litigants it serves.

*I*, 2025 WL 3899824, at *2. Discerning no clear error,[2] NCAOC's motion to intervene, Dkt. 41, is GRANTED.

## FACTS AND PROCEDURAL HISTORY

CRC brings this lawsuit to recognize and enforce its alleged qualified First Amendment right to view child dependency proceedings. *See* Dkt. 1 ¶ 1. CRC is a civil-rights law firm "dedicated to addressing systemic injustice in our legal system through advocacy, public education, policy change, and litigation." *Id.* ¶ 2. Recently, it has directed its attention to North Carolina's dependency court system because "it is investigating whether Durham County dependency proceedings are violating the civil rights of children and parents." *Id.* ¶ 15. It asserts that recent scholarship from academics and advocacy from community members have focused on systemic injustices in dependency proceedings, which it asserts disproportionately impact economically disadvantaged and Black communities. *See id.* ¶¶ 17-19. According to CRC, Durham County's proceedings reveal "a general dysfunction in dependency proceedings." *Id.* ¶ 21.

---

[2] When the parties do not object to a magistrate judge's recommendation, the Court need not make a *de novo* determination. 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). Instead, the Court "must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note to 1983 amendment).

To investigate these concerns, CRC sent some of its attorneys to watch Durham County dependency proceedings. *See id.* ¶ 24. These proceedings occur in Durham County over the course of two weeks every month, and Judge Walker presides over one of those weeks. *See id.* ¶ 26. But, according to the Complaint, Judge Walker and Sheriff Birkhead have consistently rebuffed all of CRC's attempts to view these court hearings. *See id.* ¶ 25. CRC specifically asserts that Judge Walker has closed her courtroom or has ordered CRC attorneys removed whenever she notices CRC attorneys observing her dependency proceedings from the gallery. *See id.* ¶ 26. Though North Carolina state law empowers Judge Walker to close her courtroom during dependency hearings, *see id.* ¶ 25 (citing N.C. Gen. Stat. § 7B-801), that statute requires that court-closure orders be made on a case-by-case basis, *id.* CRC contends that almost every time its attorneys have tried to observe dependency proceedings before Judge Walker, they "have been removed from the courtroom even while other persons unaffiliated with the case are permitted to stay." *Id.* ¶ 27; *see also id.* ¶¶ 28-31. The law firm asserts that Judge Walker's court-closure orders violate its qualified First Amendment right to view child dependency proceedings because they are not issued following specific, heightened factual findings on the record. *See id.* ¶ 25.

According to CRC, Sheriff Birkhead also has a role in Judge Walker's court-closure orders. The bailiffs that work in his office "staff[] the dependency courtrooms" and "enforce the unconstitutional courtroom exclusion orders, such as by patrolling the court

to ascertain the identity of the public who are present," "escorting [CRC] out of the courtroom," and "hanging 'CLOSED HEARING' sign[s] on the courtroom door after [CRC] personnel are excluded." *Id.* ¶ 33. CRC contends that on multiple occasions, Sheriff Birkhead's bailiffs "escorted [CRC] staff from their seats and past various other individuals who were unaffiliated with the particular proceedings but permitted to remain." *Id.* And a deputy sheriff in Sheriff Birkhead's office removed a CRC attorney from the Durham County Courthouse after he "requested a record of the order closing" Judge Walker's courtroom in September 2023. *Id.* ¶ 29.

While its efforts to observe child dependency proceedings have so far been unavailing, CRC still asserts that it "intends to continue attempting to observe proceedings in [Judge Walker's] courtroom, as well as the courtroom of other Durham County dependency court judges[.]" *Id.* ¶ 32.

CRC seeks the aid of this Court to continue court watching child dependency proceedings in Judge Walker's courtroom. It filed a complaint (the "Complaint") with this Court on November 11, 2024, suing Judge Walker and Sheriff Birkhead under § 1983 in their official capacities. *See generally id.* The Complaint asserts that Judge Walker and Sheriff Birkhead have infringed CRC's qualified First Amendment right to view dependency proceedings by ordering and enforcing, respectively, dependency proceedings closed without first considering alternatives to closing court on the record. *Id.* ¶¶ 80, 83. CRC seeks a declaration against Judge Walker recognizing that: (1) it

possesses a qualified First Amendment right to view dependency proceedings; and (2) Judge Walker will violate its First Amendment rights if she closes her courtroom without making specific, reviewable findings on the record that closure is necessary. *Id.* ¶¶ A-B. It also requests a preliminary and permanent injunction against Sheriff Birkhead preventing him, through his bailiffs, from enforcing Judge Walker's court-closure orders unless she makes specific factual findings on the record justifying court closure. *Id.* ¶ C.

On December 2, 2024, CRC filed a motion for a preliminary injunction against Sheriff Birkhead. *See* Dkt. 12. In January 2025, NCAOC moved to intervene as a defendant, Dkt. 41, and Sheriff Birkhead moved to dismiss CRC's complaint, Dkt. 43. The next month, Judge Walker and NCAOC also moved to dismiss. Dkts. 65, 67. On October 30, 2025, Judge Webster issued his nearly fifty-page Recommendation resolving those motions. *See generally* Dkt. 89. He recommends granting NCAOC's motion to intervene, denying Defendants' motions to dismiss, and denying CRC's motion for a preliminary injunction. *CRC I*, 2025 WL 3899824, at *1. The parties filed timely objections to the Recommendations' conclusions. Dkts. 92-95. And they responded to the other side's objections, as well. Dkts. 96-101. Having reviewed the Recommendation and the parties' objections, and after thorough consideration and appropriate review, for the reasons discussed below the Court adopts the Recommendation with modifications.

## STANDARDS OF REVIEW

For timely objections, this Court is required to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). It "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge …, or recommit the matter to the magistrate judge with instructions." *Id.* As to the sections of the Recommendation to which the parties do not object, the Court need not make a *de novo* determination. *Id.*; *see also* Fed. R. Civ. P. 72(b)(3). Instead, it "must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note to 1983 amendment).

## ANALYSIS

Defendants' objections to the Recommendation are overruled in their entirety.[3] CRC has adequately alleged standing to sue Judge Walker and Sheriff Birkhead. And

---

[3] Defendants rest their objections on four grounds: (1) CRC lacks standing to proceed against either Judge Walker or Sheriff Birkhead, *see* Dkt. 92 at 10-13 (Judge Walker); Dkt. 93 at 12-16 (NCAOC); Dkt. 94 at 8-18 (Sheriff Birkhead); (2) this Court lacks subject-matter jurisdiction over the dispute pursuant to the *Rooker-Feldman* doctrine, *see* Dkt. 93 at 12 (NCAOC); (3) this Court should abstain from hearing the dispute, *see* Dkt. 92 at 3-9 (Judge Walker); Dkt. 93 at 5-11 (NCAOC); and (4) CRC fails to adequately allege a qualified First Amendment right to view dependency proceedings that either Judge Walker or Sheriff Birkhead injured, *see* Dkt. 93 at 16-25 (NCAOC); Dkt. 94 at 18-22 (Sheriff Birkhead).

neither the *Rooker-Feldman* doctrine nor principles of abstention preclude this Court from adjudicating the parties' dispute. Finally, NCAOC's objections regarding the adequacy of CRC's substantive allegations in the Complaint do not warrant dismissal at this stage of the proceeding.

CRC's competing objections to the Recommendation are also overruled. CRC has not persuaded the Court that it may sue Sheriff Birkhead without meeting the requirements for imposing municipal liability. Nor has CRC met its burden to establish entitlement to preliminary injunctive relief because it has yet to demonstrate that it is likely to succeed on the merits of its First Amendment claim.

The Court proceeds first by answering whether CRC possesses Article III standing to sue Judge Walker and Sheriff Birkhead. The Court then addresses whether it lacks subject-matter jurisdiction over this dispute pursuant to *Rooker-Feldman*. It next assesses whether abstention principles preclude the Court from awarding CRC its requested relief. It then rejects CRC's contention that it may sue Sheriff Birkhead under the *Ex parte*

---

CRC objects to the Recommendation on two grounds: (1) the Recommendation incorrectly concluded that it could only sue Sheriff Birkhead in his official capacity by imposing municipal liability, *see* Dkt. 95 at 27-33; and (2) it is entitled to preliminary injunctive relief, *see id.* at 10-27.

None of the parties object to Judge Webster's rejection of Defendants' sovereign or judicial immunity defenses, *see CRC I*, 2025 WL 3899824, at *5-8, determination that CRC's claims are ripe, *see id.* at *12, decision not to discretionarily dismiss CRC's claims for declaratory relief, *see id.* at *12-13, or recommendation to grant NCAOC's motion to intervene, *see id.* at *2-4. The Court discerns no clear error with Judge Webster's analysis of these issues and adopts it. *See Diamond*, 416 F.3d at 315.

*Young* doctrine. It concludes by analyzing whether CRC has adequately alleged that Judge Walker and Sheriff Birkhead violated its First Amendment rights before finally turning to whether CRC has established entitlement to preliminary injunctive relief.

## I. CRC Possesses Standing to Sue Judge Walker and Sheriff Birkhead.

CRC alleges Article III standing. CRC alleges that Judge Walker has ordered Sheriff Birkhead's bailiffs to remove its attorneys from her courtroom without making the heightened findings allegedly necessary to ensure her court-closure orders comply with the First Amendment. And it alleges that Judge Walker will order—and Judge Birkhead's bailiffs will enforce—court closure against CRC's attorneys again in the future. Those allegations sufficiently plead standing in this case. Defendants' objections to the contrary misread precedent and overcomplicate the standing analysis, so they will be overruled.

A federal court does not possess subject-matter jurisdiction over a dispute unless the lawsuit presents an Article III "case or controversy." *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Article III imposes a standing requirement that necessitates litigants possess a "personal stake" in their disputes to "ensure that courts decide litigants' legal rights in specific cases … and that courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Id.* (internal quotation marks omitted). Accordingly, Article III standing is a "bedrock constitutional requirement" that must be exhibited by every case brought in federal court. *See United States v. Texas*, 599 U.S. 670, 675 (2023). When standing is

challenged, it must be established by the party invoking the federal court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Article III standing has three elements: (1) injury-in-fact, (2) traceability, and (3) redressability. *Lujan*, 504 U.S. at 560-61. "[S]tanding is not dispensed in gross," and it must be established as to each claim that a plaintiff presses and for each form of relief it seeks. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But, like the merits of a claim, a plaintiff's burden to demonstrate standing progresses with the lifecycle of its lawsuit. *See Lujan*, 504 U.S. at 561.

"At the pleading stage, general factual allegations of injury resulting from" the defendants' "conduct may suffice." *Id.* A motion to dismiss under Rule 12(b)(1) is reviewed under the same standard as Rule 12(b)(6). *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 193 (4th Cir. 2026). All of Defendants' standing objections are reviewed pursuant to Federal Rule of Civil Procedure 12(b)(1), so the Court must "accept as true the facts alleged in the … complaint and construe those facts in the light most favorable" to CRC. *See S.C. State Conf. of NAACP v. Weaver*, 181 F.4th 353, 362 (4th Cir. 2026).

Defendants object that CRC has not established any of the elements of standing.[4] The Court disagrees.

---

[4] All three Defendants object that CRC has not adequately alleged injury-in-fact. *See* Dkt. 92 at 10-12 (Judge Walker); Dkt. 93 at 13-15 (NCAOC); Dkt. 94 at 9-12 (Sheriff Birkhead). Sheriff Birkhead objects that CRC has not adequately alleged an injury traceable to him. *See* Dkt. 94 at 12-14. And all three Defendants object that CRC's requested relief will not

### A. CRC has demonstrated injury-in-fact.

CRC has demonstrated an injury-in-fact because it adequately alleges that it is likely to suffer injury to its First Amendment rights in the future. Injury-in-fact is an invasion of any legally cognizable interest that is both: (1) concrete and particularized, and (2) actual or imminent. *Lujan*, 504 U.S. at 560. An injury is concrete if it is "real and not abstract." *TransUnion*, 594 U.S. at 424. And an injury is particularized if it affects "the plaintiff in a personal and individual way" rather than merely being a "generalized grievance." *Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). Further, an injury is "actual or imminent" if it has "already occurred" or is "likely to occur soon." *Id.* But past injury cannot confer standing to seek prospective relief like an injunction or declaration, so "the plaintiff must establish a sufficient likelihood of *future* injury" when it seeks such relief. *See id.* (emphasis added); *see also Wells v. Johnson*, 150 F.4th 289, 300 (4th Cir. 2025) (declaratory judgments "give plaintiffs facing future injuries a remedial option other than injunctions").

CRC has adequately alleged an injury to a legally cognizable interest that is concrete and particularized. An alleged injury to one's First Amendment rights unquestionably constitutes a legally-cognizable injury constituting injury-in-fact. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *Doe v. Pub.*

---

redress its asserted injury. *See* Dkt. 92 at 12-13 (Judge Walker); Dkt. 93 at 15-16 (NCAOC); Dkt. 94 at 14-18 (Sheriff Birkhead).

*Citizen*, 749 F.3d 246, 263-64 (4th Cir. 2014); *see also Hippocratic Med.*, 602 U.S. at 381 (examples of injuries-in-fact include "physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights"). The Complaint, accepted as true, adequately alleges that Judge Walker's court-closure orders violate CRC's First Amendment rights because she orders CRC's attorneys removed from dependency hearings without making the heightened factual findings necessary to comport with strict scrutiny, as is allegedly required by *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982). *See* Dkt. 1 ¶¶ 26-36. Every time Judge Walker fails to make heightened factual findings on the record prior to removing CRC's attorneys, CRC's First Amendment rights are allegedly violated, and it incurs constitutional injury-in-fact.

Judge Walker and Sheriff Birkhead's objections to the contrary are meritless. The pair first assert that CRC has failed to allege an injury-in-fact because it does not allege Judge Walker has exceeded her authority under state law. *See* Dkt. 92 at 11; Dkt. 94 at 11-12. They direct the Court to Section 7B-801 of the North Carolina General Statutes, which governs court closure in dependency proceedings. *See* N.C. Gen. Stat. § 7B-801. The statute requires that the North Carolina courts consider certain factors when deciding whether to close a dependency proceeding. *See id.* §§ 7B-801(a)(1)-(5). Judge Walker and Sheriff Birkhead claim that because CRC has not alleged Judge Walker failed to comply with these requirements, it cannot demonstrate an injury-in-fact. They emphasize that CRC recognizes that § 7B-801 ensures presumptively open dependency proceedings. *See*

Dkt. 1 ¶ 52 ("Notwithstanding Defendants' unconstitutional practice, state law still provides for a presumption of open courts …." (citing N.C. Gen. Stat. § 7B-801)).

But that argument impermissibly wades into the merits of CRC's First Amendment claim. When assessing standing, the Court must "accept as valid the merits of [CRC's] legal claims." *See FEC v. Cruz*, 596 U.S. 289, 298 (2022). The Fourth Circuit has specifically cautioned against confusing standing with the merits because standing is not dependent on a plaintiff's ultimate success. *Ass'n of Am. R.Rs. v. Hudson*, 114 F.4th 582, 589 (4th Cir. 2025). In essence, Judge Walker and Sheriff Birkhead quibble with CRC's legal theory, asserting that it should have challenged Section 7B-801, not Judge Walker's specific acts of exercising the discretion that statute affords judges. *See* Dkt. 94 at 12 ("The limitation on access to juvenile court in N.C. Gen. Stat. § 7B-801 is Constitutional, as [CRC] acknowledges, and [CRC] has not alleged that [Defendants] did not follow that statute."). But even if the statute presumptively keeps North Carolina dependency proceedings open, that does not impact whether the *First Amendment* requires that Judge Walker close those proceedings only after making heightened factual findings on the record. *Cf. Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 560, 580-81 (1980) (plurality opinion) (striking down as unconstitutional a state-court closure order issued without factual findings and only upon a motion of the defendant, which was then-permissible under a Virginia statute); *see also Jonathan R. ex rel. Dixon v. Justice*, 41 F.4th 316, 323 (4th Cir. 2022) ("*Jonthan R. I*") (observing that plaintiffs challenging West Virginia's foster

care system "do not challenge any state statutes or any state-court judgments," only state practices that allegedly injured them). Whether the conceded constitutionality of Section 7B-801 insulates Judge Walker and Sheriff Birkhead from liability for allegedly unconstitutional exercise of that statute is a question for the merits, not standing.

Judge Walker next asserts that CRC will not suffer future First Amendment injury because CRC's attorneys could be removed even if she made heightened findings on the record. Dkt. 92 at 11. This objection again wades in the merits of CRC's First Amendment claim, *see Hudson*, 114 F.4th at 589, because it misconstrues CRC's asserted First Amendment right as an absolute right to open dependency proceedings. As CRC acknowledges, the Constitution only guarantees a "qualified … right of public access to certain types of judicial proceedings." Dkt. 1 ¶ 34 (internal quotation marks omitted). CRC's claimed injury is not its removal from Judge Walker's courtroom, but rather *removal without the requisite findings and consideration of less-restrictive alternatives*, as is required by the heightened scrutiny allegedly afforded to the public's alleged qualified right to view dependency proceedings. *See Pub. Citizen*, 749 F.3d at 266 (qualified public right of access may be abrogated by a "compelling government interest" and denial of access that is "narrowly tailored to serve that interest" (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)).

In short, it is irrelevant that CRC's attorneys could be removed from Judge Walker's courtroom in the future. According to CRC's own request for relief, that would

be permissible under the First Amendment—if such removal was *after* requisite findings on the record. But that conclusion does not change the fact that Judge Walker is alleged to have ordered her courtroom closed without making any findings and likely will continue to fail to make such findings, all in violation of CRC's qualified First Amendment right to view the child dependency proceedings. CRC has thus asserted a legally cognizable interest that is sufficiently concrete and particularized.

CRC also adequately alleges that its injury is imminent due to the likelihood that it will incur First Amendment injury from Judge Walker and Sheriff Birkhead in the future. *See Lujan*, 504 U.S. at 560. A plaintiff can demonstrate a likelihood of future injury by alleging that: (1) it intends "to engage in conduct at least arguably protected by the First Amendment but also proscribed by the [action] [it] wish[es] to challenge;" and (2) a "credible threat" that the defendants will enforce the violation against it in the future. *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018); *see also Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 159 (2014). Evidence of past enforcement, standing alone, does not demonstrate a likelihood of future injury, *see Abbott*, 900 F.3d at 176, but it can serve as evidence that a threat of future enforcement is credible, *see Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citing *Susan B. Anthony List*, 573 U.S. at 164).

Here, CRC adequately alleges both elements necessary to demonstrate a likelihood of future First Amendment injury. It specifically alleges that it intends to send its attorneys to watch Judge Walkers' dependency hearings again in the future, and that she

has closed almost every proceeding its attorneys have attended without making heightened findings, even though other members of the public have been permitted to remain. *See* Dkt. 1 ¶¶ 26-28, 33. It further alleges that its court-watching is protected by the public's qualified First Amendment right to view dependency proceedings, which Judge Walker and Sheriff Birkhead violate when they remove its attorneys without Judge Walker making heightened findings on the record. *See id.* ¶¶ 26-36. These allegations collectively assert that CRC faces a credible threat that Judge Walker and Sheriff Birkhead will remove its attorneys from dependency hearings in the future without making heightened findings, allegedly in violation of its First Amendment rights. That threat is especially credible because Judge Walker concedes in her briefing that she could—and would—continue to order the removal CRC's attorneys from her courtroom. *See* Dkt. 92 at 12-13 ("Plaintiff's requested declaratory relief would only require Defendant Walker to explain thoroughly her closure rulings .... Plaintiff does not request the relief that would allow access to hearings that Defendant Walker would otherwise close ...."); *see also Kenny*, 885 F.3d at 288 ("Threat of [First Amendment injury] is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future." (quoting *Susan B. Anthony List*, 573 U.S. at 165)).

By demonstrating a legally cognizable interest that is concrete, particularized, and sufficiently imminent, CRC has established injury-in-fact.

### B. CRC's injuries are fairly traceable to Sheriff Birkhead.

CRC has also established the second element of standing, traceability. Of the Defendants, only Sheriff Birkhead challenges this element, asserting CRC's injuries are not traceable to him.

Sheriff Birkhead's traceability objections, Dkt. 94 at 12-14, however, largely misread authority. Traceability is the causation element of standing. It requires that the plaintiff "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *overruled in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). This requirement ensures that plaintiffs seek to redress harm caused by the defendants by rejecting claims that hinge on "the independent action of some third party not before the court," *see Lujan*, 504. U.S. at 560 (internal quotation marks omitted), or self-inflicted injury caused exclusively by the plaintiff, *see DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). So long as a defendant's conduct is "at least in part responsible for" causing the plaintiff's injury, then traceability is met. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). At the motion-to-dismiss stage, traceability is an especially low bar, and it poses a lower hurdle than the causation necessary to prevail in a tort suit because proximate causation is not an element of standing. *DiCocco*, 52 F.4th at 592 (finding that although employee's resignation was self-inflicted, her injury was still traceable to defendant-employer because its "discriminatory

policy[] was the but-for cause of her injuries"); *see also Rouse v. Fader*, 171 F.4th 272, 280 n.8 (4th Cir. 2026).

CRC's injuries are traceable to Sheriff Birkhead because his bailiffs effectuate Judge Walker's court-closure orders. All CRC must demonstrate is that his bailiffs are "at least in part responsible for" removing CRC's attorneys from Judge Walker's courtroom without first ensuring closure complies with the First Amendment. *Libertarian Party*, 718 F.3d at 316. The bailiffs are the direct means by which Judge Walker carries out her orders. Indeed, as the Fourth Circuit has observed, "While a judge unquestionably has the right to maintain order in [her] courtroom by ordering a disruptive individual removed, the proper authority to carry out the removal itself would be a sheriff or bailiff or other court security officer." *Gibson v. Goldston*, 85 F.4th 218, 226 (4th Cir. 2023). Even if Judge Walker's closure orders are the proximate cause of CRC's injuries, Sheriff Birkhead's bailiffs are still a but-for cause, as CRC's attorneys would not be removed but for his bailiffs enforcing her closure orders made without heightened factual findings. *See DiCocco*, 52 F.4th at 592 (plaintiff's resignation was traceable to defendant's discriminatory employment policy because, but for the policy, she would not have resigned).

Sheriff Birkhead's arguments to the contrary overcomplicate the inquiry. He asserts two reasons that CRC's injuries are not traceable to him: (1) he exercises no authority over whether to close Judge Walker's dependency proceedings, *see* Dkt. 94 at

12-13; and (2) his bailiffs act as a mere extension of Judge Walker and therefore do not independently "enforce" her closure orders, *see id.* at 13-14.

Sheriff Birkhead first relies on *Bennett v. Spear*, 520 U.S. 154 (1997), to argue that he does not exercise any authority over Judge Walker's decision to close her courtroom. *See* Dkt. 94 at 11-13. But *Bennett* (which found in favor of traceability) concerned whether an injury can be traceable to a defendant when the more immediate cause of the plaintiff's injury is a third party not before the court. *See* 520 U.S. at 169-70; *see also id.* at 159 (observing that neither the agency alleged to have directly injured the plaintiffs nor its officials were named as defendants). *Bennett* therefore has no bearing on whether CRC's injuries are traceable to Sheriff Birkhead, as he is a defendant in this action and his bailiffs are allegedly the direct, but-for cause of CRC's injuries. *See* Dkt. 1 ¶ 33. *Bennett* would only speak to whether CRC's injuries are traceable to Judge Walker *if* Sheriff Birkhead were not a defendant in this action. *See Bennett*, 520 U.S. at 168-69; *see also Rouse*, 171 F.4th at 281 (delineating the third-party standing test for traceability when the defendant is alleged to have caused a third-party to injury the plaintiff).[5]

[5] Even accepting that *Bennett*'s third-party standing principles did apply to this dispute, Sheriff Birkhead misconstrues the facts of *Bennett*. He claims *Bennett* supports his case because CRC does not allege *he* has coercive effect over *Judge Walker*. *See* Dkt. 94 at 11-13. In *Bennett*, plaintiffs sued the Fish and Wildlife Service and the Secretary of the Interior, claiming that Fish and Wildlife's biological opinion injured them by permitting the Bureau of Reclamation to engage in a project that allegedly endangered certain wildlife. *See* 520 U.S. at 159-60. The Supreme Court held that the plaintiffs adequately alleged traceability because, although they had not sued the Bureau of Reclamation or its officials,

Further, a more recent Fourth Circuit decision has already rejected an argument similar to the one Sheriff Birkhead advances here. *See Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 338 (4th Cir. 2021). In *Doe 4*, a putative class of unaccompanied immigrant children sued to challenge their treatment at a juvenile detention facility in West Virgina. *See id.* at 329. The detention facility was operated by a commission, although a federal agency "retain[ed] ultimate responsibility for [the children's] placement and mental health treatment." *Id.* at 329, 336. The commission argued that the plaintiffs' injuries were not redressable without the federal agency as a defendant because only the federal agency could ultimately effectuate the policy changes the plaintiffs sought. *Id.* at 336. Relying on *Bennett*, the Fourth Circuit rejected the commission's position, reasoning that the federal agency's "actions are not wholly independent from those of" the commission. *Id.* at 337. While the agency might have had "final say over the provision of certain medical or mental health services," its

---

they demonstrated that Fish and Wildlife's biological opinion (which did not carry the force of law) nevertheless directly influenced the Bureau of Reclamation's behavior because it had to move forward with the project in accordance with the biological opinion. *Id.* at 168-70. Here, Sheriff Birkhead contends that he is like Fish and Wildlife and CRC has not alleged that he has determinative or coercive effect over Judge Walker, who he likens to the Bureau of Reclamation. *See* Dkt. 94 at 11-13. But *he* is the Bureau of Reclamation and *Judge Walker* is Fish and Wildlife under his analogy. Judge Walker takes action that can only be effectuated through Sheriff Birkhead's bailiffs, and she guides their action through her orders. And vice versa. Sheriff Birkhead's bailiffs do not have the power to remove CRC's attorneys unless ordered by Judge Walker. *Bennett*, therefore, does not support—nor really speak to—Sheriff Birkhead's traceability concerns.

decision-making was "limited to *approving* measures" ultimately undertaken by the commission. *Id.* at 338 (emphasis in original). Sheriff Birkhead is analogous to the commission in *Doe 4*. Though his bailiffs may only act subject to the order and approval of Judge Walker, *see* Dkt. 94 at 13, his bailiffs are ultimately the means through which court closure is effectuated, making CRC's injuries traceable to him.

Next, Sheriff Birkhead construes the Supreme Court's decision in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), far beyond its holding. He appears to assert that: (1) he acted in a judicial capacity when enforcing Judge Walker's orders; and (2) *Whole Woman's Health* precludes lawsuits targeting court officers who merely act as the vehicles through which judges effectuate their courtroom orders. *See* Dkt. 94 at 13-14. Specifically, he asserts that his bailiffs "act as an extension of the judge and not of their own accord when they directly carry out orders of a sitting judge in his/her presence." *Id.* at 13. He continues that "[a] bailiff's action in closing the courtroom at the judge's order is much like the clerks in *Whole Women's Health v. Jackson* [*sic*] in that the enforcement connection does not exist apart from the true enforcer," the judge. *Id.* at 14.

But *Whole Woman's Health*'s analysis of the court clerks only concerned Article III's adversity requirements and the contours of *Ex parte Young*, 209 U.S. 123 (1908). *See Whole Woman's Health*, 595 U.S. at 39-43. The case does not directly address standing in lawsuits targeting judges and judicial officers, and this Court is not at liberty to divine standing principles from its holding. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144

(2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."). In any event, *Whole Woman's Health* does not wholesale conclude that judges and judicial officers *never* enforce allegedly unconstitutional state action; it simply reiterates that a plaintiff may not manufacture an Article III "case or controversy" by suing the judicial officers overseeing the adjudication of a law the plaintiff contends is unconstitutional. *See* 595 U.S. at 39-41; *see also Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984). Indeed, the Fourth Circuit reads *Whole Woman's Health* to hold judges and judicial officers are improper defendants under *Ex parte Young* only when they act in an "adjudicatory capacity," not when they act as an "enforcer or administrator" of the law. *See Frazier v. Prince George's County*, 140 F.4th 556, 562-63 (4th Cir. 2025).

To the extent that Sheriff Birkhead relies on *Whole Woman's Health* to argue that CRC's injury is not traceable to him because he is not a proper defendant with enforcement authority over Judge Walker's court-closure orders, *see* Dkt. 94 at 14, he is mistaken. *Cf. Sheppheard v. Morrisey*, 143 F.4th 232, 243-44 (4th Cir. 2025) (plaintiffs' injuries were not fairly traceable to state officials who did not enforce the challenged laws). As a county sheriff, Sheriff Birkhead "is the only officer who is also responsible for the courts of the State" and who "*administers and executes* … civil justice and acts as the ex officio detention officer." N.C. Gen. Stat. § 17E-1 (emphasis added); *see also id.* § 162-16 (sheriff "may be required" to "execute" judicial orders). That bailiffs lack

discretion to ignore a court-closure order only reinforces traceability because their "actions are not wholly independent from those of" Judge Walker. *See Doe 4*, 985 F.3d at 337. Sheriff Birkhead's bailiffs physically enforce court closure against CRC, so, under core standing principles, he is "at least in part responsible" when that court closure does not comply with CRC's asserted qualified First Amendment right of access, and, thus, CRC's injuries are traceable to him. *See Libertarian Party*, 718 F.3d at 315-16.

### C. A declaration against Judge Walker and an injunction against Sheriff Birkhead would redress CRC's injuries.

As for the last element of standing, the Court has the authority to issue the equitable relief CRC seeks and that relief would redress CRC's injuries. An injury is redressable if the Court "has the power to grant the plaintiff's requested relief" and "such relief would redress the plaintiff's injury." *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). The redressability analysis requires that a court examine the relationship between the injury the plaintiff claims and the judicial relief it requests. *See California v. Texas*, 593 U.S. 659, 671 (2021). At the pleading stage, a plaintiff can meet its burden by demonstrating that it "personally would benefit in a tangible way from the court's intervention." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018).

Declaratory and injunctive relief is likely to redress CRC's injuries. A declaration against Judge Walker that closing dependency proceedings without making heightened factual findings on the record violates CRC's qualified First Amendment right of access provides "a legal ruling that [CRC] can someday use in a lawsuit" against Judge Walker

because it would be "a declaration that will bind" her in the future. *See Wells*, 150 F.4th at 303. And an injunction against Sheriff Birkhead redresses CRC's injury by preventing Sheriff Birkhead's bailiffs from effectuating Judge Walker's allegedly injurious court-closure orders. *See id.* at 301 ("An injunction redresses a future injury by ordering the defendant not to cause it."). According to its allegations, then, CRC's requested relief will redress its injuries.

Practicality and federalism concerns do not preclude CRC's requested injunctive relief, contrary to Sheriff Birkhead's suggestion. *See* Dkt. 94 at 14-18; Dkt. 96 at 8-12. Sheriff Birkhead objects primarily on policy grounds, asserting that CRC's requested injunction is overly intrusive into the functioning of the North Carolina state courts, usurps the adjudicative authority of state-court judges, and requires his bailiffs act as an appellate court for Judge Walker. *See* Dkt. 94 at 14-18. To the extent he argues that federalism concerns deprive this Court of the power to issue injunctive relief aimed at reforming state courts, the Fourth Circuit recently rejected that argument. *See Jonathan R. ex rel. Dixon v. Morrisey*, 178 F.4th 139, 154 (4th Cir. 2026) ("*Jonathan R. II*") ("[T]his Court and the Supreme Court continue to affirm the power of the federal courts to reform state institutions."). For the same reason, Sheriff Birkhead's practicality concerns do not drive the redressability analysis. *See id.* at 158-161. Those concerns are best addressed if and when this Court determines that injunctive relief should be issued. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiffs."); *see also Bone v. Univ. of N.C. Health Care Sys.*, 678 F. Supp. 3d 660, 705 (M.D.N.C. 2023) (analyzing federalism and practicality concerns associated with issuing injunction to determine if it is properly tailored). At the pleading stage, it is "sufficient to show redressability" that "[a]t least some of the injunctive relief [CRC] seek[s] is within [a] district court's authority and would relieve at least part of [CRC's] injuries." *Jonathan R. II*, 178 F.4th at 168 (Rushing, J., concurring in the judgment in part and dissenting in part); *see also B.F. ex rel. Falk v. López*, No. 1:23-cv-109, 2026 WL 696753, at *16 (D. Md. Mar. 12, 2026) (mere fact that plaintiff may be "unable to show entitlement to certain forms of injunctive relief" does not mean he "lack[s] standing *en toto*").

Defendants' remaining objections to the Recommendation's redressability analysis do not alter the Court's analysis, either. They collectively assert that prospective relief will not redress CRC's injury because Judge Walker could remove CRC after making heightened findings and that, in any event, other avenues exist for removing CRC. *See* Dkt. 92 at 10-13; Dkt. 93 at 15-16; Dkt. 94 at 15-18. As an initial matter, Defendants again mischaracterize the right CRC asserts. For instance, Judge Walker's argument that "Plaintiff's requested declaratory relief would only require [her] to explain thoroughly her closure rulings," Dkt. 92 at 12, does nothing but underscore that a declaration against her would redress CRC's injuries. As explained above, CRC's injury is not removal *per se*, but removal without Judge Walker explaining why her court-closure

orders comply with CRC's qualified First Amendment right of access. *See Wash Post.*, 807 F.3d at 390 (finding that the First Amendment's qualified public right of access "does not entitled the press and public to access in every case"). Thus, by Judge Walker's own admission, a declaration requiring that she explain her closure orders protects CRC's asserted qualified right of access.

Nor may Defendants challenge CRC's standing by speculating about other ways CRC's requested relief might be rendered unnecessary or ineffective. "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285; *accord Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022). And Defendants may not "challenge [CRC's] standing on the speculation that a third party might do something that affects the relief provided." *Doe 4*, 985 F.3d at 338. As a legal matter, it is therefore irrelevant that, for instance, a juvenile might request the dependency proceedings remain open even if Judge Walker ordered closure. *See* Dkt. 92 at 12; *see also* N.C. Gen. Stat. § 7B-801(b) (requiring dependency proceedings to remain open if requested by the juvenile). Nor does it matter that state statutory law supposedly "renders the requested relief … largely duplicative of the already provided statutory protections." Dkt. 93 at 16; *see also* N.C. Gen. Stat. § 7B-801(a) (outlining factors a judge must consider before closing dependency proceedings).

Although resolving Defendants' objections has required exhaustive analysis, the Court emphasizes the simplicity of CRC's standing theory. CRC alleges that Judge

Walker cannot constitutionally close her courtroom without making heightened factual findings on the record that closure complies with its qualified First Amendment right of access. CRC has attempted to court watch dependency proceedings before Judge Walker and intends to do so again in the future. Judge Walker has so far ordered her courtroom closed without making any findings when CRC's attorneys are present. She then directs Sheriff Birkhead's bailiffs to remove CRC's attorneys, close her courtroom doors, and affix a sign denoting that the proceedings are now closed. Simply put, those allegations demonstrate Article III standing against Judge Walker and Sheriff Birkhead.

## II. *Rooker-Feldman* Does Not Deprive this Court of Subject-Matter Jurisdiction.

The *Rooker-Feldman* doctrine does not apply because CRC does not seek review of a state-court judgment issued prior to these proceedings. NCAOC asserts that CRC effectively seeks review of Judge Walker's past court-closure orders, in violation of *Rooker-Feldman*. *See* Dkt. 93 at 12. It contends that this Court lacks subject-matter jurisdiction to review and reject Judge Walker's past court-closure orders. *Id.* NCAOC's objection is overruled because NCAOC mischaracterizes the relief CRC requests.

*Rooker-Feldman* prohibits federal district courts from sitting as appellate courts of review to state courts. It derives from a pair of Supreme Court cases decided sixty years apart. *See generally Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). It enforces an implied inverse of the express grant of *certiorari* jurisdiction to the Supreme Court from the states' highest courts. *See* 28 U.S.C. § 1257(a)

(limiting the Supreme Court's jurisdiction to review state-court judgments only to "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had"). It is based on "two closely related bases of reasoning." *T.M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739, 1747 (2026) ("*T.M. II*"). First, that "when plaintiffs 'essentially invite federal courts of first instance to review and reverse unfavorable state-court judgments,' they are seeking an exercise of appellate jurisdiction." *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005)) (citation modified). And second, that appellate jurisdiction is vested solely with the Supreme Court under 28 U.S.C. § 1257. *Id.* Accordingly, under § 1257, *Rooker-Feldman* "strips federal courts of subject-matter jurisdiction when 'state-court losers complain of injuries caused by state-court judgments' in district court." *Jonathan R. I*, 41 F.4th at 339 (quoting *Exxon*, 544 U.S. at 284) (citation modified).[6] For the doctrine to apply, the following elements must be met: (1) the plaintiff is a state-court loser (2) complaining of injuries caused by a state-court judgment (3) rendered before the district court proceedings commenced and (4) inviting the district court to review and reject that judgment. *Exxon*, 544 U.S. at 284. NCAOC's objection fails because CRC does not complain of injuries caused by a state-court judgment rendered prior to these proceedings.

[6] Though the Recommendation mistakenly characterized *Rooker-Feldman* as an abstention doctrine, that mistaken nomenclature did not impact Judge Webster's correct determination that the doctrine does not bar CRC's lawsuit. *See CRC I*, 2025 WL 3899824, at *9.

At the outset, it is worth noting that the *Rooker-Feldman* doctrine is incredibly narrow. "In the years since *Rooker* and *Feldman*, [the Supreme Court] has refused to expand the *Rooker-Feldman* doctrine." *T.M. II*, 146 S. Ct. at 1747. Indeed, it has expressly limited the doctrine to "cases of the kind from which the doctrine acquired its name." *See Exxon*, 554 U.S. at 284. And following the Supreme Court's *Exxon* decision, the Fourth Circuit had "never, in a published opinion, held that a district court lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine" until *T.M. v. University of Maryland Medical System Corp*. *See* 139 F.4th 344, 346 (4th Cir. 2025) ("*T.M. I*") (internal quotation marks omitted). The Supreme Court affirmed that ruling this past term. *See T.M. II*, 146 S. Ct. at 1744. But both the Fourth Circuit and the Supreme Court emphasized the extraordinary facts of the case, which they agreed bore "an uncanny resemblance to *Rooker*." *T.M. I*, 139 F.4th at 349; *see also T.M. II*, 146 S. Ct. at 1748 (agreeing that "T.M.'s case is the paradigm situation in which *Rooker-Feldman* precludes a federal district court from proceeding" (internal quotation marks omitted)).

NCAOC's objection that the *Rooker-Feldman* doctrine strips this Court of subject-matter jurisdiction, Dkt. 93 at 12, is overruled because CRC does not invite review of a state-court judgment issued prior to these proceedings. The *Rooker-Feldman* doctrine poses no obstacle to federal lawsuits that "at most affect future state-court decisions." *Jonathan R. I*, 41 F.4th at 340; *see also Manning v. Caldwell for Roanoke*, 930 F.3d 264, 270 n.4 (4th Cir. 2019) (finding *Rooker-Feldman* did not bar prospective challenge to Virginia's

interdiction order procedures). CRC never once asks this Court to declare a specific past closure order "unconstitutional" or "unenforceable" or "grant preliminary and permanent injunctive relief preventing" its enforcement, as was the case in *Rooker* and *T.M. I & II*. *See T.M. I*, 139 F.4th at 350. It simply seeks forward-looking relief to prohibit future violations of its alleged qualified right to view Judge Walker's dependency hearings. *See* Dkt. 1 ¶¶ B-C. NCAOC does not meaningfully contest any of this authority, instead relying on the Fourth Circuit's now-disavowed pre-*Exxon* precedent treating *Rooker-Feldman* as a preclusion doctrine. *See* Dkt. 93 at 12 (citing *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 199 (4th Cir. 2000)). NCAOC's objection that *Rooker-Feldman* deprives this Court of subject-matter jurisdiction therefore fails.

## III. Principles of Abstention Do Not Require this Court to Abstain.

Judge Walker and NCAOC argue that the Court should abstain from awarding CRC injunctive or declaratory relief. Dkt. 92 at 3-10 (Judge Walker); Dkt. 93 at 5-11 (NCAOC). The Court, however, declines their invitation to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), or *O'Shea v. Littleton*, 414 U.S. 488 (1974). A federal court's "obligation to hear and decide a case is virtually unflagging." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (internal quotation marks omitted). Abstention remains the "exception, not the rule." *Id.* at 82 (internal quotation marks omitted).

Judge Webster properly concluded that neither *Younger* nor *O'Shea* precludes the Court from issuing prospective relief in CRC's favor. *See CRC I*, 2025 WL 3899824, at *8-

9. *Younger* is inapplicable because CRC is not a party to any state court proceeding and, in any event, it does not seek to enjoin a pending proceeding. And the Supreme Court's concerns in *O'Shea*—to the extent they even constitute a basis for abstention independent of *Younger*—are absent in this case. The Court begins with an analysis of *Younger* before addressing *O'Shea*.

### A. *Younger* abstention does not apply.

*Younger* does not preclude the prospective relief CRC requests in this case. In 1971, the Supreme Court declared that comity and federalism concerns weighed against federal courts awarding injunctions to state-court defendants seeking to enjoin the state criminal proceedings against them. *See Younger*, 401 U.S. at 44. After the Supreme Court subsequently held that § 1983 could be used to enjoin pending state-court proceedings notwithstanding the Anti-Injunction Act, *see Mitchum v. Foster*, 407 U.S. 225, 226 (1972); *see also* 28 U.S.C. § 2283, the Supreme Court slowly expanded the bounds of *Younger* to various criminal or quasi-criminal state-court proceedings, *e.g.*, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (civil enforcement proceedings); *Juidice v. Vail*, 430 U.S. 327, 335-36 (1977) (contempt proceedings); *Trainor v. Hernandez*, 431 U.S. 434, 435-38, 443-47 (1977) (civil forfeiture proceedings); *Moore v. Sims*, 442 U.S. 415, 418-19, 423 (1979) (proceedings to terminate parental rights); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) (attorney disciplinary hearings). The Court also extended the doctrine to certain state-court orders necessary to effectuate state-court judgments. *See Pennzoil*

*Co. v. Texaco, Inc.*, 481 U.S. 1, 5-6, 10-14 (1987) (judgment liens). And *Younger* was further expanded to bar lawsuits designed to circumvent its strictures. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 462-63 (1974) (finding declaratory relief is barred by *Younger* unless no state-court proceeding is pending); *Hicks v. Miranda*, 422 U.S. 332, 349-50 (1975) (holding *Younger* requires federal courts to abstain to later-filed state-court actions if there were no "proceedings of substance on the merits" in the federal action).

But *Younger* is not a nebulous invitation to abstain from any lawsuit relating to state court proceedings, and the Supreme Court has more recently narrowed the doctrine. *See Sprint*, 571 U.S. at 72 (*Younger* "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter" as a federal lawsuit). *Sprint* clarified that *Younger* only applies to three "exceptional" categories of state-court proceedings: (1) criminal proceedings; (2) civil-enforcement proceedings; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 73, 78. Even if a certain state-court proceeding falls within the ambit of *Younger*, a federal court should abstain only if there are: (1) *ongoing* state judicial proceedings (2) that implicate important state interests, and (3) provide an adequate opportunity to raise federal challenges. *See Middlesex*, 457 U.S. at 432; *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). And abstention is yet still improper if: (1) the state proceedings were brought in bad faith or to harass, (2) the challenged statute is "flagrantly and patently violative of express constitutional

prohibitions," or (3) "other extraordinary circumstances or unusual situations" exist. *Air Evac*, 37 F.4th at 97 (internal quotation marks omitted).

NCAOC urges that *Younger* abstention is in order. It complains that the Recommendation erroneously concluded that CRC needed to be a party to or interested in a state-court proceeding for *Younger* to apply. Dkt. 94 at 9-11; *see also CRC I*, 2025 WL 3899824, at *8-9. It relies on *Hicks*, which held that *Younger* barred a federal injunction sought by the employers of criminal defendants in state court, reasoning that the employers and the state-court defendants had intertwined interests as evidenced by their shared counsel and employment relationship. *See* 422 U.S. at 348-49; *see also Cinema Blue of Charlotte, Inc. v. Gilchrist*, 887 F.2d 49, 53 (4th Cir. 1989) ("It is no barrier to *Younger* abstention here that the injunction in terms protects individuals who are not parties to the pending state prosecution.").

Even assuming without deciding that child dependency proceedings are one of *Younger*'s three "exceptional" proceedings outlined in *Sprint*, *see* 571 U.S. at 73, 78, NCAOC misreads *Hicks*, as *Younger* only bars parties to state-court proceedings from using stand-in plaintiffs to sue on their behalf in federal court. *Cf. Cinema Blue*, 887 F.2d at 83 (finding it irrelevant that federal plaintiffs were not parties to state proceedings because "[t]he express purpose of the injunction was to vindicate the rights of parties" to the state proceedings). Here, CRC is not "the subject[] of state [dependency] proceedings," nor does it seek to act on behalf of any such party. *See Civ. Rts. Corps v.*

*Pestana*, No. 21-cv-9128, 2022 WL 1422852, at *4 (S.D.N.Y. May 5, 2022). Indeed, it does not "ask for any direct intervention into the proceedings themselves—only access." *Civ. Rts. Corps v. LaSalle*, 184 F.4th 104, 113 n.11 (2d Cir. 2026). Because CRC's request does not directly impact ongoing state child dependency proceedings or their outcome in any way—CRC simply asks for the *qualified right to view* those proceedings—there is no basis for *Younger* abstention.[7]

*Younger* is inapplicable for another, even more basic reason. *Younger* would not apply unless CRC sought an injunction or declaration against *ongoing* state court proceedings. As the Fourth Circuit has stated, "*Younger* and its progeny limit injunctive [and declaratory] relief that would interrupt 'an ongoing state judicial proceeding.'" *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021) (quoting *Nivens v. Gilchrist*, 219 F.3d 151, 153 (4th Cir. 2003)). Neither CRC nor any of the Defendants have directed the Court "to any ongoing state proceeding with which this case would interfere" and the Court "know[s] of none." *Id.* NCAOC's "reliance on *Younger* abstention is therefore misplaced." *Id.*

*Younger* abstention is exceptional. *See Sprint*, 571 U.S. at 73. Its "narrow scope safeguards [CRC's] right[] … to present [its] claims to a federal tribunal." *Jonathan R. I*,

[7] For that reason, CRC's lawsuit is distinguishable from *Moore*. The plaintiffs in *Moore* were parents seeking to enjoin the state proceedings to terminate their parental rights, *see* 442 U.S. at 418-19, whereas CRC is merely attempting to observe dependency proceedings. It does not seek to interfere with dependency proceedings at all.

41 F.4th at 321. If the Court endorsed NCAOC's reading of *Younger* and its progeny, lawsuits seeking qualified access to state-court proceedings could effectively never be brought in federal court. CRC is neither a party to Judge Walker's dependency proceedings nor is it seeking to enjoin any pending proceedings. NCAOC's objections are therefore overruled.

### B. *O'Shea* abstention also does not apply.

*O'Shea* does not provide a basis for abstention either. During the heyday of *Younger*, the Supreme Court heard a dispute challenging Illinois court procedures that allegedly discriminated against persons of color by engaging in unconstitutional bond-setting, sentencing, and jury-fee practices. *See O'Shea*, 414 U.S. at 490. The Court dismissed the case for lack of Article III standing, reasoning that the plaintiffs had failed to prove that they were likely to suffer future injury warranting injunctive relief. *Id.* at 493. But the Court observed that even if the plaintiffs did possess Article III standing, it would still be compelled to abstain under the principles announced in *Younger* even though the plaintiffs did not challenge any pending state-court proceedings. *See id.* at 499. The Court reasoned that it would run afoul of the principles of equity, comity, and federalism at the heart of *Younger* to permit "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials" because such relief was "nothing less than an ongoing federal audit

of state criminal proceedings which would indirectly accomplish the kind of interference that [*Younger*] sought to prevent." *Id.* at 500.

The Fourth Circuit has yet to definitively address the import of *O'Shea*'s discussion of *Younger*, and it has only sparingly analyzed the case outside the context of standing. Prior to the Supreme Court's decision in *Sprint*, the Fourth Circuit held that *Younger* and *O'Shea* barred a lawsuit brought by a party to pending state criminal proceedings to enjoin future criminal proceedings against him. *See Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir. 1986). More recently, the Fourth Circuit has addressed *O'Shea*'s abstention analysis twice, albeit without extensive discussion. It first held that a declaration that state-court clerks must docket civil complaints the same day they receive them did not implicate *O'Shea*. *See Schaefer*, 2 F.4th at 324-25. And in *Jonthan R. I*, the court rejected the prospect that injunctive relief designed to reform West Virginia's foster care system would constitute an ongoing federal audit of foster care proceedings, reasoning that the injunctive relief sought largely targeted state executive bodies, not courts. *See* 41 F.4th at 334-35.

Judge Walker and NCAOC object to the Recommendation's reading of *Schaefer* and *Jonathan R. I*. *See* Dkt. 92 at 3-10; Dkt. 95 at 6-8. Judge Webster read the two cases to jointly stand for the proposition that *O'Shea* applies only to claims for injunctive relief against state courts or court officials. *See CRC I*, 2025 WL 3899824, at *9. Since CRC seeks an injunction against an *executive* official and a *declaration* against a court official, he

reasoned *O'Shea* did not apply. *Id.* It is unnecessary for the Court to assess the propriety of the Recommendation's bright-line rule. Judge Webster correctly recommended that this Court not abstain under *O'Shea* because CRC does not seek "an ongoing federal audit" of state-court dependency proceedings. *See O'Shea*, 414 U.S. at 500; *see also CRC I*, 2025 WL 3899824, at *9 (reasoning that even if *O'Shea* were implicated by CRC's lawsuit, CRC does not seek an ongoing federal audit of North Carolina dependency proceedings).

Given the dearth of clear Fourth Circuit authority, the Court begins with a review of the case law delineating the bounds of *O'Shea* from other circuits. The Court concludes that CRC's relatively narrow requested relief is not akin to the sort of cases in which *O'Shea* has been held to warrant abstention. In this case, CRC seeks a bright-line finding that it possesses a qualified First Amendment right to view dependency proceedings and that Judge Walker and Sheriff Birkhead will violate that right if they remove CRC from dependency proceedings without Judge Walker making heightened factual findings on the record. Such relief does not require repeated, piecemeal intervention from this Court. *See O'Shea*, 414 U.S. at 500. After this Court makes a one-time ruling—should such a finding be warranted on the merits—and Judge Walker institutes a process whereby she makes the requisite First Amendment findings on the record, ostensibly nothing more will be needed from this Court. *See LaSalle*, 184 F.4th at 123 ("The declaratory relief Plaintiffs seek does not impose ongoing intrusion into adjudications (e.g., by altering

evidentiary standards or instituting review of substantive outcomes) but instead would simply apply a presumption of public access.").

The federal courts have taken wildly divergent approaches to understanding *O'Shea*, and it is not even clear that *O'Shea* justifies abstention *unless* a plaintiff seeks relief targeting a future proceeding falling within one of the three *Sprint* categories. The Second, Fifth, and Ninth Circuits have all concluded or suggested that *O'Shea* is an abstention doctrine unique from *Younger* that bars prospective relief aimed at reworking or reforming state-court institutions. *See Kaufman v. Kaye*, 466 F.3d 83, 86-87 (2d Cir. 2006) (*O'Shea* prohibited court from hearing constitutional challenge to the New York state courts' system for assigning cases to appeals court judges); *Daves v. Dallas County*, 64 F.4th 616, 626-31 (5th Cir. 2023) (en banc) (*O'Shea* and *Younger* prohibited court from issuing injunctive relief designed to reform Texas's bail-bond system); *Miles v. Wesley*, 801 F.3d 1060, 1064, 1066 (9th Cir. 2015) (*O'Shea* required abstaining from lawsuit seeking to reduce number of courthouses for retainer actions in Los Angeles); *Courthouse News Serv. v. Planet*, 750 F.3d 776, 789-90 (9th Cir. 2014) (recognizing Ninth Circuit precedent that "*O'Shea* compels abstention where the plaintiff seeks an ongoing federal audit of the state judiciary" (internal quotation marks omitted)). And although it did not expressly rely on *O'Shea*, the Seventh Circuit has also abstained from overseeing a dispute seeking same-day access to state-court complaints based on "general principles of federalism" as

informed by *Younger* and *O'Shea*. *See Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018).[8]

Other courts—even more recent panels in the Second Circuit—appeared to instead analyze *O'Shea* as an extension of *Younger* abstention that prohibits plaintiffs from "circumvent[ing] the abstention doctrine by attempting to accomplish the same type of interference with state proceedings through a claim for prospective relief." *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 611-12 (8th Cir. 2018) (*O'Shea* required *Younger* abstention from lawsuit seeking to reform South Dakota child custody proceedings because "[t]he relief requested would interfere with the state judicial proceedings by requiring the defendants to comply with numerous procedural requirements at future … hearings"); *Hartmann v. Chudzik*, 185 F.4th 65, 72-73 (3d Cir. 2026) (*O'Shea* did not compel *Younger* abstention where plaintiffs sought declaration and injunction prohibiting defendants from detaining them pre-trial unless defendants first determined they could pay the bond for bail); *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 914 (8th Cir. 2022) (questioning

[8] The Court observes that *Brown* is a lone outlier, however. Every other court of appeal to address the question, including the Fourth Circuit, has concluded that neither *Younger* nor *O'Shea* barred lawsuits brought by Courthouse News Service seeking same-day access to state-court complaints. *See Schaefer*, 2 F.4th at 324-25; *Planet*, 750 F.3d at 790; *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 77-78 (2d Cir. 2025); *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 914 (8th Cir. 2022); *Courthouse News Serv. v. Omundson*, __ F.4th __, 2026 WL 2603864, at *4-5 (9th Cir. Sept. 3, 2026); *Courthouse News Serv. v. N.M. Admin. Off. of the Cts.*, 53 F.4th 1245, 1258-60 (10th Cir. 2022). The Fourth Circuit concluded that *Brown*, which purported to create a new basis for abstention, is "inconsistent with [Fourth Circuit] precedent and Supreme Court guidance." *Schaefer*, 2 F.4th at 325 n.2.

whether *O'Shea* is an independent basis to abstain from *Younger*, but concluding that even if the court adopted defendants' reading of *O'Shea*, they failed to prove abstention was warranted); *Walker v. City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018) (*O'Shea* did not require *Younger* abstention from lawsuit challenging municipal bail-bond procedures); *see also Courthouse News Serv. v. Corsones*, 131 F.4th 59, 77-78 (2d Cir. 2025) (recognizing that *O'Shea* is an extension of *Younger*, but holding that abstention was not warranted even under the facts of *O'Shea*); *Disability Rts. N.Y. v. New York*, 916 F.3d 129, 134-35 & n.3 (2d Cir. 2019) (*O'Shea*, "an extension of the principles set forth in *Younger*," required abstaining from lawsuit seeking to reform New York's surrogate court system). And the Tenth Circuit has expressly held *O'Shea* inapplicable when plaintiffs target "state court operations divorced from any current or future state court proceedings." *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1259 (10th Cir. 2022).

The Court need not address whether *O'Shea* may provide a basis for abstention independent from *Younger* because even reading *O'Shea* "for all it is worth," *see Gilmer*, 48 F.4th at 914, Judge Walker and NCAOC do not demonstrate that abstention under *O'Shea* is proper. Judge Walker contends that the declaration against her "is plainly intrusive because it would subject every future courtroom-closure decision … to federal oversight for compliance with the declaratory judgment." Dkt. 92 at 10. NCAOC adds that other courts have concluded that *O'Shea* bars lawsuits seeking to reform state dependency proceedings or other similar court proceedings. Dkt. 93 at 7-8; *see also*

*Disability Rts. N.Y.*, 916 F.3d at 137 (surrogate court hearings); *Oglala*, 904 F.3d at 611-12 (child custody proceedings); *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2012) (per curiam) (dependency proceedings).

Judge Walker and NCAOC are mistaken that CRC's lawsuit requests the sort of relief warranting abstention under *O'Shea*. Though the courts of appeal have diverged in their application and understanding of *O'Shea*, all generally recognize that it is not implicated unless a plaintiff asks "for the sort of pervasive federal court supervision of [s]tate criminal proceedings that was at issue in *O'Shea*." *See Walker*, 901 F.3d at 1255. Where there is little "risk that a decision in [the plaintiff's] favor would interrupt any state-court proceeding," *O'Shea* does not apply. *See Gilmer*, 48 F.4th at 914. The Ninth Circuit perhaps captured the lower federal courts' treatment of *O'Shea* the best:

> These cases suggest that *O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but it is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment.

*Planet*, 750 F.3d at 790.

The Court concludes that CRC does not request an audit of North Carolina dependency proceedings that would "monitor the substance of individual cases on an ongoing basis." *Id.* It seeks relief "akin to [a] bright-line finding" that Judge Walker and Sheriff Birkhead would violate the First Amendment by enforcing court-closure orders against CRC's attorneys unless Judge Walker and Sheriff Birkhead ensure those orders

comply with the public's asserted qualified First Amendment right to view dependency proceedings. *See id.* at 791; *see also LaSalle*, 184 F.4th at 121 ("[W]e have recently clarified that when the remedy sought is a 'bright-line rule, [*O'Shea* is not implicated].'" (quoting *Corsones*, 131 F.4th at 77)). Nor would the Court need to "examine the administration of a substantial number of individual cases" with continuous, piecemeal interruptions, *see Planet*, 750 F.3d at 791 (citation modified), because CRC "merely asks for a prompt … determination of a distinct issue" that "will not interfere with subsequent" child dependency proceedings, *see Hartmann*, 185 F.4th at 72 (quoting *Walker*, 901 F.3d at 1255) (citation modified). Indeed, CRC's requested relief asks that Judge Walker and Sheriff Birkhead comply with the presumptive right of access by keeping dependency proceedings open to the public, "except where a process already exists to consider case-specific factors that may justify" closing the court. *Planet*, 750 F.3d at 792 (internal quotation marks omitted).

The Second Circuit's recent decision in a similar public-access lawsuit brought by CRC emphasizes why *O'Shea* provides no basis for abstention. *See LaSalle*, 184 F.4th at 122. There, CRC and a coalition of law professors sued the presiding judge of the Second Department of the Appellate Division of the New York Supreme Court requesting a declaration that attorney grievance proceedings are presumptively open to the public under the First Amendment. *Id.* at 106-07. After the plaintiffs prevailed on summary judgment, the defendant appealed and argued that the district court should have

abstained under *O'Shea* because ensuring compliance with the declaration would warrant repeated intervention from the federal courts. *See id.* at 112-13, 121-22. The Second Circuit determined that abstention was inappropriate under *O'Shea*, reasoning that "mere possibility that a finding of unconstitutionality of the originally challenged state procedure may be followed by a further challenge to the subsequently developed, ameliorative state procedure does not make it an ongoing federal audit." *Id.* at 121 (citation modified). The court explained that the bright-line rule enforced through the plaintiffs' declaration distinguished it from *O'Shea* and other cases requiring a district court to oversee systematic reform or restructuring of court systems. *Id.* at 123-24. The Second Circuit added, "It is of no moment that the [plaintiffs'] declaration might invite 'further challenge to the subsequently developed, ameliorative' grievance procedures or the [s]tate's specific, on-the-record findings for privacy in a particular disciplinary matter." *Id.* at 123 (quoting *Corsones*, 131 F.4th at 78).

The Second Circuit's analysis in *LaSalle* applies with equal force here. The declaration and injunction CRC seeks merely enforces a bright-line finding that CRC possesses a qualified First Amendment right to access dependency proceedings. CRC's relief does not work an audit on North Carolina courts simply because Judge Walker and Sheriff Birkhead might need to comply with the bright-line relief CRC seeks. *See id.* Indeed, they may not rely on the possibility of further intervention from this Court

occasioned by their own noncompliance because courts "presume court orders will be obeyed." *See Jonathan R. I*, 41 F.4th at 331.

Accordingly, "*O'Shea* does not resemble" the facts of this case "in any way that matters" because the injunctive relief CRC seeks will not interfere with individual state-court proceedings in any meaningful sense. *See id.* at 344. While relief from this Court may impose a burden on Judge Walker and Sheriff Birkhead to ensure factual findings are properly made before Judge Walker may close dependency proceedings, that fact alone does not counsel in favor of abstention because the relief sought is at best minimally intrusive. *See Gilmer*, 48 F.4th at 914; *LaSalle*, 184 F.4th at 122. CRC's prospective relief does not request, much less require, repeated piecemeal intervention from this Court. *See* Dkt. 1 ¶¶ B-C. Judge Walker and NCAOC's objections are therefore overruled.

In overruling those objections, the Court stresses that abstention is the exception, not the rule. *See Sprint*, 571 U.S. at 81-82. While Defendants raise reasonable policy and practicality concerns with the relief CRC seeks from this Court, those objections do not warrant that this Court take the extraordinary measure of declining jurisdiction. *See Jonathan R. II*, 178 F.4th at 169 (Rushing, J., concurring in the judgment in part and dissenting in part) (concerns about the scope of requested injunctive relief are best addressed "when it comes time to fashion injunctive relief tailored to remedying … specific violations"). *Younger*, *O'Shea*, and their progeny cannot be read so

broadly as to block this Court from answering the questions it is "obliged to decide" in this case. *See Sprint*, 571 U.S. at 72.

**IV. CRC Has Stated a Claim for Relief Against Judge Walker and Sheriff Birkhead.**

Having rejected Defendants' justiciability and abstention objections, the Court turns to the sufficiency of CRC's allegations. CRC, Sheriff Birkhead, and NCAOC all object to Judge Webster's analysis concerning the sufficiency of CRC's allegations. Dkt. 93 at 16-25 (NCAOC); Dkt. 94 at 18-22 (Sheriff Birkhead); Dkt. 95 at 27-33 (CRC). CRC objects that the Recommendation erroneously determined that it could not proceed against Sheriff Birkhead in his official capacity under the *Ex parte Young* doctrine. Sheriff Birkhead objects to Judge Webster's recommendation that CRC be permitted to proceed against him by imposing municipal liability under 42 U.S.C. § 1983. And NCAOC objects that CRC has failed to adequately allege a qualified First Amendment right to view dependency proceedings. All three objections fail.

The Court may dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual content to demonstrate that its claim is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Naked assertions of wrongdoing, legal conclusions devoid of factual enhancement, and recitations of the elements of a cause of action do not meet a plaintiff's burden. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Dismissal is proper if the well-pleaded facts of the complaint, taken in the

light most favorable to the plaintiff and excluding 'unwarranted inferences, unreasonable conclusions, or arguments,' fail to state a plausible claim for relief." *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023) (quoting *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014)).

The Court begins by assessing CRC and Sheriff Birkhead's objections. It concludes that CRC may not proceed against Sheriff Birkhead under *Ex parte Young* even though it has stated a claim for relief under *Monell*'s test for municipal liability. Both parties' objections are therefore overruled. NCAOC's objections are also overruled because CRC adequately alleges that it possesses a qualified First Amendment right of access to child dependency proceedings.

### A. CRC may not proceed against Sheriff Birkhead under *Ex parte Young*, though it may proceed against him under *Monell*.

CRC may not proceed against Sheriff Birkhead in his official capacity when, as here, he is not entitled to raise sovereign immunity as a defense to liability. Judge Webster correctly held Sheriff Birkhead suable, however, under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), rejecting CRC's contrary assertion that it may proceed under *Ex parte Young*, 209 U.S. 123 (1908). The Recommendation concludes that Sheriff Birkhead could only be sued in his official capacity under *Monell* because "official capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent," *CRC I*, 2025 WL 3899824, at *14 (quoting *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982) (quotation modified)), "Sheriff Birkhead is

an agent of Durham County," and a municipality is only suable under § 1983 by way of *Monell*, *id.* (citing *Harter v. Vernon*, 101 F.3d 334, 338-43 (4th Cir. 1996)).[9] Judge Webster further acknowledged that the Supreme Court has held that "*Monell*'s 'policy or custom' requirement [necessary to impose municipal liability] applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." *Id.* (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 39 (2010)).

CRC asserts that Judge Webster erred in holding Sheriff Birkhead could only be sued in his official capacity by imposing municipal liability under *Monell*, rather than through the *Ex parte Young* doctrine. It contends that the *Ex parte Young* doctrine "clarifies that federal courts can enjoin ongoing or imminent violations of the federal constitution under the color of state law by *anyone*—regardless of whether they work for the state, county, or federal government." Dkt. 95 at 28 (emphasis in original). Though it does not directly challenge Judge Webster's determination that Sheriff Birkhead is a municipal official, it asks this Court to hold that *Ex parte Young* may be used to sue municipal actors acting under the color of state law to abate actual or imminent violations of federal law, even though municipal officers are never entitled to raise sovereign immunity as a

[9] While the error was harmless, Judge Webster erred in concluding that Sheriff Birkhead is an agent of Durham County. As Sheriff Birkhead explains, *see* Dkt. 94 at 16 n.4, North Carolina sheriffs' departments are municipal bodies independent from the counties they serve, and sheriffs are policymakers for their sheriffs' departments, *see Knight v. Vernon*, 214 F.3d 544, 552 (4th Cir. 2000); *Parker v. Bladen County*, 582 F. Supp. 2d 736, 739 (E.D.N.C. 2008); *Boyd v. Robeson County*, 169 N.C. App. 460, 621 S.E.2d 1, 5 (2005).

defense to official-capacity lawsuits. *See Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 434 (4th Cir. 2025) (officer who represents an office that would not be entitled to raise sovereign immunity may not raise the defense when sued in his official capacity as representative of that office); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (municipalities are not entitled to sovereign immunity). The Court holds that *Ex parte Young* is inapplicable in the absence of a sovereign immunity defense. CRC's arguments to the contrary are far more complex than it lets on, so background on the *Ex parte Young* doctrine and *Monell* liability is warranted.

The *Ex parte Young* doctrine is a judicially-created remedy with a largely singular purpose: to abrogate sovereign immunity ordinarily enjoyed by state actors sued in their official capacities. *See Jackson*, 153 F.4th 434-35 (discussing *Ex parte Young* and its rationale); *King v. Youngkin*, 122 F.4th 539, 544 n.1 (4th Cir. 2024) ("The Supreme Court has since clarified that *Ex parte Young* is a judge-made remedy that stems from courts' power to grant equitable relief." (internal quotation marks omitted)); *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (*Ex parte Young* is an exception to sovereign immunity and "limited to [the] precise situation" where "a federal court commands a state official to do nothing more than refrain from violating federal law"). Official capacity lawsuits against state actors are, in effect, lawsuits against the state they represent because the state is the true party-in-interest. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("A judgment against a public servant in his official capacity imposes

liability on the entity that he represents." (citation modified)); *Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (an official-capacity lawsuit against a state official is a lawsuit "in fact … against the official's office"). And because the state is the true party-in-interest, the official is ordinarily entitled to raise sovereign immunity as a defense to liability, even when the plaintiff seeks equitable relief. *See Jackson*, 153 F.4th at 433-34 ("Sovereign immunity only ever comes into question with an official-capacity suit, and only when the office is part of the state or an arm of the state.").

*Ex parte Young* announced an exception to the general principles of official-capacity lawsuits against state officials, abrogating sovereign immunity in suits against state actors in their official capacity that "allege[] an ongoing violation of federal law and seek[] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted). For the doctrine to apply, the defendant sued must: (1) have "some connection with enforcement" of the state action alleged to violate federal law; and (2) enforce or be imminently about to enforce the challenged state action. *Doyle v. Hogan*, 1 F.4th 249, 254 (4th Cir. 2021) (quotation modified). The plaintiff may not seek retroactive relief because such relief is necessarily against the state. *See Edelman v. Jordan*, 415 U.S. 651, 666-67 (1974) (*Ex parte Young* did not permit injunction seeking disbursement of wrongfully-withheld state disability benefits).

*Ex parte Young* created a sort of legal double-think: "the official must both be a state actor for constitutional purposes and not be a state actor for sovereign immunity

purposes …." *Jackson*, 153 F.4th at 434. Though the state official is still, in effect, the state for purposes of imposing liability and effectuating a remedy, *see Lewis*, 581 U.S. at 162, *Ex parte Young* fashioned a judicial remedy stripping state officials of the sovereign immunity they may otherwise enjoy as a representative of their state office when they violate federal law, *see* 209 U.S. at 159-61. The Court reasoned that, consistent with the Supremacy Clause, states may not instruct their officers to enforce unconstitutional state laws. *Id. Ex parte Young* thus provides an avenue for plaintiffs to abate state violations of federal rights because "certain suits for declaratory or injunction relief against state officers must … be permitted if the Constitution is to remain the supreme law of the land." *Alden v. Maine*, 527 U.S. 706, 747 (1999).

A little over fifty years after *Ex parte Young*, the Supreme Court further expanded individuals' ability to sue state officials to remedy violations of federal law. In *Monroe v. Pape*, the Court held that individuals may employ 42 U.S.C. § 1983 to sue state and local officials for monetary and equitable relief to remedy violations of federal law, construing that statute's "'under color of' state law" requirement to impose liability even if the official's action was not sanctioned by official state or local law or policy. *See* 365 U.S. 167, 182-87 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *see also Zinermon v. Burch*, 494 U.S. 113, 124 (1990) ("In *Monroe*, this Court rejected the view that § 1983 applies only to violations of constitutional rights that are

authorized by state law, and does not reach abuses of state authority" compensable under state law).

But *Monroe* also initially rejected the prospect that § 1983 could be used to impose liability on municipalities, such as cities or counties. *See* 365 U.S. at 187-92. The Court reasoned that the legislative history behind § 1983 did not indicate Congressional intent "to bring municipal corporations within the ambit" of the statute. *Id.* at 187-88. It further questioned whether Congress even possessed the constitutional authority "to make municipalities liable for acts of its officers that violate the civil rights of individuals." *Id.* at 191.

This second holding in *Monroe* was later overruled by the Supreme Court's landmark decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Though the *Monell* Court agreed with *Monroe* that municipalities could not be held *de facto* liable for the tortious conduct of their agents through *respondeat superior* principles, it concluded that municipalities were "persons" under § 1983 and suable for their own tortious conduct. *See Monell*, 436 U.S. at 690-691. As explained by the *Monell* Court, a municipality engages in conduct violative of the federal constitution when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" and that "official policy is responsible for a deprivation of rights protected by the Constitution." *Id.* at 690. Essentially, though *Monroe* does not require that a municipality sanction an agent's

conduct to hold that agent liable in an individual capacity for money damages under § 1983, *see* 365 U.S. at 173-74, when a municipality *does* sanction an agent's misconduct through an official "policy or custom," that municipality may also be liable for injury that the policy inflicts on a plaintiff's constitutional rights, *see Humphries*, 562 U.S. at 36.

*Ex parte Young*, *Monroe*, and *Monell* collectively permit plaintiffs to sue state and local officials and municipalities to vindicate federal civil rights. *Monroe* holds § 1983 to provide a cause of action to sue state and local officials for civil rights violations. If that official is entitled to raise sovereign immunity as a defense to liability, *Ex parte Young* may abrogate that sovereign immunity if the official enforces or is about to enforce state action alleged to violate the federal constitution, and the plaintiff seeks prospective relief. *Monell* further permits plaintiffs to sue municipalities under § 1983 for money damages and equitable relief. But what does *Ex parte Young* provide to plaintiffs seeking to vindicate their civil rights if there is no sovereign immunity to abrogate? In short, nothing.

Relevant case law indicates that *Ex parte Young* does not provide a free-wheeling cause of action to sue officials in their official capacities in the absence of a sovereign immunity defense. To CRC's credit, the First Circuit has recognized the tension between the *Ex parte Young* legal fiction and *Monell* liability. *See Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71-72 (1st Cir. 2002). But that court rejected the Ninth Circuit's decision in *Chaloux v. Killeen*, which held *Monell*'s "policy or custom" requirement inapplicable to

claims for prospective equitable relief against a municipal official in his official capacity. *See Chaloux v. Killeen*, 886 F.2d 247, 250-52 (9th Cir. 1989); *see also Dirrane*, 315 F.3d at 71; *Greensboro Prof. Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 n.6 (4th Cir. 1995) (also rejecting *Chaloux*). The Supreme Court in *Humphries* subsequently overruled *Chaloux* and reaffirmed that *Monell*'s "policy or custom" requirement applied to all § 1983 actions against municipalities, regardless of the relief sought. *Humphries*, 562 U.S. at 34.

Since *Humphries*, several courts have rejected the possibility that *Ex parte Young* may be used to sue municipal officials. The Fifth Circuit held that a plaintiff could not sue a judge under *Ex parte Young* when that judge was a municipal, rather than state, official. *See Freedom from Religion Found. v. Mack*, 4 F.4th 306, 311-12 (5th Cir. 2021). Various district courts, including this Court, have also held or suggested that *Ex parte Young* may not be invoked absent the need to abrogate sovereign immunity. *See, e.g.*, *Hadley v. City of Mebane*, No. 1:18-cv-336, 2020 WL 1539724, at *8-9 (M.D.N.C. Mar. 31, 2020); *Vondra v. City of Billings*, No. CV 22-30, 2023 WL 197029, at *3-4 (D. Idaho Jan. 17, 2023); *Cain v. City of New Orleans*, No. 15-4479, 2017 WL 467685, at *15-16 (E.D. La. Feb. 3, 2017). The Sixth Circuit has expressed a similar sentiment, observing that "*Ex parte Young* provides a path around sovereign immunity *if* the plaintiff already has a cause of action

from somewhere else." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014).[10]

The Recommendation was correct to conclude that CRC must proceed against Sheriff Birkhead under *Monell*. *See CRC I*, 2025 WL 3899824, at *14. An official-capacity lawsuit against an official "is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. Indeed, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell* … local government units can be sued directly for damages and injunctive or declaratory relief." *Graham*, 473 U.S. at 167 n.14. While *Ex parte Young* creates a legal fiction whereby the official "is no longer considered an official of the state" *for purposes of sovereign immunity* because he is alleged to enforce an unconstitutional law, *Jackson*, 153 F.4th at 434, that legal fiction is accepted only because it is necessary to "permit the federal courts to vindicate federal rights" when sovereign immunity might otherwise pose a bar, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984). *Ex parte Young*'s legal fiction is unnecessary when suing municipal officials, as municipalities are categorically unable to raise sovereign immunity as a defense to liability for civil-rights violations. *See Jackson*, 153

[10] The Fourth Circuit has noted in dicta, however, that the Sixth Circuit's view that *Ex parte Young* is not itself a cause of action appears to conflict with later guidance from the Supreme Court indicating that the doctrine is both a cause of action and judicially-created remedy. *See King*, 122 F.4th at 544 n.1 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)).

F.4th at 433 ("Municipalities and other independent governmental entities do not partake in the sovereign's immunity."). "It thus follows that *Ex parte Young* cannot apply when [sovereign immunity] cannot apply" because that immunity "must necessarily be implicated" for *Ex parte Young*'s abrogation of sovereign immunity to be required. *See Hadley*, 2020 WL 1539724, at *8.

*Humphries* also cuts against CRC's position. *Humphries* is clear that "*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." 562 U.S. at 39. Were this Court to endorse CRC's position, it would effectively be imposing *respondeat superior* liability on municipalities sued for prospective relief in contravention of *Monell* and *Humphries*. Plaintiffs like CRC could simply skirt *Monell*'s more stringent "policy or custom" test by suing the municipality's officials in their official capacity under *Ex parte Young*. The very lower court case *Humphries* overruled, the Ninth Circuit in *Chaloux*, endorsed that practice. *See Chakoux*, 886 F.2d at 250-52 (holding county sheriff was suable under *Ex parte Young* after concluding that *Monell*'s policy or custom requirement did not extend to the lawsuit against him in his official capacity). Considering Supreme Court precedent to the contrary, this Court will not revive *Chaloux*. *See Humphries*, 562 U.S. at 37 ("To find the [policy or custom] requirement inapplicable where prospective relief is at issue would undermine *Monell*'s logic.").

CRC's arguments do not convince the Court otherwise. CRC contends that several courts, including another judge of this Court, have applied *Ex parte Young* to permit injunctions against county sheriffs, or, at the very least, permit injunctive relief to proceed against county sheriffs without mention of *Monell*. *See* Dkt. 95 at 30-33. A review of that case law reveals a more complicated picture. For one, it appears that the case CRC cites from this District merely observed that the sheriff conceded he was not entitled to raise sovereign immunity, obviating the need to assess whether *Ex parte Young* could abrogate that immunity. *See Guill v. Allen*, 1:19-cv-1126, 2023 WL 6159978, at *35 (M.D.N.C. Sept. 21, 2023). This Court later rejected the sheriff's argument that he lacked enforcement authority over the at-issue pretrial policies, but the Court did not mention or interact with *how* the sheriff was being sued in his official capacity. *See id.* at *35-36.

Authority CRC cites from the courts of appeal is similarly unhelpful. CRC latches onto broad language from the Sixth and Ninth Circuits, *see* Dkt. 95 at 32-33, to suggest that *Ex parte Young* may supply a cause of action for prospective relief even when sovereign immunity does not need to be abrogated. *See McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 994-95 (6th Cir. 2019) ("If [the sheriff] acts for the State, *Ex parte Young* permits this injunction action against him. If he acts for the county, neither sovereign immunity, qualified immunity, nor any other defense stands in the way at this stage of the case."); *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) ("Actions under *Ex parte Young* can be brought against both state and county officials … so it is unnecessary for us

to resolve the parties' dispute" as to whether the sheriff was a state or county actor). The passing language cited by CRC does not support the weight of CRC's argument. *McNeil* was an appeal from the sheriff seeking to reverse the grant of a preliminary injunction. *See* 945 F.3d at 993. The Sixth Circuit merely observed that the preliminary injunction could be affirmed notwithstanding the sheriff's sovereign immunity defense because if he was a state actor, *Ex parte Young* would abrogate sovereign immunity, and if he was a local actor, he would not be entitled to raise the defense. *Id.* at 994; *see also Schultz v. Alabama*, 42 F.4th 1298, 1314-15 (11th Cir. 2022) (similar). While *Moore* did explicitly state that *Ex parte Young* could be used to sue state and local actors, it provided no meaningful analysis to support that proposition. *See Moore*, 899 F.3d at 1103. The Court is not persuaded by *Moore*'s matter-of-fact assertion that *Ex parte Young* may be used to sue local officials, especially when that decision appears to reiterate principles from *Chaloux* overruled by the Supreme Court in *Humphries*. *See Humphries*, 562 U.S. at 37 ("To find the [policy or custom] requirement inapplicable where prospective relief is at issue would undermine *Monell*'s logic.").

*Ex parte Young* is a judicially-created remedy designed to abrogate sovereign immunity in certain instances. It is not implicated when an official cannot raise that defense. CRC does not object to the Recommendation's conclusion that Sheriff Birkhead acts as a municipal official. *See* Dkt. 95 at 29 ("Regardless of whether he is a state or county actor, Birkhead easily meets the test for injunctive relief as an enforcement

official."). Nor does the Court find the Recommendation to have clearly erred in that conclusion. *See Harter*, 101 F.3d at 343 (North Carolina sheriffs are municipal officials that may not raise the defense of sovereign immunity); *see also Diamond*, 416 F.3d at 314-15. As a municipal official, Sheriff Birkhead may not raise the defense of sovereign immunity, *Harter*, 101 F.3d at 343, so *Ex parte Young* is inapplicable. The Court therefore concludes that Judge Webster correctly determined that CRC could only proceed against Sheriff Birkhead in his official capacity under *Monell* and that CRC stated a claim under that framework. *See CRC I*, 2025 WL 3899824, at *15-16. CRC's objection is overruled.

Sheriff Birkhead's competing objection to the Recommendation's *Monell* analysis is misguided. Sheriff Birkhead objects to the Recommendation's conclusion that the Complaint adequately alleged a policy or custom that injured CRC. *See* Dkt. 94 at 20-22. But he only objects on the ground that he does not have the authority to decide whether to close Judge Walker's courtroom during dependency proceedings, and, therefore, cannot establish a policy or custom. *Id.* at 21-22. The Recommendation explains, however, that Sheriff Birkhead is alleged to have an implicit policy instructing his bailiffs to *effectuate* court-closure orders that fail to comply with the First Amendment. *See CRC I*, 2025 WL 3899824, at *15. Sheriff Birkhead has final policymaking authority over whether to enforce court-closure orders because he "is the only officer who is also responsible for the courts of the State" and who "administers and executes … civil justice and acts as the ex officio detention officer." N.C. Gen. Stat. § 17E-1; *see also Pembaur v.*

*City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[W]hether an official [has] final policymaking authority is a question of state law."). And, as the Recommendation acknowledged, *see CRC I*, 2025 WL 3899824, at *15, the seven separate instances Sheriff Birkhead's bailiffs were alleged to have removed CRC's attorneys is sufficient to show his "actual or constructive knowledge" of a "persistent and widespread practices of municipal officials which although not authorized by written law, are so permanent and well-settled as to have the force of law," *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (citation modified). Because Sheriff Birkhead does not object to the rest of the Recommendation's *Monell* analysis, and Judge Webster's analysis was not clearly erroneous, *Diamond*, 416 F.3d at 314-15, Sheriff Birkhead's objection is overruled.

### B. CRC plausibly alleges a qualified First Amendment right to view dependency proceedings.

CRC has plausibly alleged a qualified First Amendment right to view dependency proceedings under the "experience and logic" test articled by the Supreme Court. NCAOC objects to the contrary, asserting two reasons why CRC's allegations are insufficient: (1) relevant authority precludes the existence of a qualified First Amendment right of access to dependency proceedings, and (2) CRC fails to plead a qualified right under the "experience and logic" test. Dkt. 93 at 16-25. The objections fail. The Court first reviews the relevant case law before turning to NCAOC's objections.

As the Recommendation noted, "[t]he Fourth Circuit has recognized a right of public access to civil proceedings, including civil trials and certain civil filings." *CRC I*,

2025 WL 3899824, at *16 (citing *Am. Civ. Liberties Union v. Holder*, 673 F.3d 245, 253 (4th Cir. 2011)). That case law derives from Supreme Court authority delineating the bounds of the public's qualified First Amendment right to view criminal trials.

The Supreme Court first recognized that the First Amendment protects a qualified right of public access to criminal proceedings in *Richmond Newspapers, Inc. v. Virginia*. *See* 448 U.S. at 573. A three-Justice plurality of the Court concluded that the "unbroken, uncontradicted history, supported by reasons as valid today as in centuries past," indicated that criminal trials carry "a presumption of openness." *See id.* at 573. The plurality struck down as unconstitutional a Virginia court-closure order made without any findings and issued only after a request from the defendant, which, at the time, was permitted by Virginia statute. *See id.* at 560, 580-81.

Though the plurality opinion only garnered three votes, seven of the nine Justices agreed that the First Amendment protected presumptively open criminal trials. *See id.* at 573 (plurality opinion); *id.* at 584-85 (Brennan., J., with Marshall, J., concurring in the judgment); *id.* at 598-99 (Stewart, J., concurring in the judgment); *id.* at 601 (Blackmun, J., concurring in the judgment). Justice Brennan's concurrence is perhaps the most important. He distilled what in his view constituted the proper test for determining whether a particular type of court proceeding is entitled to presumptive openness under the First Amendment as follows:

> First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree

> to particular proceedings or information .... Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process.

*See id.* at 589 (Brennan, J., concurring in the judgment).

Justice Brennan would go on to adopt his *Richmond Newspapers* concurrence in *Globe Newspaper Co. v. Superior Court for Norfolk County*. *See* 457 U.S. 596, 598, 602 (1982). He observed that a particular criminal proceeding is presumptively open under the First Amendment if "both logic and experience" recognizes that proceeding to be presumptively open. *Id.* at 606. And he clarified that under his "logic and experience" test, a qualified First Amendment right to view court proceedings exists if: (1) the proceeding is one that has historically "been open to the press and general public," and (2) "the right of access … plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Id.* at 605-06. Applying strict scrutiny, Justice Brennan went on to hold unconstitutional under the First Amendment a Massachusetts statute mandating the closure of criminal trials during the testimony of child victims of sex crimes. *See id.* at 607-08. He rejected two compelling interests proposed by the state: (1) protecting minor victims of sex crimes from trauma and

embarrassment; and (2) encouraging victims of child sexual abuse to testify truthfully and credibly about their experiences. *Id.*

Chief Justice Berger—who wrote the plurality opinion in *Richmond Newspaper*—disagreed with the majority. He dispelled the notion that the First Amendment protected a presumptive right to access all aspects of criminal trials under all circumstances. *Id.* at 613 (Berger, C.J., dissenting). While he acknowledged that *Richmond Newspaper* reflected "[t]he opinions of a majority of the Justices" that there is an American "historical tradition of open criminal trials," he argued that no such history of openness extended to "trials involving sexual assaults, particularly those against minors." *Id.* at 613-14 (collecting cases). He further acknowledged that American courts have historically "gone to great lengths to protect minors charged with crime" by closing child criminal proceedings. *Id.* at 612. To Chief Justice Berger children were different. In his view, history did not reveal a presumptive right to access criminal trials concerning crimes perpetrated by or against children. *See id.*; *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 107 (1979) (Rehnquist, J., concurring) ("It is a hallmark of our juvenile justice system [that] youths brought before our juvenile courts have been shielded from publicity.").

Chief Justice Berger would go on to clarify the "experience and logic" test announced in *Globe* in two subsequent opinions. *See generally Press-Enters. Co. v. Sup. Ct. of Cal.*, 464 U.S. 501 (1984) (*Press-Enterprise I*); *Press-Enters. Co. v. Sup. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986) (*Press-Enterprise II*). In the former—*Press-Enterprise I*—the Court

expanded the presumptive First Amendment right of access to criminal voir dire proceedings. *See* 464 U.S. at 505. In the latter—*Press-Enterprise II*—it extended that presumptive right of access to pretrial criminal proceedings. *See* 478 U.S. at 13. *Press-Enterprise II* provides two helpful pieces of clarification. First, the experience prong requires "the near uniform practice of state and federal courts" to have recognized the presumption of openness. *Id.* at 10. Second, the experience and logic prongs are "complimentary considerations." *Id.* at 8.

After *Press-Enterprise II*, the Fourth Circuit first recognized that experience and logic counseled in favor of public access to civil court proceedings and civil court filings. *See Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Holder*, 673 F.3d at 252 ("[M]ost circuit courts, including the Fourth Circuit, have recognized that the First Amendment right of access extends to civil trials and some civil filings."). *Rushford* held that the public enjoys a First Amendment right of presumptive access to documents filed in connection with summary judgment in civil proceedings. 846 F.2d at 253. The Fourth Circuit has applied the "experience and logic" test to civil cases in published opinions at least twice since *Rushford*. It first extended the public right of access to summary judgment materials recognized in *Rushford* to judicial opinions resolving summary judgment motions. *See Pub. Citizen*, 749 F.3d at 267-68. And, more recently,

that court concluded that both experience and logic support a presumptive First Amendment right to access newly-filed civil complaints. *See Schaefer*, 2 F.4th at 325-28.[11]

Contrary to NCAOC's objections, CRC has met its burden to allege a violation of its First Amendment presumptive right of access to child dependency proceedings. NCAOC contends that CRC has not alleged that either experience or logic supports a presumptive right to access civil dependency proceedings. *See* Dkt. 93 at 17-24. It first points to persuasive case law it contends conclusively establishes that there is no First Amendment right of access. *See id.* at 19-20. It also argues that the complaint does not plead a "near uniform" historical practice of open child dependency proceedings. *Id.* at 19 (quoting *Press-Enterprise II*, 478 U.S. at 10). And it further asserts that logic also does not support openness. *See id.* at 23-25.

The Court disagrees. CRC has pleaded sufficient factual content to demonstrate that its claims are plausible on their face. *See Iqbal*, 556 U.S. at 678. Plausibility does not

---

[11] The Fourth Circuit has also addressed the test several times in criminal cases. *See, e.g.*, *Wash. Post*, 807 F.2d at 389-90 (public enjoys a qualified First Amendment right to access documents filed in connection with plea and sentencing hearings); *Balt. Sun Co. v. Goetz*, 886 F.2d 60, 64-65 (4th Cir. 1989) (public does not enjoy qualified First Amendment right to access affidavits filed in support of search warrants); *In re United States for an Order Pursuant to 18 U.S.C. § 2703(D)*, 707 F.3d 283, 291-92 (4th Cir. 2013) (public does not enjoy a qualified First Amendment right to access proceedings and orders pursuant to Section 2703(d) of the Stored Communications Act ); *United States v. Doe*, 962 F.3d 139, 145-46 (4th Cir. 2020) (assuming without deciding that public enjoys qualified First Amendment right to access judicial orders filed in criminal proceedings). It has also assumed without deciding that the public possesses a qualified First Amendment right of access to complaints and docket sheets in qui tam actions. *See Holder*, 673 F.3d at 252.

mean probability. *Id.* at 678. Persuasive authority does not bar CRC's claim at this stage. And CRC adequately alleges that both experience and logic support presumptively open child dependency proceedings. Whether CRC can ultimately establish that the public enjoys a First Amendment right of presumptive access to child dependency proceedings is a question for another day. The Court begins by reviewing persuasive authority before progressing to assess CRC's allegations concerning the *Globe* "experience and logic" test.

#### 1. *Persuasive authority does not preclude CRC from pleading a qualified First Amendment Right to view child dependency proceedings.*

Relevant authority is mixed at best, and it certainly does not preclude the existence of a qualified First Amendment right to view child dependency proceedings. It is true that many state courts have concluded that civil child dependency proceedings and/or criminal juvenile delinquency proceedings are not presumptively open to the public, but they largely did not analyze the question under the "experience and logic" test. *See In re J.S.*, 438 A.2d 1125, 1127-28 (Vt. 1981) (pre-*Globe* and *Press-Enterprise I & II*, concluding that *Richmond Newspapers*' holding concerning criminal trials was inapplicable to juvenile delinquency proceedings, which are not criminal in nature); *Edward A. Sherman Publ'g Co. v. Goldberg*, 443 A.2d 1252, 1258 (R.I. 1982) (pre-*Globe* and *Press Enterprise I & II*, agreeing with *J.S.* that *Richmond Newspapers* was limited only to criminal trials and therefore inapplicable to civil dependency proceedings); *Fla. Publ'g Co. v. Morgan*, 322 S.E.2d 233, 238 (Ga. 1984) (concluding without any citation or analysis that "in their relatively brief

history, it would appear that juvenile proceedings have been closed to the public"); *In re N.H.B.*, 769 P.2d 844, 848 (Utah Ct. App. 1989) (upholding under state and federal constitution a statute presumptively closing juvenile delinquency proceedings, reasoning that the U.S. Supreme Court had repeatedly "evinced an appreciation for the purposes served by closure"); *In re Minor*, 563 N.E.2d 1069, 1074 (Ill. Ct. App. 1990) (relying on persuasive authority of other state courts concerning juvenile delinquency proceedings to conclude that the federal constitution does not provide an "absolute right" to view juvenile dependency proceedings).[12] And although NCAOC points the Court to two federal district court opinions it asserts found no presumptive First Amendment right to view juvenile court proceedings, neither are persuasive. The former was overruled by the Sixth Circuit, and, therefore, does not constitute good law. *See Ky. Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 864 (E.D. Ky. 2005), *overruled on ripeness grounds*, 454 F.3d 505 (6th Cir. 2006). And the latter, reviewing a *pro se* complaint, simply held that the

[12] *See also, e.g.*, *Stauffer Commc'ns, Inc. v. Mitchell*, 789 P.2d 1153, 1155-57 (Kan. 1990) (observing that the parties agreed that newspaper had no constitutional right to view juvenile detention proceedings, and construing state statute mandating for open court proceedings to exclude all juvenile proceedings for individuals under fifteen); *In re J.D.C.*, 594 A.2d 70, 75-77 & n.6 (D.C. 1991) (noting that newspaper conceded that it had no constitutional right to view juvenile delinquency proceedings, and holding that it had no statutory right under D.C. law, either).

plaintiff there failed to adequately allege a presumptive First Amendment right of access. *See Briggman v. Burton*, No. 5:15-cv-76, 2016 WL 5462840, at *5 (W.D. Va. Sept. 27, 2016).[13]

There is more on-point authority, however. Two state courts have expressly held, under the "experience and logic" test, that child dependency proceedings are not presumptively open to the public. *See San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Sup. Ct.*, 232 Cal. App. 3d 188, 197-205 (1991) (logic prong supported public access to dependency proceedings, but experience prong did not); *Nat. Parents of J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 780 So.2d 6, 9-11 (Fla. 2001) (neither experience nor logic supported First Amendment right to view juvenile dependency hearings). On the other side, the New Jersey and Nevada Supreme Courts have held the experience and logic prongs compel presumptively open dependency proceedings under the First Amendment. *See N.J. Div. of Youth & Fam. Servs. v. J.B.*, 576 A.2d 261, 264-67 (N.J. 1990); *Falconi v. Eighth Jud. Dist. Ct.*, 543 P.3d 92, 96-99 (Nev. 2024), *cert. denied*, 145 S. Ct. 445 (2024).[14]

---

[13] Yet another case NCAOC cites does not even concern (much less address) the "experience and logic" test. *See Tower v. Leslie-Brown*, 167 F. Supp. 2d 399, 405 (D. Me. 2001) (analyzing whether to seal documents from a child delinquency proceeding).

[14] The First Department of the Appellate Division of the New York Supreme Court also appears to have construed New York statutory law to protect presumptively open child dependency proceedings, compelled by *Richmond Newspapers* and its progeny. *See Anonymous v. Anonymous*, 550 N.Y.S.2d 704, 705 (1st Dep't 1990) (lower court did not err in closing court in highly publicized juvenile proceeding even though "[p]ublic access to court proceedings is strongly favored, both as a matter of constitutional law … and as statutory imperative" (citing *Richmond Newspapers*, 448 U.S. 555); *see also Anonymous v. Anonymous*, 705 N.Y.S.2d 339, 340-42 (1st Dep't 2000) (public right of access may be

In essence, NCAOC seeks dismissal of CRC's complaint on the basis that CRC asserts a novel qualified right of access to view child dependency proceedings that has been questioned or rejected by other courts. *Cf.* Dkt. 93 at 20-23 (urging this Court to reject CRC's allegations by taking judicial notice of "the historical record detailed" in the cases favorable to NCAOC's position). At minimum, NCAOC asserts that the Recommendation "overlooks the numerous cases concluding that juvenile proceedings and records have been historically closed to the public." Dkt. 93 at 20. That objection unfairly focuses on the cases supporting NCAOC.

As outlined in detail above, the Recommendation correctly concluded that "[t]he caselaw on this issue … remains unsettled," *see CRC I*, 2025 WL 3899824, at *21, and therefore that case law does not preclude CRC from pleading a qualified First Amendment right of access. As the Fourth Circuit has repeatedly observed, "Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *Davison v. Randall*, 912 F.3d 666, 691 (4th Cir. 2019); *see also Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015); *Trujillo v. Landmark Media Enters., LLC*, 689 F. App'x 176, 178 (4th Cir.

overcome by specific findings from family court that compelling interest in closure outweighs public's interest in proceedings). But the Second Department has explicitly found that there is no First Amendment right to view child protective proceedings, *see Matter of Katherine B.*, 596 N.Y.S.2d 847, 851 (2d Dep't 1993), apparently in conflict with the First Department.

2017). NCAOC points to no binding authority from the Fourth Circuit or Supreme Court calling into question the existence of a qualified First Amendment right of access to child dependency proceedings. *Cf. Chollet v. Brabrand*, 137 F.4th 241, 245-47 (4th Cir. 2024) (affirming dismissal of plaintiffs' complaint after concluding that they possessed no property right to public education that would be compensable under the Takings Clause). That is for a good reason. "[T]he Supreme Court has not addressed whether the First Amendment's right of access extends to civil trials or other aspects of civil cases," and the Fourth Circuit generally recognizes that civil proceedings are presumptively open to the public. *See Holder*, 673 F.3d at 252. The mere fact that other courts have declined to endorse CRC's position is not grounds for dismissal at this stage. *See Wright*, 787 F.3d at 263 (it is not a basis for dismissal that a plaintiff's claims "do not fall within the four corners of … prior case law" (internal quotations omitted)).

**2. *CRC adequately alleges that experience and logic support presumptively open child dependency proceedings.***

Considering the divided case law, CRC's allegations are sufficient to survive a motion to dismiss. CRC alleges that since the English common law child dependency proceedings (or their historical analogues) have been presumptively open to the public, although a minority of states began to walk back that openness during the mid-twentieth century. *See* Dkt. 1 ¶¶ 37-52. It further alleges that public openness furthers public trust in the judicial process and serves as a check against judicial abuse of power, two concerns that are especially important in child dependency proceedings, where parental rights

may be terminated and children may be taken from their families. *See id.* ¶¶ 53-64. These allegations make it plausible that the United States historically "had a near uniform practice" of conducting dependency proceedings in open court, and that "public access" to dependency proceedings "plays a particularly significant positive role in the actual functioning of the [judicial] process." *See Press-Enterprise II*, 478 U.S. at 10-11. As Judge Webster concluded, CRC's "allegations adequately assert that dependency courts and their historical equivalents have been open in multiple jurisdictions from before the American Revolution to the present day" and provides "multiple facts specific to dependency hearings" indicating that "open dependency hearings have yielded public benefits in certain states." *CRC I*, 2025 WL 389924, at *18-19.

NCAOC's objections to the contrary are unpersuasive. It first contends that CRC does not adequately allege a "near uniform" historical record of openness, Dkt. 93 at 19 (quoting *Press-Enterprise II*, 478 U.S. at 10), because the Complaint acknowledges that even by 1939 "Connecticut, the District of Columbia, Minnesota, Pennsylvania, Virginia, and Wisconsin had presumptively closed courts," Dkt. 1 ¶ 45 n.21. "Near uniform," however, does not mean a *perfectly uniform* historical record because "the experience prong does not require a wholly unbroken and uniform nationwide practice." *LaSalle*, 184 F.4th at 126. Indeed, the Supreme Court rejected NCAOC's position when it overruled the Puerto Rico Supreme Court's determination that Puerto Rico's unique history of closed preliminary criminal hearings distinguished them from the preliminary

hearings held presumptively open in *Press-Enterprise II*. *See El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150-51 (1993) (per curiam). The Supreme Court observed that the lower court's "reliance on Puerto Rican tradition [was] misplaced" because "the 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead to the experience in that type or kind of hearing throughout the United States." *Id.* at 150 (citation modified). The mere fact that five states and the District of Columbia have historically maintained presumptively closed child dependency proceedings cannot override the "near uniform" tradition of most jurisdictions, which CRC alleges have historically held child dependency proceedings presumptively open. *See* Dkt. 1 ¶¶ 37-52; *see also Press-Enterprise II*, 478 U.S. at 10-11 & nn.3-4 (while "the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court," Michigan and California had maintained closed proceedings, and several states "have allowed preliminary hearings to be closed on the motion of the accused … for cause shown"). Were it any other way, a minority of jurisdictions that have historically disagreed with the "near uniform" nationwide history of openness could ironically *preclude* a finding of historical openness. *See Press-Enterprise II*, 478 U.S. at 10-11.

Nor does it matter at this stage that some states moved away from openness in "the late 1960s and 1970s." Dkt. 1 ¶ 48; *see also* Dkt. 93 at 19-20, 23. The courts of appeal are split on the exact historical evidence required to meet a near uniform history of

openness under the experience prong, particularly as it relates to whether periods of closure can preclude a finding of historical openness.[15] At this stage in the proceeding, though, the Complaint's allegations of a short period in the mid-twentieth century when a minority of jurisdictions moved towards closure does not necessarily undermine the otherwise five-hundred-year history of openness such that it would preclude CRC from pleading a qualified First Amendment right of access as a matter of law. *See N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 213 (3d Cir. 2002). Even after some states moved

[15] The Court provides the following sampling from the courts of appeal as examples. The Ninth Circuit has found a qualified First Amendment right to view executions, relying on the English common law and Founding Era tradition of public execution, though states generally abolished public execution during the 1800s. *See Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875-76 (9th Cir. 2002). But a divided panel of the Seventh Circuit recently concluded that post-Founding Era practice in favor of closure precluded a finding of presumptively-open execution proceedings, disagreeing with the Ninth Circuit in *Woodford*. *See Associated Press v. Neal*, 177 F.4th 862, 866-68 (7th Cir. 2026). The Sixth and Third Circuits have both refused to allow modern historical practice of closure to preclude a finding of qualified First Amendment rights to view deportation proceedings and arbitration-like proceedings before the Delaware Court of Chancery, respectively. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 701-03 (6th Cir. 2002) (concluding that "[a]lthough exceptions may have been allowed, the general policy has been one of openness" since the "first general immigration act was enacted in 1882"); *Del. Coal. for Open Gov't v. Strine*, 733 F.3d 510, 518 (3d Cir. 2013) (though the more recent practice of private arbitration "reveal[ed] a mixed record of openness," "the history of civil trials and arbitrations demonstrates a strong tradition of openness for proceedings like Delaware's government-sponsored arbitrations"). Another panel of the Third Circuit has disagreed with the Sixth Circuit that the history of deportation proceedings demonstrated openness, although it acknowledged that "a showing of openness at common law is not required." *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 211-14 (3d Cir. 2002). That court has also held that post-Founding-Era history away from voice-vote elections and towards private "Australian system" voting did not indicate a history of public access to polling data. *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 109-10 (3d Cir. 2013).

dependency proceedings towards closure, "the states implemented procedures that ensured [they] would remain open to some public scrutiny." *See Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002). As the Complaint alleges, though "the Illinois juvenile courts supposedly 'closed' its hearings in 1965," the state "still permitted public access to the press." Dkt. 1 ¶ 48. States like North Carolina, while permitting court closure, still held them presumptively open. *See* Dkt. 1 ¶ 46. "And throughout the country, judges often permitted teachers, counselors, clergy, extended family members, and other members of the public to attend proceedings." *Id.* ¶ 48. These allegations do not indicate that the more recent practice has been that of a "long-standing trend away from openness, toward a closed" dependency proceeding. *See PG Publ'g Co. v. Aichele*, 705 F.3d 91, 108-10 (3d Cir. 2013) (finding nineteenth-century trend of closed elections through polling booths that led most jurisdictions to close elections by the twentieth century did not indicate near uniform history of public access to voting processes). Only a *minority* of jurisdictions moved towards presumptive closure in the 1900s, and, in any event, "[t]his experiment with closed dependency proceedings in some states did not last long" because "[i]n the 1980s, many states that had closed their dependency courts began reopening them," including Oregon, Michigan, New York, and Minnesota. Dkt. 1 ¶ 49. "In light of this [500]-year-plus tradition of openness" alleged in the Complaint, "the force of the First Amendment cannot be evaded on the basis" that a minority of jurisdictions moved towards closure in the twentieth century. *See LaSalle*, 184 F.4th at 126-27 (that

attorney disciplinary hearings more recently transitioned towards private adjudication could not overcome long-standing history of proceedings in open court).

Nor does NCAOC persuade the Court that CRC's logic allegations are insufficient at this stage. NCAOC argues that CRC only alleges generic public benefits of open court proceedings that should be disregarded as conclusory. *See* Dkt. 93 at 23-24. And it further contends that the Recommendation ignores the various policy considerations that Courts have recognized counsel against open juvenile proceedings. *Id.* at 23. As to the former objection, NCAOC mischaracterizes the Complaint. The Complaint succinctly alleges how policy considerations that the Fourth Circuit and Supreme Court found to counsel in favor of openness under the logic prong apply with equal force to dependency proceedings. *See* Dkt. 1 ¶¶ 53-64. And the mere fact that some jurists have recognized that logic counsels against extending openness to juvenile criminal proceedings, *see, e.g.*, *Richmond Newspapers*, 457 U.S. at 613-14 (Berger, C.J., dissenting); *Smith*, 443 U.S. at 107-08 (Rehnquist, J., concurring), does not undermine the plausibility of the Complaint's legal conclusions, which are supported by thorough factual allegations about the benefit of public dependency proceedings, *see Iqbal*, 556 U.S. at 678 (legal conclusions *devoid* of factual enhancement are not well-pleaded).

NCAOC's objections concerning the sufficiency of CRC's allegations are thus overruled. At this stage in the proceedings, the Complaint adequately alleges that the

public possesses a qualified First Amendment right to view child dependency proceedings.

## V. The Court Will Not Grant CRC Preliminary Injunctive Relief.

Even though CRC has *plausibly alleged* the likelihood of imminent injury to its First Amendment rights, the Court agrees with the Recommendation that it has not met its higher burden to establish entitlement to preliminary injunctive relief. *See CRC I*, 2025 WL 3899824, at *21-23. CRC does not establish a likelihood of success on the merits of its claims given the divided case law and the presently underdeveloped factual record. CRC's objection is therefore overruled, and its motion for a preliminary injunction is denied.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added). To establish entitlement to preliminary injunctive relief under *Winter*, the plaintiff must show "(1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) equity favors granting preliminary relief; and (4) preliminary relief is in the public interest." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 (4th Cir. 2025). Failure to establish any of the four *Winter* factors precludes the award of a preliminary injunction. *Frazier v. Prince George's County*, 86 F.4th 537, 544 (4th Cir. 2023).

CRC's motion for a preliminary injunction fails because it does not establish a likelihood of success on the merits at this stage. While a likelihood of success on the merits does not require "certainty of success," the plaintiff must meet its burden to demonstrate that it is "likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The "plausibility threshold for a Rule 12(b)(6) motion … is lower than the likelihood of success standard for preliminary injunctions." *CRC I*, 2025 WL 3899824, at *22 (quoting *Democracy N.C. v. Hirsch*, No. 1:23-cv-878, 2024 WL 1415113, at *9 (M.D.N.C. Apr. 2, 2024)). While CRC has adequately alleged that experience and logic support presumptive openness under the First Amendment, the Court agrees with the Recommendation that its evidence "remains insufficiently detailed at this juncture for the [Court] to say that CRC's ultimate success is likely." *Id.* As explained above, the authority delineating public access to court proceedings is divided and often contradictory, the Fourth Circuit has sparingly opined on the issue, and the state courts have fractured about whether the First Amendment protects a right to view juvenile court proceedings. Though Defendants have not meaningfully contested CRC's historical evidence, they have provided the Court with significant authority disagreeing with CRC's reading of that history and relevant precedent. *See, e.g.*, Dkt. 93 at 20-22 & n.2. Lacking clear guidance from the federal courts concerning CRC's claim and faced with an underdeveloped factual record, this Court simply cannot conclude that preliminary injunctive relief is warranted. *See Cap. Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281,

296 (M.D.N.C. 2015) ("Many courts have also denied a motion for preliminary injunction where the plaintiff has failed to make a 'clear showing' of likelihood of success on the merits due to an undeveloped record.").

**CONCLUSION**

CRC's First Amendment claim is justiciable. The Court need not abstain from awarding CRC prospective relief, either. And CRC adequately alleges that Judge Walker and Sheriff Birkhead will violate its qualified First Amendment right to view child dependency proceedings by removing its attorneys from Judge Walker's courtroom without making specific factual findings on the record. The merits of CRC's First Amendment claim are properly addressed later, once the parties have concluded discovery.

The Recommendation, Dkt. 89, is ADOPTED WITH MODIFICATIONS. Defendants' objections, Dkts. 92-94, are OVERRULED. CRC's objections, Dkt. 95, are also OVERRULED. Defendants' motions to dismiss, Dkts. 43, 65, 67, are DENIED. And CRC's motion for a preliminary injunction, Dkt. 12, is DENIED. NCAOC's motion to intervene, Dkt. 41, is GRANTED.

It is SO ORDERED.

This the 17th day of September, 2026.

LINDSEY A. FREEMAN
UNITED STATES DISTRICT JUDGE